UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
NO. 7:21-cv-04695-KMK

TOWNSQUARE MEDIA,          )    DEPOSITION UPON
INC.,                      )
                           )
          Plaintiff,       )    ORAL EXAMINATION
                           )
   - vs -                  )
                           )         OF
REGENCY FURNITURE,         )
INC., and REGENCY          )
MANAGEMENT SERVICES,       )    TARA KELLY
LLC                        )
                           )
          Defendants.      )
- - - - - - - - - - - -


TRANSCRIPT OF DEPOSITION,
taken via Zoom web conference, by and before
PATRICE SWEENEY, Professional Reporter and
Notary Public, on Wednesday, September 1,
2021, commencing at 2:03 p.m.


ERSA COURT REPORTERS
30 South 17th Street
United Plaza - Suite 1520
Philadelphia, PA 19103
(215) 564-1233

**2**

```
 1    A P P E A R A N C E S:
 2   (Via Zoom)
 3
 4        SCHWARTZ SLADKUS REICH GREENBERG ATLAS, LLP
          BY:  JARED E. PAIOFF, ESQUIRE
               Jpaioff@ssrga.com
 5        444 Madison Avenue
          6th Floor
 6        New York, NY 10022
               Attorneys for the Plaintiff
 7
 8        TOWNSQUARE MEDIA GENERAL COUNSEL
          BY:  ALLISON ZOLOT, ESQUIRE
 9        1 Manhattanville Road
          Suite 202
10        Purchase, NY 10577
               Attorneys for the Plaintiff
11
12        ALAN L. FRANK LAW ASSOCIATES, P.C.
          BY:  ALAN L. FRANK, ESQUIRE
13             Afrank@alflaw.net
          135 Old York Road
14        Jenkintown, PA 19046
               Attorneys for the Defendants
15
16
17
18
19
20
21
22
23
24
```

**4**

| | E X H I B I T S | | | |
|---|---|---|---|---|
| | | PAGE | PAGE | |
| NUMBER | DESCRIPTION | | MARKED | ATTACHED |
| P-11-1 | Ashley Statement | 121 | 138 | |
| P-12 | 12/19 Invoices | 121 | 139 | |
| P-16 | Ashley Statement | 121 | 140 | |
| P-17 | Ashley Statement | 121 | 141 | |
| P-19 | 12/20 E-mails | 121 | 142 | |
| P-20 | 4/21 E-mails | 121 | 143 | |

```
 1
 2
 3
 4
 5
 6
 7
 8
 9
10
11
12                  - - -
13
14
15
16
17
18
19
20
21
22
23
24
```

**3**

```
 1              I N D E X
 2
 3   WITNESS                      PAGE
 4
 5   TARA KELLY
 6   (Via Zoom)
 7
 8     By:  Mr. Paioff          5
 9                - - -
10
```

| | E X H I B I T S | | | |
|---|---|---|---|---|
| | | PAGE | PAGE | |
| NUMBER | DESCRIPTION | | MARKED | ATTACHED |
| P-1 | Interrogatories | 121 | 128 | |
| P-2 | Complaint | 121 | 129 | |
| P-3 | E-mails | 121 | 130 | |
| P-5 | 11/19 Budget E-mail | 121 | 131 | |
| P-6 | 12/19 Budget E-mail | 121 | 132 | |
| P-7 | 1/20 Budget E-mail | 121 | 133 | |
| P-8 | 2/20 Budget E-mail | 121 | 134 | |
| P-9 | 3/20 Budget E-mails | 121 | 135 | |
| P-10 | 12/20 Budget E-mails | 121 | 136 | |
| P-11 | Ashley Statement | 121 | 137 | |

```
11              E X H I B I T S
12                           PAGE     PAGE
13   NUMBER     DESCRIPTION        MARKED   ATTACHED
...
24                    (Continued...)
```

**5**

```
 1              (By agreement of counsel, the
 2   signing, sealing, filing, and certification
 3   of the transcript have been waived; and all
 4   objections, except as to the form of the
 5   question, have been reserved until the time
 6   of trial.)
 7
 8              TARA KELLY, after having been
 9   duly sworn, was examined and testified as
10   follows:
11
12   BY MR. PAIOFF:
13   Q.    Hi, Ms. Kelly.  My name is Jared Paioff.
14   My firm represents the plaintiff in this action for
15   which you are here for your deposition, Townsquare
16   Media.
17         Have you ever been deposed before?
18   A.    Yes.
19   Q.    Approximately how many times?
20   A.    I think just once.
21   Q.    Just once.
22         Okay.  And can you just -- very broadly, in
23   broad strokes, what was the subject matter with
24   that?
```

**ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES**

TARA KELLY

**6**

1  A.    It was nothing too related -- it was
2  personal.
3  Q.    Personal.
4       Okay.  So just, you know, I don't know if
5  you remember the process, but I'm going to ask you a
6  series of questions, you'll provide answers to me,
7  which you're giving under oath.  If you don't
8  understand a question, please ask me to rephrase or
9  clarify and I will.
10       If you answer one of my questions, I'm
11  going to assume that you did understand it and that
12  your answer is responsive.  Please answer verbally.
13  No head nods, no hand gestures so the reporter can
14  take a clean record.  If you need a break at any
15  time, you can take one, it's just so long as no
16  question is pending.  If there's a pending question,
17  you have to answer first and then you can take a
18  break.
19       Does that all sound fine to you?
20  A.    Sure.
21  Q.    Okay.  Prior to coming here today for your
22  deposition, did you review any documents in
23  connection with this case?
24  A.    Yes.

**7**

1  Q.    What documents did you review?
2  A.    We reviewed e-mails.  We reviewed invoices,
3  insertion orders, garden variety work exchange
4  stuff.
5  Q.    When you say "insertion orders," can you be
6  more specific like in terms of dates, terms?
7  A.    Yeah, sure.
8       So starting in, I want to say, to the best
9  of my knowledge, April 2019, when I was booking
10  radio through Townsquare, we would formally
11  communicate budgets to them through a system that
12  just kind of would spit it out and keep a tally for
13  us of what we were looking for that month.  It was
14  more of an account management system than anything
15  so that our media reps, in this case Fran
16  Northridge, would know how to then go forward and
17  put together a proposal.
18  Q.    Okay.  And what e-mails did you review in
19  anticipation of your deposition?
20  A.    I'm sorry, which e-mails did we review?
21  Q.    Did you review in anticipation of your
22  deposition?
23  A.    We -- a lot of them.  Mostly those that
24  included dialog related to invoices and proposals

**8**

1  and just stuff like that; again, garden variety.
2  Q.    Did you review any internal e-mails that
3  did not include anyone from Townsquare Media on the
4  communication?
5  A.    Only the e-mails between me and Alan, I
6  guess that would be the only thing; other than that,
7  no.
8  Q.    Okay.  Did you have any conversations with
9  anyone in anticipation of your deposition aside from
10  your attorney?
11  A.    No.  Well, David Hu, actually someone on
12  our side.  I did speak with David Hu.
13  Q.    What was the sum and substance of that
14  conversation?
15       MR. FRANK:  So, Tara, I'm going
16       to suggest that you not reveal
17       conversations that occurred while I was
18       present in the same conversation, otherwise
19       you can answer.  Okay?
20       THE WITNESS:  Yeah, absolutely.
21       I'm sorry, what was the question
22       again?  I'm sorry.
23  BY MR. PAIOFF:
24  Q.    What was the sum and substance of your

**9**

1  conversation with Mr. Hu regarding your upcoming
2  deposition?
3  A.    It was consistent with what I already
4  shared, you know, I had spoken to Alan about.
5  Consistent.  The same conversation.
6  Q.    Have you ever had any conversations about
7  this lawsuit with anyone other than your legal
8  counsel?
9  A.    No.
10  Q.    What's your highest level of education?
11  A.    A bachelor's degree.
12  Q.    From where?
13  A.    Holy Family.
14  Q.    Are you currently employed?
15  A.    Yes.
16  Q.    By whom?
17  A.    Regency Management Services.
18  Q.    And what is your title at Regency
19  Management Services?
20  A.    Director of marketing and advertising.
21  Q.    For how long have you worked for Regency
22  Management Services?
23  A.    So we were acquired, I want to say, in
24  September of 2016, to the best of my knowledge.

3 (Pages 6 to 9)

TARA KELLY

10

1 Q.    When you say "we," who are you referring
2 to?
3 A.    I had previously worked for a brand that
4 has since been sunsetted, that was owned by another
5 company and Regency acquired that company.
6 Q.    And what was the name of that company?
7 A.    The equity firm was named Parallel.
8 Q.    Okay.  And since 2016, have you held any
9 other titles than the one that you just mentioned?
10 A.    No.
11 Q.    Can you briefly give me your employment
12 history leading up to your role with Regency
13 Management Services?
14 A.    All of it?
15 Q.    Well, let's say, when did you graduate
16 college?
17 A.    In the early 2000s.  So 2005 I worked in
18 radio for almost ten years, then I worked in
19 franchising in different forms for almost ten years
20 as well.  And then a small stint when Fios came into
21 the market.  And then I think from there is when I
22 went with Parallel, who was the owner of Mealey's
23 Furniture, and then I -- you know, that's when Abdul
24 acquired the company.

11

1 Q.    Okay.  Are you familiar with an entity
2 called Regency Furniture, Inc.?
3 A.    No.
4 Q.    Okay.  Have you ever heard of that entity's
5 name before?
6 A.    I think I saw it in some of your paperwork,
7 but not prior to that.
8 Q.    What is the nature of Regency Management
9 Services' business?
10 A.    We're a furniture retailer.
11 Q.    And in generally speaking, what are your
12 job responsibilities for that entity?
13 A.    My job responsibilities are to, you know,
14 receive the marketing plans for the brands, the PR,
15 social media, advertising, digital.  Pretty much
16 anything that would encompass the marketing and
17 advertising.
18 Q.    Do you report to anyone?
19 A.    I report to Abdul.
20 Q.    And who is he?
21 A.    He's the CEO, Abdul Ayyad.
22 Q.    Do you have any -- do you have anyone
23 reporting to you?
24 A.    Yes.

12

1 Q.    Approximately how many employees report to
2 you?
3 A.    Four.
4 Q.    Okay.  And approximately how many employees
5 are there at the company?
6 A.    In total?
7 Q.    Correct.
8 A.    You know, I honestly don't know the answer
9 to that post-COVID.
10 Q.    Can you tell me pre-COVID?
11 A.    I would say 1,500 to 2,000 would be my
12 guess.  I'm not a hundred percent sure.
13 Q.    Are you familiar with the company Ashley
14 Furniture?
15 A.    Yes.
16 Q.    What connection, if any, does Ashley
17 Furniture have with Regency Management?
18 A.    We are a licensee.
19 Q.    When you say "we," you're saying Regency
20 Management is a licensee of Regency furniture --
21 sorry, of Ashley Furniture?
22 A.    I can't say for sure if it's Regency
23 Management or if it's under Abdul's name.  I don't
24 have the details down in the weeds.  I just know

13

1 that we are a licensee.
2 Q.    And what do they license to you?
3 A.    Naming branding rights.
4 Q.    Okay.  Were you familiar with the plaintiff
5 here, Townsquare Media?
6 A.    Yes.
7 Q.    And what's your familiarity with it?
8 A.    I placed media with them for -- on behalf
9 of Ashley.
10 Q.    And how did you first get introduced to
11 Townsquare Media?
12 A.    So the showrooms that are part of the
13 Central New Jersey footprint was another acquisition
14 that took place, and I was introduced to them
15 through Mike Ritter as an asset that they had
16 already been currently using prior to that current
17 acquisition.
18 Q.    And who's Mike Ritter?
19 A.    He is Ashley's -- our Ashley's VP of sales.
20 Q.    And who does Mike Ritter report to?
21 A.    I think now Troy Davis.
22 Q.    And who's Troy Davis?
23 A.    Troy Davis is our chief strategy officer.
24 He joined the company maybe three months ago.  I

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

TARA KELLY

14

1  might be a little off on that, but about three
2  months ago.
3  Q.    Okay.  Before he joined the company, did
4  Mike Ritter report to anyone else?
5  A.    I can't say with any certainty who his
6  direct report was.
7  Q.    Did there come a time that you worked on --
8  you worked with Townsquare Media?
9  A.    I'm sorry?
10  Q.    Did there come a point in time where you
11  personally worked with Townsquare Media?
12  A.    Oh, yeah.  Of course.  Yup.
13  Q.    Approximately when was that?
14  A.    Best guess would be like April-ish of 2019,
15  somewhere in there.
16  Q.    Okay.  And had someone on behalf of your
17  company been working with Townsquare Media prior to
18  when you started with them?
19  A.    Correct.
20  Q.    Sorry.  Prior to when you started working
21  with Townsquare Media?
22  A.    Correct.
23            MR. FRANK:  Objection to form.
24            You can answer.

15

1  BY MR. PAIOFF:
2  Q.    Who was that person?
3  A.    Mike Ritter.
4  Q.    And what was his relationship with --
5  withdrawn.
6        What was his role in connection with the
7  relationship with Townsquare Media?
8            MR. FRANK:  Objection to form.
9            You can answer.
10            THE WITNESS:  Alan, can I answer?
11            MR. FRANK:  Yes.
12            THE WITNESS:  Okay.  My
13  understanding was when he was part of that
14  other licensee group, he was exclusively
15  and solely responsible for placing and
16  negotiating the advertising and marketing
17  for those showrooms in Central New Jersey.
18            MR. FRANK:  So, just to clarify,
19  Mr. Paioff, are you doing these designee
20  depositions that you've noticed together in
21  the same dialog or are you going to
22  separate them?
23            MR. PAIOFF:  Isn't Ms. Kelly
24  being produced as the corporate designee?

16

1            MR. FRANK:  She's being produced
2  for both entities.  Are you conducting this
3  deposition for both entities together?
4            MR. PAIOFF:  I am.  Yes, I am.
5            MR. FRANK:  Okay.  All right.
6        Please continue.
7  BY MR. PAIOFF:
8  Q.    Okay.  Does Mike Ritter currently work with
9  Townsquare Media or on that account?
10            MR. FRANK:  I'm going to object
11  because that's not a noticed topic.  If she
12  knows the answer, she can provide it
13  individually to you.
14            THE WITNESS:  Can I answer that?
15            MR. FRANK:  Yes.
16            THE WITNESS:  Okay.  Not
17  currently, to my knowledge.  Certainly not
18  with our company.  Outside of our company,
19  I wouldn't know.
20  BY MR. PAIOFF:
21  Q.    Does Mike Ritter still work for your
22  company?
23            MR. FRANK:  Same objection.
24            THE WITNESS:  Yes.

17

1            MR. FRANK:  And if you -- other
2  questions pertaining to Mr. Ritter you can
3  answer, but she's not the designee for that
4  purpose.
5            MR. PAIOFF:  You can answer.
6            THE WITNESS:  Yes, he still works
7  for the company.
8  BY MR. PAIOFF:
9  Q.    Do you know when the last time he worked on
10  Townsquare's account?
11            MR. FRANK:  Same objection.
12            THE WITNESS:  I get lost with the
13  COVID year.  I want to say -- I would say
14  probably through, at the very least, the
15  end of 2019, possibly early 2020, and
16  that's really a best guess.
17  BY MR. PAIOFF:
18  Q.    And your role at the company, what was your
19  involvement with Townsquare Media?
20  A.    To place advertising.
21  Q.    What type of advertising did you place with
22  them?
23  A.    Radio and digital at different periods.
24  Q.    Do you know for how long Townsquare Media

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

TARA KELLY

18

1    has been doing business with Regency Management?
2    A.    I would say probably since we acquired that
3    Central New Jersey footprint be a best guess,
4    but I'm not a hundred percent sure.
5    Q.    Do you know how the relationship first
6    formed?
7              MR. FRANK:  Objection.  Again --
8              THE WITNESS:  I do not.
9              MR. FRANK:  -- these are not
10   subjects that you noticed, and so to the
11   extent she's aware, I'm going to urge her
12   to respond, but not as today's designee.
13             MR. PAIOFF:  Well, we -- this is
14   -- first of all, this was included in the
15   topics that we noticed.
16             MR. FRANK:  I didn't say that.
17             MR. PAIOFF:  How the relationship
18   between the parties formed, you're saying
19   that that's -- that wasn't designated --
20             MR. FRANK:  I don't think so.
21             MR. PAIOFF:  -- in the topics?
22   You can answer the question.
23             THE WITNESS:  I'm sorry, do you
24   mind repeating it?

19

1    BY MR. PAIOFF:
2    Q.    Do you know how the relationship between
3    Townsquare Media and Regency Management first
4    formed?
5    A.    Not with certainty, no.
6    Q.    Does Townsquare Media currently provide --
7    perform any services for Regency Management?
8    A.    Currently, no.
9    Q.    When was the last time it performed
10   services for Regency Management?
11   A.    Best guess, I would say back in June.
12   Q.    June of 2021?
13   A.    I believe so, yeah.
14   Q.    Did Regency Management and Townsquare enter
15   into any type of agreements for services that were
16   performed?
17   A.    No.
18   Q.    Did Regency Management purchase any type of
19   advertising services from Townsquare Media?
20   A.    Yes.
21   Q.    What type of advertising services were
22   purchased?
23   A.    Radio and digital.
24   Q.    What were the structures of those

20

1    purchases?
2    A.    I don't understand the question.
3    Q.    Sure.
4              Explain to me the process of how the
5    purchases were executed.
6    A.    Loosely speaking, at the beginning of each
7    month, we would provide, you know, I'd say a radio
8    budget, for instance.  We would give them the
9    flights and the promotion, respectively, the budget
10   that goes with each of those flights and those
11   promotions and they would, you know, in the radio
12   scenario come back and put together a proposal for
13   review and we would take it from there.
14   Q.    And so you said they would submit a
15   proposal for review, and then would that proposal be
16   approved or -- withdrawn.
17             Would that proposal be approved by Regency?
18   A.    Yes.
19   Q.    Would there ever be modifications to the
20   proposal?
21   A.    Oh, for sure.  Yeah.
22   Q.    In what manner?  Sorry.
23             In what manner would Regency approve a
24   proposal?

21

1    A.    So when I was handling it, those approvals
2    were always done in writing.
3    Q.    Saying --
4    A.    Prior to me managing it, I couldn't answer.
5    I wouldn't be able to tell you.
6    Q.    But since -- you're saying since you
7    started managing it, and I think you testified you
8    said April of 2019?
9    A.    That's when I started with the radio, not
10   the digital.  Just the radio.
11   Q.    When did you start with the digital?
12   A.    Not until 2021.
13   Q.    What month?
14   A.    Let's see.  I think January.
15   Q.    Okay.  And when you say "in writing," the
16   approval was given in writing, what form of writing
17   would it be in?
18   A.    The radio proposals would be approved via
19   e-mail.
20   Q.    Okay.  What about digital?
21   A.    Well, digital there was no proposal
22   presented.  It's more of a budget.  It's more of a
23   postmortem kind of thing that has to happen.
24   Q.    With the budget as part of the process,

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

TARA KELLY

22

1    would the budget be approved?
2    A.    Yes.
3    Q.    Okay.
4              MR. PAIOFF:  I'm going to ask the
5         court reporter to display Plaintiff's
6         Exhibit 1.
7    BY MR. PAIOFF:
8    Q.    Ms. Kelly, I'm going to ask you to take a
9    look at this document and then let me know if you
10   recognize what this document is.  And you can ask
11   the court reporter to zoom in, zoom out, scroll down
12   so you can familiarize yourself with the document.
13   A.    I believe I've seen this or some version of
14   it.
15   Q.    Okay.
16             MR. PAIOFF:  Ms. Sweeney, if you
17        can scroll to the very last page.
18             MR. FRANK:  So to the extent
19        while she's looking at that, I'm going to
20        raise this objection again.  I don't see
21        this is a topic in the designee deposition
22        notice, but you can answer it individually.
23   BY MR. PAIOFF:
24   Q.    Ms. Kelly, is that your signature on here?

23

1    A.    Yes.
2    Q.    And did you review this document before
3    signing it?
4    A.    Yes.
5    Q.    And did you confirm the accuracy of the
6    information in this document before signing it?
7    A.    To the best of my knowledge, yes.
8    Q.    Okay.
9              MR. PAIOFF:  If we could go to
10        page 2 of the document, and I'm focusing on
11        the bottom of the page, the request 2.
12   BY MR. PAIOFF:
13   Q.    Okay.  Ms. Kelly, do you see here the
14   interrogatory No. 2 asks Regency Management to
15   identify all persons who possess knowledge of any
16   facts relevant to the issues in this action and
17   describe in detail the extent and nature of their
18   knowledge?  Do you see that?
19   A.    Yes.
20             MR. PAIOFF:  Ms. Sweeney, if you
21        could scroll down to page 3.
22   BY MR. PAIOFF:
23   Q.    Okay.  Now, you mentioned Mr. Ritter
24   before.  Was there ever any overlap between you and

24

1    Mr. Ritter in terms of working on Townsquare's
2    account?
3    A.    Can you define overlap?
4    Q.    I mean, did you work with Townsquare at the
5    same time?
6    A.    No.  I mean, we had -- obviously we're
7    internal, we have collaborative approaches, of
8    course, but no.
9    Q.    Okay.  Were there any other employees of
10   Regency Management that worked with Townsquare
11   Media, let me say from the date you started working
12   with them?
13   A.    I mean, certainly my team had, you know,
14   sent any information or radio spots or creative or
15   whatever was needed to support what was going on.
16   Q.    You see under G, David, is it Hu, is
17   identified?
18   A.    Correct.
19   Q.    What involvement, if any, did David Hu have
20   with respect to Townsquare Media?
21   A.    So David Hu was a part of a pilot or a
22   test, if you will, that we activated in 2021 between
23   multiple agencies.  So David was -- I don't even
24   know how to say it.  David was kind of the data

25

1    collector and, you know, translating data that was
2    coming in between the three agencies, I guess would
3    be the best way to say it.
4    Q.    Who did David Hu report to?
5              MR. FRANK:  Again, these are
6         subjects that are not within the scope of
7         the designee deposition notice, so you can
8         answer individually.
9              THE WITNESS:  At this point, I
10        assume he reports to Troy Davis.
11   BY MR. PAIOFF:
12   Q.    Going down to H, I know I'm going to
13   butcher his name, but I'm going to refer to him as
14   Abdul.
15   A.    Sure.
16   Q.    Does he go by that name?
17   A.    Does he go by Abdul Ayyad?
18   Q.    Yeah.
19   A.    Yes.
20   Q.    Okay.  So Mr. Ayyad, did you ever have any
21   conversations with Mr. Ayyad regarding the invoices
22   that are subject of this lawsuit?
23   A.    No.  Not to my knowledge.
24   Q.    Did you ever have any conversations with

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

TARA KELLY

**26**

1  Mr. Ayyad about any of the claims in Townsquare's
2  complaint in this lawsuit?
3  A.    No.
4  Q.    Did you ever have any discussions with
5  Mr. Ayyad about Townsquare Media?
6  A.    Of course.
7  Q.    Did any of those discussions pertain to --
8  withdrawn.
9        Did any of those discussions occur after
10  the legal complaint in this action was filed?
11  A.    I don't believe so.
12  Q.    Who at the company is responsible for
13  approving the payment of invoices?
14  A.    It's kind of multi-layered.  I think each
15  department head is responsible for, you know,
16  possibly validating invoices versus what they
17  booked.  Our CFO obviously has a role in it.  Our
18  accounting department has a role in it.  I think
19  there's several people involved.
20  Q.    To your knowledge, did Mr. Ayyad ever
21  advise anyone at your company or direct them not to
22  pay any of the invoices that are the subject of this
23  lawsuit?
24  A.    Not to my knowledge.

**27**

1  Q.    You see in L it says Craig Jones?
2  A.    Yes.
3  Q.    Who is Craig Jones?
4  A.    Craig is our CFO.
5  Q.    Did he have any involvement in the
6  relationship with Townsquare?
7  A.    I believe that they exchanged some e-mails
8  kind of between them; outside of that, I don't know.
9  Q.    Did you ever have any discussions with
10  Mr. Jones regarding the invoices that are the
11  subject of this lawsuit?
12  A.    I have not.
13  Q.    Did you ever have any discussions with
14  Mr. Jones regarding any of the -- the claim in this
15  lawsuit?
16  A.    I have not.
17  Q.    Have you ever had any discussion with --
18  withdrawn.
19        Have you ever had any discussions with
20  Mr. Jones concerning Regency Management's
21  relationship with Townsquare?
22  A.    I'm sure.
23  Q.    When was the most recent such discussion
24  with him?

**28**

1  A.    Probably when he was first onboarded.  I
2  can't recall when that was.  But as the new CFO, he
3  was trying to get himself acclimated with all of our
4  vendors; that's probably the extent of it.
5  Q.    When did he become the CFO of the company?
6  A.    I'm not sure, to tell you the truth.
7  Q.    Do you recall the year?
8  A.    I want to say last year, but I'm not a
9  hundred percent sure.
10  Q.    Going down, Irv Klein, who is that?
11  A.    Irv Klein is a consultant, a marketing
12  consultant.
13  Q.    And does he -- does he work for Regency
14  Management?
15  A.    He's a consultant for Regency Management.
16  Q.    What involvement, if any, did he have with
17  respect to Townsquare?
18  A.    Since I became the department head, none.
19  Q.    Prior to you becoming the department head?
20  A.    I wouldn't know.
21  Q.    What information does he have regarding the
22  invoices that are the subject of this lawsuit?
23  A.    Probably none.
24  Q.    So do you know why the response here is

**29**

1  that he likely has some information?
2  A.    I don't know.  I mean, I think, you know,
3  when Irv was running the department, I think he
4  probably had peripheral knowledge, like in passing
5  type of knowledge, but I don't think anything
6  related to this.
7  Q.    Did you prepare the responses that are in
8  this document?
9  A.    I did.
10  Q.    Did anyone else from your company give any
11  input towards the responses?
12  A.    No.
13  Q.    Who's Avery Nelson?
14  A.    Avery Nelson is a former employee who also
15  worked in the marketing department.
16  Q.    And what was Avery Nelson's role at the
17  company?
18  A.    I believe she was a marketing manager, to
19  the best of my knowledge.  I don't remember her
20  title.
21  Q.    And what, if any, involvement did
22  Ms. Nelson have on the -- with the relationship with
23  Townsquare?
24  A.    I don't know.  So Avery actually did not

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

TARA KELLY

30

1    report to me or Irv.  She reported directly to Mike.
2    Q.    Did you ever have any discussions with
3    anyone at Regency Management regarding the invoices
4    that are the subject of this lawsuit?
5    A.    No.
6    Q.    Did you ever engage in any communications
7    with anyone at Regency Management regarding the
8    invoices that are the subject of this lawsuit?
9    A.    No.
10          MR. PAIOFF:  If you can scroll
11          down to No. 11.
12    BY MR. PAIOFF:
13    Q.    I'm asking this for clarification purposes;
14    interrogatory 11, have you seen it?
15    A.    Yes.
16    Q.    And if you just look at the response, the
17    response says:  See response interrogatory No. 11.
18          I'm just -- I just want to know if that was
19    an error and it was supposed to be -- and this
20    response was supposed to be referring to a different
21    interrogatory response?
22    A.    I'm not sure.
23    Q.    Okay.
24          MR. PAIOFF:  Ms. Sweeney, if you

31

1          can scroll to interrogatory 12 response.
2    BY MR. PAIOFF:
3    Q.    I'm going to ask you to read interrogatory
4    No. 12 to yourself and let me know when you're done,
5    and then I'm going to ask you some questions about
6    the response.
7    A.    Yes.  Okay.
8    Q.    Okay.  Now, focusing on your response, the
9    second sentence says:  Subject to and without
10    waiving the foregoing, in late 2019, there was a
11    meeting between David Hu, Michael Ritter, and
12    Townsquare where David Hu raised an objection about
13    audited invoices proving that Townsquare was
14    charging the actual market rate instead of some
15    other rate.
16          Do you see that?
17    A.    I do.
18    Q.    And the meeting being referred to, did you
19    attend that meeting?
20    A.    I did.
21    Q.    Who else from Regency attended that
22    meeting?
23    A.    A gentleman that no longer works here, his
24    name was Taoufik Jazouli, was at that meeting.  I

32

1    think that was it, to the best of my knowledge.
2    Q.    Do you mind spelling it, unless Ms. Sweeney
3    was able to transcribe it?
4    A.    Let me look it up for you real fast.  So
5    it's T-A-O-U-F-I-K, and the last name is
6    J-A-Z-O-U-L-I.
7    Q.    Now, you say that meeting occurred in late
8    2019, do you recall what month it was?
9    A.    I believe it was December.
10    Q.    December of 2019.
11          Okay.  And who from Townsquare was in
12    attendance?
13    A.    Bill Campbell, Krystin Conklin, Matt, and I
14    feel like there was one other person there.
15    Q.    Matt who?
16    A.    I can't even remember his last name, but I
17    could probably pull up a calendar invite, if that
18    would help.
19    Q.    We can leave it blank for now, maybe during
20    a break you can fill it in.
21          So you said Matt, and there was one other
22    individual you believe?
23    A.    I think there was one other individual.
24    Q.    And was that meeting in person or --

33

1    A.    It was.
2    Q.    -- some other -- okay.
3          Where did it occur?
4    A.    In our Philadelphia office.
5    Q.    And who initiated that meeting?
6    A.    I'm not sure.
7    Q.    And what was the purpose of that meeting?
8    A.    The purpose of that meeting was to review
9    capabilities.  Oh, here is who was here.  Bryan
10    McMillan, Troy Overby, Krystin Conklin, and Bill
11    Campbell.  That's who was at the meeting.
12    Q.    Okay.
13    A.    If that helps.
14          The context of that meeting was to review
15    capabilities and start preparing for that pilot test
16    that was scheduled to happen in 2020, but obviously
17    because of COVID it didn't.
18    Q.    What was the pilot test supposed to be?
19    A.    The pilot test was, you know, a -- what
20    would have been a comparison of three agencies'
21    performance.
22    Q.    Okay.  What else was discussed at that
23    meeting?
24    A.    Oh, jeez.  I mean, nothing not related to

TARA KELLY

**34**

1    work. I mean, it was all just about capabilities
2    and, you know, the dog and pony show you would
3    expect from anybody pitching a client.
4        Q.    Okay. Was there any discussion during that
5    meeting regarding any of the invoices that are the
6    subject of this lawsuit?
7        A.    No.
8        Q.    Now, you said in your response that Mr. Hu
9    raised an objection about audited invoices. What
10   was the nature of that -- of that part of the
11   discussion?
12       A.    So I think it was a general comment that
13   one of the things we were looking for from partners,
14   digital partners exclusively, because, you know, on
15   the other side, the radio and TV side, obviously we
16   get affidavits of performance per the SCC. We were
17   not getting that from Townsquare and it was raised
18   kind of as, hey, this is something we're going to
19   need from you. We kind of can't do this on the
20   honor system. We need to see affidavits of
21   performance.
22       Q.    Okay. And did you -- subsequent to that
23   meeting, did you receive those affidavits that you
24   asked for?

**35**

1        A.    We did not.
2        Q.    Did you continue doing business with
3    Townsquare after that meeting?
4        A.    A year later.
5        Q.    A year later?
6        A.    Right. Because we had COVID in all of
7    2020. This was the end of 2019. We didn't start
8    the pilot testing until 2021.
9        Q.    Because of COVID?
10       A.    Correct.
11       Q.    Was there any business that was done with
12   Townsquare in January of 2020?
13       A.    Probably radio, to the best of my
14   knowledge.
15       Q.    What about February 2020?
16       A.    Probably radio.
17       Q.    Okay. March 2020?
18       A.    To the best of my knowledge, probably
19   radio. I don't know the exact date everything shut
20   down.
21       Q.    What is an audited invoice?
22       A.    It's an affidavit of performance
23   essentially.
24       Q.    When you refer to the phrase here, actual

**36**

1    market rate, what do you mean by that?
2        A.    I didn't use that term, actually, David Hu
3    did. I was just reiterating what was mentioned in
4    that meeting. I only --
5        Q.    Do you know what that term is?
6            MR. FRANK: Please, Mr. Paioff,
7        let her finish her answers.
8            MR. PAIOFF: You can finish.
9            THE WITNESS: Okay. I can only
10       interpret what he may have meant. I don't
11       want to speak for him.
12   BY MR. PAIOFF:
13       Q.    Well, you were involved in that
14   conversation, correct?
15       A.    Correct.
16       Q.    Based on your involvement, do you have a
17   good sense of what he meant by that?
18       A.    I mean, again, it would be conjecture on my
19   part, but I could say that he may have meant that,
20   you know, we probably wanted to make sure we were
21   getting a fair shake on our rate instead of some
22   artificially inflated rate that didn't have an
23   affidavit of performance to substantiate, you know,
24   what was being presented to us.

**37**

1        Q.    Now, you testified earlier that the audited
2    invoices were not provided. And you also testified
3    that Regency did business with Townsquare in the
4    beginning of 2021. What was the reason that Regency
5    continued to do business with Townsquare in early
6    2021 without having received the audited invoices?
7            MR. FRANK: Objection to form.
8        If you understand -- I'm sorry, objection
9        to form.
10           You can answer.
11           THE WITNESS: Can I answer?
12           MR. FRANK: Yes.
13           THE WITNESS: So I think that
14       there are -- just in the nature of
15       everything that happened in 2020, there
16       just was a lot of latitude given to
17       everybody. Offices were closed, staff was
18       let go, I think it really just boiled down
19       to that we still had an expectation of
20       receiving it. It didn't negate the fact
21       that we still wanted it.
22   BY MR. PAIOFF:
23       Q.    Do you have any reason to believe that any
24   of the invoices were inaccurate or incorrect?

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

TARA KELLY

38

1  A.    I don't have an affidavit of performance to
2  answer that.
3  Q.    That's not my question.  I said, do you
4  have any reason to believe that they were inaccurate
5  or incorrect?
6  A.    I mean, you know, it's like trust, but
7  verify.  I don't know how to answer that.  I didn't
8  sign any invoice that came to me without an
9  affidavit of performance, right.  It's just --
10  Q.    Well, is there something specific that led
11  you to believe that there was something inaccurate
12  or incorrect in any of the invoices that were
13  rendered?
14  A.    There was no information at all, so...
15  Q.    When you say "no information at all," what
16  do you mean by that?
17  A.    It essentially was like line items.  For
18  instance, it would say, and I'm just going to make
19  this up, social media $5,000 or SCO, you know,
20  $10,000 or whatever it was, but there was no
21  affidavit of performance to support where that money
22  was spent, how it was spent, how it wasn't invested.
23  There just wasn't anything supported.
24  Q.    Prior to this meeting in late 2019, had

39

1  Townsquare been providing these affidavits?
2  A.    I'm not sure.
3  Q.    Okay.  Prior to this meeting in 2019, had
4  Townsquare been invoicing Regency for services it
5  performed for it?
6  A.    I can only speak to the radio side, which,
7  of course, always comes with an affidavit of
8  performance.  So on the radio side, yes.  I wasn't
9  managing the digital side then, so I can't speak to
10  that.
11  Q.    Is there some sort of agreement on or
12  obligation on Townsquare's part to provide the
13  affidavit with respect to the digital advertising
14  services that were performed?
15  A.    For what period?
16  Q.    Well, for any period.
17  A.    So prior to 2021 I can't speak to.  But
18  after our December 2019 meeting, they assured us it
19  would be no problem to provide it.
20  Q.    Aside from their assurances, was there any
21  type of obligation or requirement for them to
22  provide that?
23  A.    I can only share with you that I did
24  follow-up in writing in an e-mail and stipulated

40

1  that it would be a requirement of doing business,
2  that they would need to provide it.
3  Q.    You put that in an e-mail to someone at
4  Townsquare?
5  A.    I did.
6  Q.    When was that e-mail sent?
7  A.    If you give me a minute, I could probably
8  look it up.
9  Q.    While you're looking, was this e-mail
10  produced in connection with your document
11  production?
12  A.    Anything that I'm going to reference here,
13  I am pretty sure I passed on to Alan and team.  It's
14  probably going to take me a minute to find this as
15  well.  This is going to be a dig for sure.
16  Q.    Well, I don't want to waste time, so maybe
17  if you can do that --
18  A.    That's fine.  It definitely was in writing.
19  MR. PAIOFF:  To the extent that
20  wasn't provided, I'm going to call for the
21  production of any e-mails from the witness
22  to the plaintiff requesting affidavits --
23  BY MR. PAIOFF:
24  Q.    What are they called, verification

41

1  affidavits?
2  A.    Proof of performance.  I mean --
3  Q.    Proof of performance?
4  A.    Yeah, I mean, sure.  There's a few ways to
5  say it.
6  Q.    Okay.  And if you -- I'm just going to
7  refer you back to exhibit 1, the very last line on
8  the bottom of page 6, it says:  Separately in
9  December of 2020, a request was made for Townsquare
10  to share their plan and execution model.
11  Who made that request?
12  A.    Who made the request for the audited
13  invoices?
14  Q.    No.  Who made the request for Townsquare to
15  share their plan and execution model?
16  A.    Us.  Probably at different points both
17  David Hu and myself.
18  Q.    I'm sorry?
19  A.    I believe maybe at different points, maybe
20  even possibly at the same time.  I believe both
21  David Hu and I both requested it.
22  Q.    And why was that request made?
23  A.    So that we had proof of performance.
24  Q.    And what is a plan -- in layman terms, what

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

TARA KELLY

42

1    is the plan of execution model?
2    A.    Their plan would be, here's how we are
3    going to spend your money, in layman's terms, and
4    here's how we're going to execute on your behalf.
5    So we are going to put this much into this bucket,
6    let's call that bucket social media, we're going to
7    put this much into this bucket, let's call it SCO,
8    you know, another slice would go into, you know,
9    maybe ad words or something like that.  That's
10   essentially what it means.
11   Q.    Was payment of Townsquare's invoices, that
12   are the subject of this lawsuit, ever conditioned on
13   Townsquare's provision of their plan of execution
14   model?
15            MR. FRANK:  Objection to form.
16            You can answer.
17            THE WITNESS:  Yes.
18   BY MR. PAIOFF:
19   Q.    And what is --
20   A.    I can't think of any universe where someone
21   would spend this or make this type of investment and
22   not require some proof of performance.  It's like
23   unheard of in my industry.  And by industry, I mean
24   marketing and advertising, not furniture.

43

1    Q.    Well, that wasn't my question.  My question
2    was:  Was it conditioned on the provision of this --
3    of these materials?
4    A.    For sure.
5    Q.    And in -- was that memorialized in any way?
6    A.    In that e-mail that I mentioned a few
7    minutes ago.
8    Q.    In that e-mail you said that as a condition
9    I'm paying your invoices, we need to see your plan
10   of execution model?
11   A.    I don't know the exact words, but I do know
12   for a fact that I outlined, you know, the proof of
13   performance would need to be required.  Did I
14   specifically say for payment of invoices, I don't
15   know, but I did request the information.
16   Q.    Then the last sentence of this response
17   says:  More information can be found in the Bates
18   stamp documents attached hereto.
19            Do you see that?
20   A.    Yes.
21   Q.    What specific -- can you please identify
22   the specific Bates range of the documents being
23   referred to in this response?
24   A.    Do you want to pull up that file and we can

44

1    go through it?  I mean, I can't obviously show you
2    digital audited invoices because we weren't provided
3    them.  So I can't show you something that I don't
4    have.
5    Q.    What --
6    A.    The request for proof of performance, you
7    know, I would assume is in that packet somewhere.
8            MR. PAIOFF:  I'm going to ask
9    Ms. Sweeney to scroll down to No. 13 in the
10   response.
11   BY MR. PAIOFF:
12   Q.    Okay.  I'm going to ask you to read to
13   yourself the interrogatory 13, the question, and we
14   will go through the response together.  Let me know
15   when you're finished reading the question.
16   A.    Sure.
17   Q.    Now, in terms of the response, after the
18   objections, your response:  Subject to and without
19   waiving the foregoing, Plaintiff included gift cards
20   in at least the invoice for
21   December 2019.
22            What did you mean by inappropriately
23   included gift cards?
24   A.    So there was -- on several invoices that I

45

1    believe were dated December of 2019, there were hard
2    costs or line items listed as gift cards and they
3    had varying amounts.  I believe that they totaled
4    somewhere between 8- and 10,000 dollars.  I can't
5    remember exactly.  Accounting flagged it and asked
6    me to address it, which I did, and I was told that
7    those gift cards were used as a holiday -- these are
8    not like our gift cards, by the way.  I assume these
9    are Visa or Amazon or something else.  These are not
10   my company gift cards that the gift cards were used
11   as a holiday bonus for Townsquare's New York buying
12   team.
13   Q.    Okay.  And what was the total amount of the
14   gift cards that were included in the December 2019
15   invoices?
16   A.    I believe it was between 8- and 10,000
17   dollars, to the best of my --
18   Q.    Eight and 10,000 dollars.
19            What was the total amount of the old
20   charges in the December 2019 invoices?
21   A.    I don't know that off the top of my head.
22   Q.    We can go back to that.
23            Now, the next sentence in this response
24   says:  Although these particular inappropriate

12 (Pages 42 to 45)

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

TARA KELLY

**46**

1    charges were credited.
2          Do you see that?
3    A.    I do.
4    Q.    How were they credited?
5    A.    I'm sure that Townsquare probably just
6    removed them from their invoices after they were
7    questioned about it, which was probably -- I believe
8    the questioning of those invoices happened eight
9    months after the fact.
10   Q.    Were those invoices -- to date, have those
11   invoices been paid?
12   A.    I'm unsure.
13   Q.    Who would know at the company?
14   A.    Probably our accounting department.
15   Q.    Can you identify someone in there that
16   would have that knowledge?
17   A.    Probably our CFO Craig would probably know
18   better.  To the best of my knowledge, they haven't
19   been paid, but I can't say with any real certainty.
20   Q.    Okay.  Are there any other invoices since
21   the invoices from December 2019 that contained any
22   charges for gift cards?
23   A.    There are not.  However, there was an
24   admission in an e-mail that those types of, you

**47**

1    know, barter, whatever you want to call them, had
2    happened in previous years, yet I have no invoice to
3    substantiate that, which is alarming.
4          MR. PAIOFF:  Okay.  I'm just
5          going to move to strike that last part as
6          unresponsive to the question.
7          MR. FRANK:  Objection to your
8          motion.  It's totally responsive.
9          MR. PAIOFF:  Okay.  Agree to
10         disagree.
11   BY MR. PAIOFF:
12   Q.    Now, your response goes on to say:  On
13   multiple occasions, Plaintiff promised that it will
14   remove the costs for these gift cards in all
15   invoices delivered prior to December of 2019.
16         Do you see that?
17   A.    What line are you on?
18   Q.    Where it says:  On multiple occasions,
19   Plaintiff promised that it would remove the costs
20   for these gift cards in all invoices delivered prior
21   to December of 2019.
22         Do you see that?
23   A.    I do.
24   Q.    To your knowledge, is the plaintiff seeking

**48**

1    payment of any invoices that were rendered prior to
2    December of 2019?
3    A.    I'm not sure.  I wasn't able to uncover any
4    invoices from 2019 that had the gift cards on it
5    despite them saying that they did it, so...
6    Q.    Who's them?
7    A.    Billy Campbell.
8    Q.    What did he say?
9    A.    There was an admission in an e-mail thread
10   where this gift card, you know, exchange, whatever
11   you want to call it, was happening even years prior
12   to December 2019.  I don't have those invoices to be
13   able to confirm if gift card charges are actually
14   reflected on them, but they said they were and that
15   they would have them removed, but I was not able to
16   find them.
17         (At this time, a short break was
18         taken.)
19   BY MR. PAIOFF:
20   Q.    Ms. Kelly, before we -- I'm showing you
21   what's been marked for identification as Plaintiff's
22   exhibit 10.  Please take a look at this document,
23   and you can ask the court reporter to scroll down so
24   you can familiarize yourself with it, and let me

**49**

1    know when you're finished.
2    A.    Yeah.  You can scroll down.  This is
3    actually the e-mail I was referring to earlier, so
4    you found it for me.
5    Q.    Okay.
6          MR. PAIOFF:  Now, if you scroll
7          back to page 2 -- up to page 2.
8    BY MR. PAIOFF:
9    Q.    Do you see when this e-mail was sent?
10   A.    Yes.
11   Q.    And was it, in fact, sent on December 16,
12   2020?
13   A.    Sure.  It appears so.
14   Q.    Okay.  Now, you mentioned that your -- the
15   conversation or the meeting you had with Townsquare
16   was from 2000 -- was December 2019; isn't that
17   correct?
18   A.    Correct.
19   Q.    Okay.  And at any point in time -- well,
20   withdrawn.
21         Does this e-mail say anywhere that -- or
22   does this e-mail request anywhere affidavits of
23   performance for digital?
24   A.    Yes.  If you scroll down a little bit.

**13 (Pages 46 to 49)**

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

TARA KELLY

50

1  Down a little bit more.  So affidavits of -- please
2  be prepared to also -- where it says, you know,
3  share January plan and execution model.  Share your
4  exchange rates with us and the breakout by
5  publisher.  We did not receive that.  Admin access
6  to the AdWords account.  We did not receive that.
7  And those are, you know, the things that would
8  support an affidavit of performance.
9  Q.     But is there any place in this e-mail where
10  you request -- where you specifically request an
11  affidavit of performance?
12  A.     That is the request.
13  Q.     What is the request?
14  A.     Those four -- those two middle bullet
15  points essentially is the request.  It doesn't get
16  any more direct than that.  I mean, in the spirit of
17  fairness, if I sent an affidavit of performance, it
18  would leave a lot of room for interpretation, which
19  is why I was so specific about what was required.  I
20  didn't want to leave any room for interpretation.
21  Q.     Well, why would it leave room -- why would
22  it leave any room for interpretation?
23  A.     An affidavit of performance, because I --
24  you know, people can interpret that to mean

51

1  different things, like, oh, I could -- and I'm just
2  making this up.  I could just present her with pie
3  charts and, you know, kind of, again, on the honor
4  system, take my word for it, this is what we did
5  versus if you provide me with clear sight and vision
6  on what is going on and what's doing, then we don't
7  have to work on the honor system.  So I was
8  deliberately explicit in those bullet points for a
9  reason.
10  Q.     You testified earlier that Townsquare
11  provided affidavits of performance for the media
12  purchases?
13  A.     For the radio, yes.
14  Q.     For the radio?
15  A.     E-mails.  Not about radio.
16  Q.     So would they know what an affidavit of
17  performance is if they were providing it to you on
18  the radio side?
19       MR. FRANK:  Objection to form.
20       You can answer.
21       THE WITNESS:  Yes.  So, no.  So
22  they are two different things.  So on the
23  radio side, their traffic department keeps
24  logs, logs that are kept and maintained for

52

1  the FCC, and it will show us, just as a for
2  instance, listened to radio, you might hear
3  a commercial and voices for radio might
4  say -- I'm going to make this up -- on
5  January 1st, this is the ISKI code that
6  ran, this is the time it ran, this is the
7  station it ran on, whereas, you know, most
8  digital platforms don't work that way.
9  It's not -- because you're not over the
10  airwaves like that.
11       So digital agencies, partners,
12  whatever it is, have different ways of
13  communicating information; again, which is
14  why I was deliberately explicit with what
15  was required.
16  BY MR. PAIOFF:
17  Q.     Okay.  I mean, does it say affidavit
18  anywhere on this -- in this e-mail?
19  A.     No.
20  Q.     Now, again, this e-mail was sent in
21  December 2020.  At any point in time, did you
22  request this information, the bullet points, prior
23  to this e-mail being sent?
24  A.     Oh, several times, yes.  Several times

53

1  during 2020, specifically.  At the height of COVID,
2  Billy Campbell and I had, you know, several just
3  checks-in, conversations, you know, benign
4  conversations where we would just say, when do we
5  think it is going to end, when do we think we can
6  get this pilot test started, and then we would just
7  kind of, you know, reiterate the plan of action and
8  expectations.
9  Q.     Okay.  Was any of that ever memorialized in
10  writing or put in writing, any formal communication?
11  A.     More than this e-mail that's in front of
12  us, no.
13  Q.     Okay.  Is any of Townsquare's invoices that
14  pertain to radio, that are included -- that are
15  included in the complaint, have any of those been
16  paid?
17  A.     I'm honestly not sure.  I don't believe so,
18  but I'm not a hundred percent sure.
19  Q.     Is there any reason why payment of those
20  invoices is being withheld?
21  A.     I'm sure it's all kind of predicated on
22  this, but I'm not a hundred percent sure.
23  Q.     Well, when you say "predicated on this,"
24  what do you mean by that?

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

TARA KELLY

54

1    MR. FRANK: So, again, just going
2   to object. She's not, I don't think, a
3   designee for that subject matter. If she
4   is, point to it, please. Otherwise, you
5   can answer individually. Go ahead.
6 BY MR. PAIOFF:
7  Q.    My question was: What do you mean -- I
8 don't think it was -- withdrawn.
9    MR. PAIOFF: Can you just --
10  Ms. Sweeney, can you repeat the answer?
11    (At this time, the court reporter
12   read back from the record as was requested:
13   "Q. Is there any reason why
14   payment of those invoices is being
15   withheld?
16    A. I'm sure it's all kind of
17   predicated on this, but I'm not a hundred
18   percent sure.
19    Q. Well, when you say
20   "predicated on this," what do you mean by
21   that.")
22    THE WITNESS: Right. So --
23    MR. PAIOFF: You can answer.
24    THE WITNESS: Yup. So, like I

55

1   mentioned, I'm not sure if they were paid.
2   I can't speak to that with a hundred
3   percent certainty. I can only assume that
4   if they weren't, it's a result of
5   satisfying these concerns.
6 BY MR. PAIOFF:
7  Q.    You --
8  A.    You know, on my part, I don't know for
9 sure.
10  Q.    But didn't you testify earlier that they
11 did receive affidavits of performance for the radio
12 purchases?
13    MR. FRANK: Objection to form.
14    You can answer.
15    THE WITNESS: Yes.
16 BY MR. PAIOFF:
17  Q.    So on what basis are you -- on what basis
18 do you believe that payment is being withheld on the
19 radio invoices --
20    MR. FRANK: Again --
21 BY MR. PAIOFF:
22  Q.    -- because of lack of provision of
23 information that was requested?
24    MR. FRANK: Objection. She's not

56

1   the designee for any subject matter that's
2   seen, but you can answer individually. Go
3   ahead.
4    THE WITNESS: I'm not even a
5   hundred percent sure that they weren't
6   paid.
7 BY MR. PAIOFF:
8  Q.    Okay. I'm going to ask you to take a look
9 at the e-mail that's been marked as Plaintiff's
10 exhibit 3, and review it and let me know when you're
11 done. And you can ask the court reporter to scroll
12 down or zoom in or zoom out, if that helps.
13  A.    Yeah, of course. You can scroll down.
14   Okay.
15  Q.    Ms. Kelly, are you familiar with this
16 e-mail chain?
17  A.    Yes.
18  Q.    Is the e-mail -- is your work e-mail
19 TKelly@Regencyfurniture.biz?
20  A.    Yes.
21  Q.    Do you use any other e-mail addresses for
22 work?
23  A.    No.
24  Q.    And did you, in fact, send and receive the

57

1   respective e-mail in this chain where that e-mail
2   address is included as a -- a sender or recipient
3   respectively?
4  A.    Yes.
5  Q.    Do you remember this conversation or this
6 discussion?
7  A.    Yes.
8  Q.    What prompted it?
9    MR. FRANK: Objection. Again,
10   this is not subject matter of the designee
11   deposition notice. Virtually, none of
12   these topics address --
13    MR. PAIOFF: They all are
14   actually, but you can answer the answer.
15    MR. FRANK: None of these topics
16   have been addressed thus far and these
17   questions, for the most part, nine or more
18   percent are directed at her individually.
19    You can answer. But, again,
20   these are individual answers, not designee
21   answers.
22    MR. PAIOFF: You can say whatever
23   you want.
24    You can answer the question.

15 (Pages 54 to 57)

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

TARA KELLY

58

1      MR. FRANK:  That's kind of my
2  role, to put an objection on the record,
3  Mr. Paioff.
4      MR. PAIOFF:  Yeah, but you can't
5  direct her how to answer, in what capacity.
6      MR. FRANK:  I'm asking her to
7  answer, but can you point to a subject
8  matter?  I've asked you about ten times.
9      MR. PAIOFF:  Gift cards, do you
10  want me to pull up the notice where it
11  says --
12      MR. FRANK:  No.  I'm saying I
13  don't see it.  If you think you do, tell me
14  and she will respond as the designee, but I
15  don't see it.  That's what my concern is.
16      MR. PAIOFF:  You know what, I
17  don't need to explain myself.  You can read
18  the notice.  I don't want to waste time
19  here.
20  BY MR. PAIOFF:
21  Q.    Ms. Kelly --
22      MR. PAIOFF:  Ms. Sweeney, can you
23  please read back the last question.
24      (At this time, the court reporter

59

1      read back from the record as was requested:
2      "Q.  Who prompted it?")
3      THE WITNESS:  I did with a phone
4  call to Fran.
5  BY MR. PAIOFF:
6  Q.    What is the sum and substance of the
7  conversation with Fran?
8  A.    I actually never connected with her.  I
9  believe I left her several voicemails.  It was
10  regarding that December invoice or invoice, my
11  apologies, with the hard cost line items for the
12  gift cards.  I think I reached out to her almost a
13  total of eight times.  I remember that very
14  specifically because it was unlike Fran not to
15  return a call.  So I found that unusual and then as
16  a result, the same thread started.
17  Q.    Do you see the redacted part on the top?
18  A.    Yes.
19  Q.    Can you tell me why that was redacted?
20  A.    I don't know.
21  Q.    Was there a subsequent -- was this e-mail
22  forwarded to anyone by you?
23  A.    Was this e-mail forwarded to anyone by you?
24  It was forwarded to Alan.

60

1  Q.    Anyone else other than your attorney?
2  A.    Possibly David Hu back when the exchange
3  was happening.  I don't know for sure.
4      MR. PAIOFF:  I'm just -- I'm
5  going to call for the production of any
6  subsequent e-mails between Ms. Kelly and
7  anyone at Regency in which this e-mail
8  chain was forwarded, and I'll follow up in
9  writing.
10  BY MR. PAIOFF:
11  Q.    Okay.  Ms. Kelly, if you look at the third
12  line down from this main paragraph, you see where it
13  starts at, in addition to tactic optimizations?  It
14  says:  Ashley awarded gift cards to our NYC buying
15  and support teams in the amount of 6K.
16  A.    Correct.
17  Q.    Do you see that?  Is that true?
18  A.    No, we didn't.
19  Q.    Do you know why that -- why that was
20  stated?
21  A.    I believe -- I believe -- I think Billy
22  stated it to substantiate the invoices, right.  I
23  mean, that's how this all started.  We were just
24  looking for an explanation of those line items.

61

1  Q.    Do you see the next line where it says:  In
2  return, TSM, referring to Townsquare Media, not only
3  covered the cost of the gift cards, but our team
4  added an additional 7,657 in media for the big Black
5  Friday push at no charge?  Do you see that?
6  A.    I do.
7  Q.    Do you have any reason to believe that any
8  part of that sentence is not true?
9  A.    I don't have any affidavits of performance
10  to support it.
11  Q.    Is that your reason for not believing it?
12  A.    Yeah, of course.
13  Q.    Is there any other basis for why you don't
14  believe the truth of that statement?
15  A.    No.  I mean, I just don't think it
16  happened.
17  Q.    If you look further down in that e-mail,
18  where it says -- the heading is November overage,
19  $23,657.
20  A.    Uh-huh.
21  Q.    Do you see -- just take a look at the three
22  bullet points there.
23  A.    Yes.
24  Q.    That explanation, did that reconcile for

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

## TARA KELLY

**62**

1  you the issue with the gift cards and whether or not
2  Regency was charged back for these gift cards?
3  A.    No.
4  Q.    Why not?
5  A.    So, you know, Jared, from where I sit, if
6  Townsquare wanted to give their New York buying team
7  a holiday bonus in the form of gift cards, they
8  could have just done that.  In my experience, and
9  I've been doing this for 25 years, I know how
10  creative accounting can very easily happen in the
11  advertising world.  It takes a very trained eye to
12  notice that behavior when it's happening.  In my
13  opinion, they were going to bury these costs and
14  turn them over as performance versus a hard cost.
15  In my opinion, somebody on the Townsquare side made
16  a mistake and furnished that invoice with a hard
17  cost line item.  I believe that these dollars were
18  intended to be charged to us, not truthfully
19  presented to us in the manner of which they were
20  used and then presented to us under the office of,
21  we spent all of your money in media when, in fact,
22  that was not true.
23  Q.    Do you have any reason to -- let me
24  withdraw that question.

**63**

1      Do you see the same e-mail, it refers to
2  the December budget?
3  A.    I do.
4  Q.    And the November budget?
5  A.    Yes.
6  Q.    Were these budgets approved by Regency?
7  A.    I don't know.  I wasn't managing it at that
8  time.
9  Q.    Who would know the answer to that question?
10  A.    Mike Ritter or Avery Nelson.
11      MR. PAIOFF:  Ms. Sweeney, if you
12      could put the complaint up.  I'm going to
13      ask you to turn to paragraph 15.  Sorry,
14      before you scroll down --
15  BY MR. PAIOFF:
16  Q.    Ms. Kelly, can you let me know if you're
17  familiar with this document that's been marked as
18  Plaintiff's exhibit 2?
19  A.    I am sure I've seen it.  You know, I've
20  been looking at a lot of documents.
21  Q.    Sure.
22      I'll represent to you on the record that
23  this is the summons and complaint.  This is the
24  legal document that we filed to commence this

**64**

1  lawsuit.
2      MR. PAIOFF:  Okay.  If we could
3      scroll down to paragraph 15 and have the
4      screen reflect paragraph 15 through 17.
5  BY MR. PAIOFF:
6  Q.    Okay.  And I'm going to ask Ms. Kelly to
7  just read to yourself these three paragraphs, 15
8  through 17, and let me know when you're finished.
9  A.    Okay.
10  Q.    So do you see where the invoices for which
11  the lawsuit seeks payment are itemized in paragraph
12  15?
13  A.    Yes.
14  Q.    Okay.  And do you see in paragraph 16 where
15  we claim that the total amount due pursuant to these
16  invoices is $777,389?
17  A.    Yes.
18  Q.    Okay.  Of that total amount being claimed,
19  what amount, if any, is Regency contending consists
20  of inappropriately charge back gift cards?
21  A.    So I think I answered this earlier.  So the
22  only invoices that we brought to their attention,
23  with the gift card line items on them, was the
24  December 2019 invoices.  However, in -- Billy

**65**

1  Campbell responded and said that it had happened
2  before; what before meant, I don't know.  And I
3  don't have -- I guess I have blind spots, that's the
4  best way to say it.  I don't have eyes on that, so I
5  can't quantify it.
6  Q.    Well, are there any invoices being -- for
7  which repayment is -- for which payment is being
8  sought in this complaint that predate 2019?
9      MR. FRANK:  Objection to form.
10      You can answer.
11      THE WITNESS:  Not to my
12      knowledge.
13      MR. PAIOFF:  Okay.  If we could
14      go back to exhibit 3.
15  BY MR. PAIOFF:
16  Q.    If you see your response here, in the
17  middle you say:  Good morning, folks.  Thanks for
18  all of the information, very helpful.
19  A.    Yes.
20  Q.    And then you say -- so is it fair to say --
21  I mean, is that an accurate statement, that the
22  information you received was helpful?
23  A.    While I was processing it, yeah, sure.
24  Q.    Okay.  And then you say:  Mike, can you

**17 (Pages 62 to 65)**

TARA KELLY

66

1  confirm you approved this and let me know if we've
2  done this in the past?
3        Why did you ask that question to
4  Mr. Ritter?
5  A.    Because at that time, he was the person
6  spearheading the digital efforts on behalf of
7  Regency.
8  Q.    Okay.
9  A.    So, again, it just goes back to my having
10 blind spots.  It wasn't, you know, part of any
11 planning or activation in that period.
12        MR. PAIOFF:  Okay.  If you can
13    scroll up a little bit, Ms. Sweeney.
14 BY MR. PAIOFF:
15 Q.    And does Mr. Ritter, in fact, confirm --
16 A.    Yes.
17 Q.    -- in response to your e-mail?
18 A.    Yes.
19 Q.    Okay.  If you look at that e-mail that
20 follows, you say:  Thanks.  Can you share with me
21 the other dates we did it and the amounts?
22        Do you see that?
23 A.    Yes.
24 Q.    Okay.  Now, Bill responds to that e-mail on

67

1  June 22nd, 2020, at 2:25 p.m.
2        Do you see his response?
3  A.    I do.
4  Q.    Did you read his response at the time?
5  A.    Yes.
6  Q.    Did you ever have any follow-up questions
7  for Bill?
8  A.    Not at that point.
9  Q.    Did you ever challenge his explanation?
10 A.    Not at that point.
11 Q.    At any point, did you ever challenge his
12 explanation?
13 A.    I don't recall.  I can't recall if there
14 may have been a conversation or not.  I know that
15 upon receipt of that e-mail it meant that I had some
16 digging to do on my side.  I was sipping through old
17 e-mails from Avery, asked Irv Klein if he had known
18 anything about this, you know, just -- essentially
19 just trying to connect the dots.
20 Q.    Was it not sufficient that --
21 A.    Why would we allow any media partner to buy
22 gift cards and turn around and charge us for it,
23 even if they were going to bury it in the
24 advertising?  It's just bad practice.  It doesn't

68

1  make any sense.
2  Q.    Michael Ritter ever take issue with this
3  practice?
4  A.    I have --
5        MR. FRANK:  Objection to form.
6    You can answer.
7        THE WITNESS:  Sorry.  I have not
8    spoken with Mike Ritter about any of this
9    since the exchange of those e-mails.
10 BY MR. PAIOFF:
11 Q.    Why not?
12 A.    I just haven't.
13 Q.    Did you and Mike Ritter ever have any
14 disagreement over the relationship with Townsquare?
15 A.    For sure.
16 Q.    What was the disagreement?
17 A.    I believe that because Mike had a
18 relationship with Townsquare prior to Regency
19 acquiring the Central New Jersey footprint -- you
20 know, listen, at the risk of sounding blunt, Mike
21 had a very, very hard time of letting go of some of
22 the things he was responsible for under his previous
23 ownership.  I think he struggled with the change and
24 wanted more involvement.  He had a very close

69

1  relationship with the Townsquare team.  They were
2  under a tremendous amount of influence by him, which
3  made it very difficult for us to -- it would make it
4  very difficult for anybody in that case to be
5  objective and make sure that things are being
6  activated and executed in the best interest of the
7  company.
8  Q.    Did Mike Ritter have the discretions to
9  approve budgets with Townsquare?
10 A.    I don't know.
11 Q.    Was that part of his responsibilities, to
12 approve budgets or review and approve budgets?
13 A.    I don't know.
14 Q.    Well, who would know that information?
15 A.    I mean, maybe Abdul.  I'm not sure.  I'm
16 not sure how any of this is handled prior to my
17 taking it over.  I mean, that's -- I just kind of
18 have some dark spots.
19 Q.    Do you see in this e-mail, it's the second
20 full paragraph where it says:  Once again there was
21 also 10K moved from December's original budget to be
22 put towards making sure we had a very successful
23 November?
24 A.    Yes.

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

TARA KELLY

70

1    Q.    Was that approved by Regency?
2    A.    Again, it wasn't under my management at the
3    time.  I can't confirm.
4    Q.    Do you have any reason to believe it wasn't
5    approved?
6    A.    No.
7            MR. PAIOFF:  Let's pull up
8        exhibit 5.
9    BY MR. PAIOFF:
10   Q.    Ms. Kelly, I'm going to ask you to scroll
11   through this and let me know if you've ever seen
12   this e-mail chain before.
13   A.    I have.
14   Q.    Okay.  I'm going to refer you to the bottom
15   e-mail chain.  Do you know why this e-mail was sent?
16   A.    Do I know why it was sent?
17   Q.    I mean, let me withdraw the question.
18           Do you know what prompted the sending of
19   this e-mail?
20   A.    I believe that they were cementing the
21   December plan, is what it looks like.
22   Q.    Okay.
23   A.    For 2019.
24   Q.    And was this -- and when you say 20 -- for

71

1    which month was this -- withdrawn.
2            Was this the budget that was approved for
3    December of 2019?
4    A.    I can't confirm that.  I mean, for what's
5    on this e-mail, I would say yes; if there was
6    further communications, I mean, obviously I'm not
7    privy to it.  I'm not on these e-mails.
8    Q.    Okay.  Well, if you can scroll up, do you
9    see that top e-mail?
10   A.    Yup.
11   Q.    Okay.  Aside from the bottom e-mail and the
12   top e-mail, are you aware of any other e-mails that,
13   you know, may have modified the budget for December
14   of 2019?
15   A.    I'm not.
16   Q.    Okay.  At the time, was this the process,
17   the procedure in which Regency and Townsquare would
18   engage in presenting and approving a budget for a
19   perspective month?
20   A.    It appears to be.
21   Q.    Do you have any reason to believe that it
22   wasn't the procedure that was -- that was --
23   withdrawn --
24   A.    No.

72

1    Q.    Do you have any reason to believe that this
2    wasn't the procedure being utilized at the time to
3    present and approve a budget?
4    A.    Honestly, Jared, I couldn't tell you either
5    way.  I couldn't tell you if this was the finite
6    directive or if it was formally followed up with
7    some kind of formal insertion order or something.  I
8    don't know.
9    Q.    Who would know that?
10   A.    Probably Mike and Avery.
11   Q.    Is there a reason why Michael Ritter is not
12   being produced for a deposition today on behalf of
13   company?
14           MR. FRANK:  Objection.  Don't
15       answer that.  That has to do with
16       attorney-client privilege communications.
17   BY MR. PAIOFF:
18   Q.    Did you ever have any discussions with
19   anyone outside the presence of Mr. Frank concerning
20   who would be produced today for a deposition on
21   behalf of Regency?
22   A.    I'm sorry, could you repeat that?
23           MR. PAIOFF:  Ms. Sweeney?
24           (At this time, the court reporter

73

1            read back from the record as was requested:
2            "Q. Did you ever have any
3        discussions with anyone outside the
4        presence of Mr. Frank concerning who would
5        be produced today for a deposition on
6        behalf of Regency?")
7        THE WITNESS:  No.
8            MR. PAIOFF:  If we scroll down to
9        the bottom e-mail for a second.
10   BY MR. PAIOFF:
11   Q.    So I just want to make sure that we're on
12   the same page here.  If we add up all of these
13   numbers, these individual budgets for the various
14   geographical areas, factoring in the change that was
15   made the top of the e-mail, I come up with a total
16   budget for December of 2019 of $162,000.  Is that
17   consistent with your math?
18   A.    I mean, I can add it up real fast, if you
19   want me to.
20   Q.    Yeah, let's do it.
21   A.    172.
22   Q.    You have 172?
23   A.    Should I do it again?
24   Q.    If we scroll up -- no.  We can scroll up.

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

TARA KELLY

**74**

1  That's accurate.  We see that it was reduced by
2  10,000?
3  A.    Yup.
4  Q.    That would make the budget 162K?
5  A.    Correct.
6  Q.    When Townsquare would invoice Regency for
7  its services, did Regency ever request a discount on
8  the invoices?
9  A.    In April of 2019 when we established the
10 in-house agency, yes, of course we put an in-house
11 agency discount.
12 Q.    What's the amount?  Is that a recurring
13 discount?
14 A.    It's 15 percent on broadcasts.
15 Q.    On broadcasts.
16 A.    Standard with any advertising agency.
17 Q.    And when you say "broadcasts," you're
18 referring to radio?
19 A.    Yes.
20 Q.    And what about on the digital side?
21 A.    I do not --
22 Q.    I'm sorry?
23 A.    I'm sorry.  I did not request any discount.
24 I can't speak to, you know, anything prior.

**75**

1  Obviously we always ask for the best deal.  But, no,
2  it was not discounted.  There was no commission
3  billed on it.
4  Q.    When a monthly budget would be proposed and
5  approved, did the amount spent for that month always
6  equal the amount of the budget?
7  A.    No.
8  Q.    Were there some months where the amount
9  spent was less than the budget?
10 A.    Sure.  If spots get bumped or, you know,
11 whatever it is.  You know, there's a million things
12 that could happen to prevent a budget from being
13 exhausted.
14 Q.    So is it fair to say that -- withdrawn.
15        For the months where the entire budget was
16 not used, would Townsquare invoice for only the
17 amount that was actually spent for the month?
18 A.    Without an affidavit of performance, I
19 can't confirm that.
20 Q.    Well, would the invoices that would be
21 remitted for those months be less than the amounts
22 of the budget?
23 A.    I'm sure in some scenarios that's happened.
24 I'm not -- I can't recall one specifically off the

**76**

1  top of my head, but I'm sure it's happened.
2  Q.    Was there ever any occasions where the
3  amount spent for a given month exceeded the approved
4  budget?
5  A.    Not when I took over.  I can't speak to
6  prior to that.
7        MR. PAIOFF:  Could we put exhibit
8    6 up, please.
9  BY MR. PAIOFF:
10 Q.    Ms. Kelly, I'm going to ask you to just
11 look at this e-mail.
12 A.    Sure.
13 Q.    Okay.  Do you recognize this e-mail?
14 A.    I've seen it, yes.
15 Q.    Does this reflect the approved budget --
16 sorry, the approved budget for the month
17 of January 2020?
18 A.    I mean, again, I'm not on these e-mail
19 threads.  And I was not part of this practice.  You
20 know, if I take the document at face value, then I
21 would say yes; outside of that, you know, I don't
22 know.
23 Q.    Well, do you have any reason to believe
24 that this was not the approved budget for the month

**77**

1  of January 2020 for digital?
2  A.    I don't.
3  Q.    Is there a reason why you weren't on these
4  e-mails?
5  A.    Because I was not -- so Avery was on our
6  team, she reported directly to Mike.  Mike and Avery
7  handled the digital together.
8  Q.    Okay.  And who was responsible for
9  approving the budget that was presented -- or sorry,
10 withdrawn.
11       Who was responsible for approving a
12 proposal that was presented by a given month by
13 Townsquare?
14 A.    At this period, I believe it was Mike.
15       MR. PAIOFF:  Can we pull up
16    exhibit 7.
17 BY MR. PAIOFF:
18 Q.    Okay.  I'm going to ask you to take a look
19 at this e-mail chain and let me know if you've ever
20 seen it before.
21 A.    I have.
22       MR. PAIOFF:  Can you scroll down
23    to the bottom, Ms. Sweeney.
24

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

TARA KELLY

78

1  BY MR. PAIOFF:
2  Q.    Is this the approved budget for digital for
3  the month of February 2020?
4  A.    Again, I think it's just more of the same.
5  I don't have any reason to believe that it's not,
6  but I'm not familiar with what the process was at
7  that time.
8  Q.    And at that time, was Michael Ritter still
9  the employee at Regency that was responsible for
10  approving the budget with Townsquare?
11  A.    Yes.
12         MR. PAIOFF:  Okay.  Could we pull
13       up exhibit 8.
14  BY MR. PAIOFF:
15  Q.    I'm going to ask you to take a look at this
16  e-mail and let me know when you're finished.
17  A.    Yeah, I got it.
18  Q.    Have you ever seen this e-mail before?
19  A.    I have.
20  Q.    Okay.  Does this e-mail reflect the
21  approved budget for digital with Townsquare for the
22  month of March 2020?
23  A.    Yeah, again, same.  I have no reason to not
24  believe that it was the budget, but I can't speak to

79

1  the process at that time.
2  Q.    Okay.  And at this time, was Michael Ritter
3  the employee at Regency that was responsible for
4  approving the budget with Townsquare?
5  A.    Yes.
6         MR. PAIOFF:  Okay.  Let's pull up
7       exhibit 9.
8         THE WITNESS:  I would stipulate
9       that all of these e-mails that look like
10       this are going to have the same response
11       from me.
12  BY MR. PAIOFF:
13  Q.    Well, this is the last such e-mail.  So
14  let's just go through this exercise.
15  A.    Okay.
16  Q.    And, you know, I appreciate you helping me
17  to be efficient here --
18  A.    No problem.
19  Q.    -- but we're almost done.
20         Do you recognize this e-mail?  If you go
21  back up.  So you see in red where it says -- the
22  second e-mail, the total March investment will be
23  $152,170?
24  A.    Yes.

80

1  Q.    Do you have any reason to believe that that
2  wasn't the approved budget for the month of April
3  2020?
4  A.    No, I don't.  That's March actually.
5  Q.    That's March.  Okay.  I was confused by
6  that.  Okay.
7         MR. PAIOFF:  Can we pull up
8       exhibit 10.
9  BY MR. PAIOFF:
10  Q.    I will ask you to look at what's been
11  marked as Plaintiff's exhibit 10 and let me know if
12  you recognize this document.
13  A.    Yes.
14  Q.    Okay.  I think I may have shown you this
15  exhibit already.
16  A.    Yes.
17  Q.    Okay.  Do you recognize -- the last page on
18  this document, do you know what this is, this page?
19  A.    Correct.  Yes, I do.
20  Q.    What is it?
21  A.    It's a budget order.  It's a purchase
22  order.  Insertion order.
23  Q.    This is when -- so at the beginning of the
24  deposition you referred to something called an

81

1  insertion order, this is the document you're
2  referring to?
3  A.    Correct.
4  Q.    Okay.  And who generates this document?
5  A.    My department does.
6  Q.    Okay.  And what's -- why is it generated?
7  A.    Accounting practices, flight management,
8  budget management, you know, making sure that
9  nothing is lost in translation when you are
10  communicating a budget to someone.  It's kind of
11  memorialized, as you would say.
12  Q.    Okay.  So after this is memorialized, is it
13  exchanged with anyone?
14  A.    It's sent to the vendor --
15  Q.    So this gets --
16  A.    -- and in this scenario it would go to
17  Townsquare.
18  Q.    Got it.
19         And the amount here, does this reflect the
20  budget for digital for January 2021 for -- with
21  Townsquare?
22  A.    Correct.
23  Q.    And was that budget, in fact, $32,500?
24  A.    Yes.

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

TARA KELLY

82

1    Q.    And that budget was approved by Regency?
2    A.    Yes.
3    Q.    Did Regency receive an invoice from
4    Townsquare for the month of January 2021 in the
5    amount of $32,500?
6    A.    I would imagine so.
7    Q.    Was that invoice paid?
8    A.    I'm not certain.
9    Q.    Okay.  When Regency would receive invoices
10   from Townsquare, were they ever forwarded to you?
11   A.    I don't believe so.  Not that I can recall.
12   Q.    Were you ever involved in the invoice
13   approval process?
14   A.    To some extent, depending on the vendor and
15   if something didn't jive or make sense or if
16   something was over, for sure.
17   Q.    So when you say "over," what do you mean by
18   that?
19   A.    Over invoiced.
20   Q.    Okay.  Were you ever consulted on payment
21   of any of the invoices from Townsquare that are the
22   subject of this lawsuit?
23   A.    No.
24   Q.    Do you see that there's a redacted section?

83

1    A.    Yes.
2    Q.    Do you know why that was redacted?
3    A.    I don't.
4    Q.    Was this e-mail forwarded to anyone aside
5    from Mr. Frank?
6    A.    No.
7          MR. PAIOFF:  If we could pull up
8       exhibit 11.
9    BY MR. PAIOFF:
10   Q.    Okay.  I'm going to ask you to take a look
11   at this e-mail starting from in the middle of the
12   first page.  Your response to Fran Northridge, it
13   says: Thanks --
14         MR. PAIOFF:  And let's just
15      scroll down.
16         THE WITNESS:  Yes.
17   BY MR. PAIOFF:
18   Q.    Let me know if you've seen this chain
19   before.
20   A.    Yes.
21   Q.    Now, I'm going to ask you to take a look at
22   pages in the PDF, it's 4 through 10.  They're
23   labeled 4 through 7.
24   A.    Yes.

84

1    Q.    Do you recognize what this document is?
2    A.    Of course.
3    Q.    What is this?
4    A.    This is a proposal for review.
5    Q.    And who prepared this proposal?
6    A.    Fran Northridge.
7    Q.    Okay.  And on behalf of Townsquare?
8    A.    Yes.
9    Q.    Okay.  Why for this month the proposal was
10   in this format?
11   A.    It's in this format for every month.
12   Q.    Oh, it's in this format for every month?
13   A.    For radio, sure.
14   Q.    Oh, for radio.
15         Okay.  Was this proposal approved?
16   A.    Yes.  To the best of my knowledge, if the
17   e-mail says it was approved, it was approved.
18   Q.    We can scroll up and let's verify.
19   A.    So there it is.  It's approved.  Yup.
20   Q.    Okay.
21         MR. PAIOFF:  If we could scroll
22      down one second to the page below this.
23   BY MR. PAIOFF:
24   Q.    Do you see in the middle of this e-mail, it

85

1    looks like there's an e-mail from you, but it says
2    message-service@sender?
3    A.    Yes.
4    Q.    Do you know what that e-mail address is?
5    A.    Yeah.  It's from our Zoho platform.
6    Q.    Is that the -- is that how you would
7    transmit the insertion order --
8    A.    Correct.
9    Q.    -- to Townsquare?  Okay.
10         (At this time, a short break was
11      taken.)
12   BY MR. PAIOFF:
13   Q.    Ms. Kelly, I'm just going to ask you to
14   take a look what's been marked as Plaintiff's
15   exhibit 11-1.
16         Do you see this document?
17   A.    Yes.
18   Q.    I just want you to confirm that this was
19   the insertion order that was prepared for the
20   digital budget with Townsquare for April of 2021?
21   A.    No.  This is the radio budget.
22   Q.    Oh, this -- this is the radio, okay.
23   Sorry.  I stand corrected for the radio.  That's
24   correct.

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

TARA KELLY

86

1   A.    Yes.
2   Q.    And this is, in fact --
3          MR. PAIOFF:  If you scroll down.
4   BY MR. PAIOFF:
5   Q.    This confirms what the approved budget was
6   of $25,500?
7   A.    Yes.
8   Q.    This listed the discount that you alluded
9   to earlier?
10  A.    Correct.
11         MR. PAIOFF:  Okay.  We can put
12      that to the side.
13         Can we pull up exhibit-12.
14  BY MR. PAIOFF:
15  Q.    Okay.  So I'm going to show you what's been
16  marked as Plaintiff's exhibit-12, it's a series of
17  invoices for the month of December 2019.
18         MR. PAIOFF:  Can we scroll down
19      so the witness can review this document.
20  BY MR. PAIOFF:
21  Q.    Have you ever seen invoices before?
22  A.    Probably -- I'm going to say probably not.
23  I mean, other than outside of what Alan may have
24  shared with me, but these are 2019 digital invoices.

87

1   Q.    Okay.  What is the process at Regency with
2   respect to receiving and paying invoices from
3   vendors?
4   A.    Currently?
5   Q.    Let's start with at the time that this
6   invoice was generated.
7   A.    I don't know.
8   Q.    What is it currently?
9   A.    Currently, we have a catch-all e-mail
10  address that the accounting department uses, all
11  e-mails -- or, I'm sorry, all invoices are sent to
12  that e-mail address.  I believe several people in
13  accounting have access to that e-mail address, and I
14  believe from that point, I think that they are like
15  logged into our QuickBooks or whatever they use.
16         MR. FRANK:  Can we note for the
17      record that that subject was not a designee
18      deposition subject in the notice, so she
19      responded individually.
20         MR. PAIOFF:  Okay.  Invoices.
21      All right.
22  BY MR. PAIOFF:
23  Q.    And what's their -- withdrawn.
24         When did that process begin?  Just so -- I

88

1   will clarify.  When I say when did that process
2   begin, I'm responding to your answer that -- you
3   know, describing what the process is currently as
4   opposed to what it was back in December of 2019.
5          MR. FRANK:  Objection to form.
6      And also the same objection, that she's not
7      the designee for this topic.
8          You can answer.
9          THE WITNESS:  I'm honestly not
10      sure.
11  BY MR. PAIOFF:
12  Q.    Did Regency receive all of the invoices
13  that are the subject of this lawsuit?
14  A.    I'm not sure.
15  Q.    Who at the company would know the answer to
16  that question?
17  A.    Maybe Craig for certain, he might know.
18  Q.    Anyone else you can think of?
19  A.    I don't know.  I would say accounting would
20  probably be the best bet.
21  Q.    Okay.  Do you have any reason to believe
22  that any of the invoices that are the subject of
23  this action were not received by Regency?
24  A.    I don't know.  Listen, we have two offices,

89

1   we have a lot of situations where invoices go to a
2   different office instead of -- you know, say it goes
3   to the Philadelphia office instead of Brandywine or
4   it goes to Brandywine instead of Philadelphia.
5   Things get lost.  So I don't know.
6          MR. PAIOFF:  It we pull up
7      exhibit 16.
8   BY MR. PAIOFF:
9   Q.    Please take a look at what's been marked as
10  Plaintiff's exhibit 16 and let me know if you
11  recognize this document.
12  A.    Yes.
13  Q.    What is this document?
14  A.    This is a budget for February radio.
15  Q.    And is this --
16         MR. PAIOFF:  Can you scroll down?
17  BY MR. PAIOFF:
18  Q.    Does this document accurately reflect the
19  approved budget for radio for February 2021 in the
20  amount of $34,000?
21  A.    To the best of my knowledge.  I mean, I
22  have to assume that there weren't any revisions.
23  But to the best of my knowledge, probably correct.
24  Q.    Are you aware of any revisions, as you sit

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

TARA KELLY

90

1    here today, to this invoice -- I'm sorry, to this
2    insertion order.
3    A.    I mean, I can look it up, but not off the
4    top of my head.  I don't recall any revisions.
5            MR. PAIOFF:  Can we pull up
6        exhibit 17.
7            THE WITNESS:  So that's revised.
8        That's a January revised insertion order.
9    BY MR. PAIOFF:
10    Q.    So is revised meaning that this was revised
11    or this is the revised version?
12    A.    That's the revision.
13    Q.    That's the first revision?
14    A.    (Witness nods.)
15    Q.    Were there subsequent revisions?
16    A.    I don't know.  I could look it up, but I
17    know that it's the first one because it says R1.
18    Q.    Okay.
19            MR. PAIOFF:  Let's scroll down.
20            THE WITNESS:  And then the notes
21        in the bottom say that I added weeks.
22    BY MR. PAIOFF:
23    Q.    Added weeks.
24        So what does that mean, that the budget

91

1    goes up or goes down?
2    A.    Likely went up.
3    Q.    Okay.  So, as you sit here today, is it
4    fair to say that the budget for January 2021 was at
5    least $35,700?
6    A.    That's probably accurate.
7    Q.    How did you first become aware of this
8    lawsuit?
9    A.    I think Alan called me.
10    Q.    Did you ever have any discussions with
11    anyone from Townsquare about nonpayment of the
12    invoices that are the subject of this action?
13    A.    Not that I recall.
14    Q.    Okay.
15            MR. PAIOFF:  Can we bring up
16        exhibit 19.  Okay.  Can we scroll down to
17        the bottom.  And scroll up slowly so
18        Ms. Kelly can familiarize herself with this
19        document.  Keep going.
20            THE WITNESS:  I am familiar with
21        this.
22    BY MR. PAIOFF:
23    Q.    You're familiar with this document?
24            MR. PAIOFF:  Can we go up.

92

1            THE WITNESS:  I am.
2            MR. PAIOFF:  All right.  Stop
3        there.
4    BY MR. PAIOFF:
5    Q.    Now, in the middle of the second page of
6    this document you see there's an e-mail, it's
7    towards the top from Fran Northridge to you?
8    A.    Yes.
9    Q.    Did you, in fact, receive this e-mail?
10    A.    It appears that I did, sure.
11    Q.    Does this e-mail refresh your recollection
12    as to whether you have ever had any conversations
13    with anyone at Townsquare regarding nonpayment of
14    the invoices that are the subject of this action?
15    A.    Yes.
16    Q.    Okay.  And I'm just going to ask you again,
17    did you, in fact, ever have any such conversations
18    with anyone at Townsquare Media?
19    A.    I guess I don't.
20    Q.    Do you recall the sum and substance of that
21    conversation?
22    A.    I don't.  I mean, now that it's in front of
23    me, I obviously can see it.  But just to recall it,
24    no, I wouldn't have been able to recall it.

93

1    Q.    If you look in this chain, there's an
2    e-mail that Fran Northridge sent to you in November
3    16, 2020, and then a follow up e-mail that was sent
4    on December 2nd, 2020.
5        Do you see that?
6    A.    Yes.
7    Q.    Did you ever respond to her November 16,
8    2020, e-mail prior to her follow-up on December 2nd,
9    2020?
10    A.    I'm sure I did.  I mean, I wouldn't have
11    ignored Fran.
12    Q.    What makes you so sure?
13    A.    I don't know.  It's just wouldn't be like
14    me to -- I like Fran, so it wouldn't have been like
15    me to just ignore her.  Just guessing.
16    Q.    All right.
17            MR. PAIOFF:  I'm going to request
18        any e-mails between Ms. Kelly and anyone at
19        Townsquare, including Fran Northridge,
20        between November 16, 2020, and December
21        2nd, 2020, concerning this subject matter.
22            Now, if we scroll up to the first
23        page.

24 (Pages 90 to 93)

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

TARA KELLY

94

BY MR. PAIOFF:

Q.    Do you see you responded on December 2nd?

A.    Yes.

Q.    And you said:  Sure, we are working on it, I promise.

A.    Yes.

Q.    Why did you respond in that way?

A.    I guess I probably just wanted to give her some comfort.  You know, I know a lot of times when there are the delays in payments, media reps in particular get charged back if their invoices aren't paid.  You know, so probably just wanted to kind of give her some comfort honestly is probably why I replied that way.  I honestly don't recall this e-mail, but...

Q.    Why were there delays in payment?

A.    I think in 2020, we were playing a fair amount of catch up.  And, again, this is just speculation on my part.  If I had to guess, it was probably because we were closed for several months, all of our locations, due to COVID.  That would be my best guess.

Q.    When you say that "we were closed," do you mean -- do you mean that there's a -- the financial

95

impact on your company and that's why there was delays in payment or maybe something else?

A.    I would imagine there was a financial impact, and I'm sure everybody was impacted by it. I can't speak with certainty, but...

Q.    Do you work in the corporate office of your company?

A.    I work in a satellite office.

Q.    Where is that located just like generally speaking?

A.    Philadelphia.

Q.    Is there like a headquarters?

A.    Yes.

Q.    Where is that?

A.    In Brandywine, Maryland.

Q.    Was your accounting department -- withdrawn.

Was your accounts payable department working remotely during the pandemic?

A.    You know, I honestly don't know.  A lot of people were furloughed.  I'm not a hundred percent sure who was there.

Q.    Can we stick to --

A.    Accounting doesn't work out of my house in

96

Philly.  They are all out of Brandywine.  I don't know who was all there.

Q.    Okay.  When you say "we are working on it," what were you doing to work on it?

A.    So probably at that time, I remember fielding a number of calls from a number of people just, you know, hey, you know, you guys are back on the air, you know, can we satisfy some of this old AR, whatever it is.  So I was just fielding phone calls from the reps perspective.  Other than them bringing it to my attention, I wouldn't necessarily know if something was so far behind or whatever.

So, obviously, you know, I wanted to give Fran some comfort that since, you know, things were slowly getting back into action, that it would hopefully get us to attention.

Q.    And when you say you're fielding calls, you know, was that -- are you referring exclusively to people from Townsquare or are you referring to other vendors as well?

A.    From other vendors as well.

Q.    And those calls pertain to nonpayment of invoices?

A.    Not nonpayment, I would say slow payment.

97

Q.    What, if anything, did you do after responding to Ms. Northridge's e-mail saying that, sure, we are working on it, I promise?

A.    To the best of my knowledge, I believe payments had been made not long thereafter; unfortunately, I can't speak to directly when or how much.

Q.    What makes you think that payments were made after this e-mail?

A.    Because she would have kept contacting me if they weren't.

Q.    Is that the only reason you think payments were made?

A.    Sure.  I don't think they would have kept accepting business from me, from where I sit, if they weren't getting paid.  I don't think anybody would.  But -- so, yeah, I mean, it's -- I don't know.  I guess from where I sit no news was good news and we were able to move forward.

Q.    Who at Regency would have information on any payments that were made after this e-mail was sent?

A.    Probably Craig would be the best person to contact.

25 (Pages 94 to 97)

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

TARA KELLY

98

1          MR. PAIOFF:  I'm going to call
2     for the production of any documents
3     evidencing or refuting that payments were
4     made against any of Plaintiff's invoices
5     subsequent to the December 2nd, 2020, date
6     of this e-mail.
7          THE WITNESS:  Prior to -- so
8     December 2020, I don't -- I can't remember
9     when Craig joined us.  I still think he
10    would be the best person to talk to.
11         MR. PAIOFF:  Okay.  Let's put
12    this aside and pull up exhibit 20.
13    BY MR. PAIOFF:
14    Q.   I'm going to ask you to take a look at this
15    e-mail chain and let me know if you recognize it.
16    A.   Yes.
17    Q.   Okay.  So this bottom e-mail is from Brian
18    Lang to Craig Jones and copying you.
19         Do you see that?  Did you receive that
20    e-mail?
21    A.   Yes.
22    Q.   Can you see where Brian said:  Craig, hope
23    all is well.  Spoke with Tara earlier and she
24    directed me your way.

99

1          That e-mail was sent on March 25th, 2021.
2     Do you see that?
3     A.   Yes.
4     Q.   Do you recall that conversation with Brian
5     Lang?
6     A.   I don't.  I have no reason to doubt that it
7     happened, but I don't recall it.
8     Q.   Do you recall anything that may have been
9     discussed during that conversation?
10    A.   I don't.  I'm sure it is summed up in this
11    e-mail somewhere.  But, no, I don't recall it.
12    Q.   Okay.
13         MR. PAIOFF:  Let's scroll up.
14    BY MR. PAIOFF:
15    Q.   Do you see Craig Jones' response to Brian?
16    A.   Yes.
17    Q.   It says:  Hi, Brian.  Hope you are doing
18    well.  We have submitted your invoices for approval.
19    I'm going to stop there.
20         Do you know if, in fact, the invoices have
21    been submitted for approval at that time?
22    A.   I don't know.
23    Q.   Okay.  Do you see in the next sentence, he
24    says:  We will elevate your request for prompt

100

1     payment.
2          Do you know if that was actually done?
3     A.   I don't know.
4     Q.   Now, I'm going to ask you to take a look at
5     Brian's subsequent e-mail on April 1st, 2021, and
6     then Craig Jones reply on April 1st, 2021.
7     A.   Yes.
8     Q.   Do you see that?
9     A.   Yes.
10    Q.   Okay.  Now, referring to Craig Jones'
11    e-mail, do you know if, in fact, Regency was working
12    on approval pushing to get payment out as quickly as
13    possible at the time?
14    A.   I do not know.  I would not have been part
15    of that.
16    Q.   Why were you copied on these e-mails?
17    A.   I think Brian initiated the e-mail and
18    copied me.  I think that's how it started.  I just
19    probably thought I could help.
20    Q.   Did you have any conversations with Craig
21    Jones at this time regarding the invoices?
22    A.   Not that I remember.
23    Q.   Now, you testified throughout your
24    deposition when presented with the various budgets

101

1     for various months that in some instances, I guess
2     before you were involved, Mike Ritter was
3     responsible for approving the budgets, right?
4     A.   (Witness nods.)
5     Q.   Then for months where he was responsible,
6     you didn't have any reason to dispute that they were
7     approved, generally speaking?
8     A.   (Witness nods.)
9     Q.   And then for the months that you were
10    involved, you confirmed that those budgets were
11    approved; is that a fair statement?
12    A.   Yes.
13    Q.   Do you have -- for any of the months for
14    which Plaintiff is seeking payment of invoices in
15    this action, do you believe that the charges in
16    those invoices do not reflect media that was
17    actually purchased pursuant to the budgets that were
18    approved?
19    A.   There's no way for me to know without an
20    affidavit of performance.
21    Q.   Well --
22    A.   I mean, I don't want to speculate, right.
23    It doesn't matter what I believe.
24    Q.   Right.

**26 (Pages 98 to 101)**

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

TARA KELLY

102

1   A.     It doesn't matter what I believe.  It only
2   matters -- I have to prove that performance.  We're
3   talking a lot of --
4   Q.     Is there other ways for you --
5              MR. FRANK:  Mr. Paioff, can you
6        let her answer -- can you let her answer --
7        complete her answer, please.
8              MR. PAIOFF:  Sure.
9              If you are not finished, please
10       finish your answer.
11             THE WITNESS:  It's fine.  You can
12       go ahead.
13  BY MR. PAIOFF:
14  Q.     Are there not other ways of verifying that
15  the media was purchased aside receiving what you're
16  calling an affidavit of performance?
17  A.     No.  Not one that wouldn't be based on an
18  honor system.
19  Q.     Well, you said you're in charge of media
20  for the company, right?
21  A.     Sure.
22  Q.     So on -- let's just say, for example, on
23  the radio side, when ads are on that Townsquare
24  plays, do you ever listen to those ads?

103

1   A.     Sometimes I do, actually.
2   Q.     Sometimes you hear them, right?
3   A.     Sure.
4   Q.     Do you ever -- do you see an impact on
5   revenues from media placement on Townsquare?
6   A.     Sure.  Sure.
7   Q.     So would those be ways in which you could
8   verify that media is actually purchased on Regency's
9   behalf by Townsquare?
10  A.     No.  I actually -- I think that's an
11  oversimplification.  So there's more than one media
12  being activated at any given time, I couple that
13  with the four walls market approach of the sales
14  associates calling previous guests, us deploying
15  e-blasts, us having stuff up on our website.
16  There's lots of things that contribute to traffic to
17  sales volume.  There's a number of things that can
18  contribute to that.
19         So even if I saw a spike, I would not be
20  able to delineate and report to one specific thing
21  and say, there's -- if we had a silver bullet, trust
22  me, I would --
23  Q.     Trust you, what?
24  A.     I would be on the beach somewhere.

104

1   Q.     What do you mean if you had -- you mean a
2   silver bullet, meaning, what, in terms of a
3   marketing device?
4   A.     Oh, yeah, for sure.  Yeah.  So I guess I'm
5   trying to answer your question in saying that even
6   if I see spikes or even if I see declines, I can't
7   attribute it to one specific media, especially when
8   multiple medias are always activated at the same
9   time.
10  Q.     What if you hear -- like you said, for
11  example, you hear the advertisements on the radio,
12  isn't that an indication that Townsquare is actually
13  placing these ads?
14  A.     I can answer your question --
15             MR. FRANK:  Objection as to form.
16        You can answer.
17             THE WITNESS:  Yes, let me try to
18        answer your question in a different way.
19        If I had to rely on the fact that I heard a
20        spot to validate that my campaign ran, I
21        would be in a big world of hurt, right.
22        That's exactly why radio doesn't do it that
23        way.  That's why they have affidavits of
24        performance.  You know, even, you know, to

105

1        some degree, although we don't do it, many,
2        many clients require them to be notarized
3        as further validation that things ran when
4        they said they are running, right.
5              There's logs inside the radio
6        infrastructure that supports that those
7        things happened.  Unfortunately, I don't
8        have that proof of performance, proof of
9        product, whatever you want to call it, on
10       the digital side.
11  BY MR. PAIOFF:
12  Q.     But you do have it on the -- on the
13  broadcast side?
14  A.     Yes, sir.
15  Q.     So why is it that Townsquare -- that
16  Regency has not paid any of the outstanding
17  broadcast invoices?
18  A.     I don't know the answer to that,
19  unfortunately.  I'm sorry.
20  Q.     Okay.  Is the failure to supply an
21  affidavit of performance on the digital side the
22  reason why Regency has not paid Townsquare's
23  outstanding invoices on the digital side?
24  A.     I think it's part of --

27 (Pages 102 to 105)

**ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES**

TARA KELLY

106

1          MR. FRANK:  Objection to the
2    extent that it calls for attorney-client
3    privilege communications.
4          You can answer, otherwise.
5          THE WITNESS:  Yes.  I believe
6    that's part of it.
7  BY MR. PAIOFF:
8    Q.    Is there any other reason?
9    A.    I think that there's been some
10  inappropriate behavior in terms of, you know, what
11  we like to call sway, paid for play, whatever you
12  want to call it.  I believe that those
13  inappropriatecies happened and influenced the
14  partnership to the extent that it was.
15    Q.    Who are you referring to?  Who was
16  influenced?
17    A.    Townsquare.
18    Q.    Townsquare was influenced by whom?
19    A.    I think that Townsquare and Mike Ritter,
20  you know, lost their objectivity, I guess is the
21  best way to say it.  I think the gift cards speak to
22  that.  I think that, you know, when I met with Brian
23  and Chris Squire, I want to say it was like in the
24  summer of last year, and subsequently I met with

107

1    Brian and Rob Williams, they made no secret about
2    the fact that this has happened in a much larger
3    scenario that I could imagine, you know, so...
4    Q.    Why is Mike Ritter -- are you done?
5    A.    Sure.
6    Q.    So why is Mike Ritter still employed by
7    Regency, if you know?
8          MR. FRANK:  Objection.
9    Objection.
10        You can answer, if you know,
11    although it's not a subject matter for the
12    designee.  Go ahead.
13        THE WITNESS:  I don't know the
14    answer to that.
15  BY MR. PAIOFF:
16    Q.    Did you ever receive any gifts from
17  Townsquare at any point in time?
18    A.    I mean, we received gifts from all of our
19  media partners.  Anything that I received, no matter
20  what my intention is and how I intend to use it,
21  whether it be for, you know, company sales
22  performance rewards, whether it's for myself
23  personally, it's always approved by my boss.
24    Q.    And are you saying that's not the case with

108

1    Mike Ritter?
2    A.    I don't know.  I don't believe that my boss
3    knew about those things.
4    Q.    And when you are saying your boss, you're
5    referring to Abdul?
6    A.    Yes.
7    Q.    Did he receive any gifts ever from
8    Townsquare?
9    A.    Not to my knowledge.
10    Q.    And the gifts that you received that he
11  approved, you've accepted those gifts?
12    A.    You third person plural.  I want to be
13  clear about that.  It's not me personally.  I
14  frequently make requests from my media partners to
15  say, hey, we're having a sales training event and,
16  you know, at the question-and-answer session when
17  somebody answers right, you know, we want to be able
18  to give them prizes.  So that's not uncommon
19  practice.
20    Q.    And who is deferring the cost of those
21  prizes?
22    A.    So we require 2 percent of our investment
23  to be used for merchandising.  That's disclosed up
24  front.  It's common practice.  It's not unusual.

109

1    Q.    So how is that any different from what
2    you're claiming Mike Ritter was doing?
3    A.    I -- well, for starters, I don't believe
4    that anybody at upper management level knew about
5    it, right.  That would be like me going to, you
6    know, Odyssey or Townsquare or anybody saying, hey,
7    I really want to give my girls a holiday bonus this
8    year, do me a favor, you're going to invoice me
9    $100, but we're only going to run 80 and I want to
10  use the other 20 to get me gift cards, right.
11  That's --
12    Q.    You just said it was -- it was folded into
13  the budget.
14    A.    Uh-huh.
15    Q.    Right?
16    A.    I believe it was buried into the budget,
17  not folded into a budget.  Buried.
18    Q.    Buried.
19        No, I'm saying what you requested of
20  Townsquare to giveaways and stuff, prizes and things
21  of that nature?
22    A.    Right.  It's added value.  It's not a hard
23  cost.  It's the things we're paying for.  They are
24  not invoicing us for it.

**28 (Pages 106 to 109)**

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

TARA KELLY

110

1    Q.    You're paying for it?
2    A.    I'm sorry?
3    Q.    You're saying that you're paying for it?
4    A.    No, I said we're not paying for it.
5    Q.    You're not paying for it, Townsquare?
6    A.    We're not paying for it.  We're not being
7    invoiced for it.  We're not, you know, giving
8    personnel gift cards on the holidays.  You know,
9    anything that we are getting from any of our media
10   partner serves a purpose, you know, for the higher
11   good of performance of the company.  It's not --
12   Q.    At any point --
13   A.    I certainly would never allow somebody to
14   invoice me and use it to bonus their staff.
15   Q.    You're saying invoice you and charge you or
16   just invoice you?
17   A.    Invoice and charge.  I mean, they are
18   interchangable to me.  But it's weird, right.  It's
19   weird that a client -- that a media partner would
20   invoice me for gift cards that went to their staff.
21   Q.    And you're saying -- and you're saying that
22   -- you're saying that you were -- that Regency was
23   charged for these gift cards you're referring to?
24   A.    Originally we were invoiced for them, sure.

111

1    Q.    No.  As you sit here today, was a credit
2    applied for those charges?
3    A.    I haven't seen an invoice with a credit.
4    If they say that a credit was applied, then I can
5    only accept that it was, but I haven't seen it.
6    Q.    Okay.  And so we're talking about here, I
7    think you testified maybe somewhere around $10,000
8    worth of gift cards?
9    A.    I think it was 8- and 10- off the top of my
10   head.
11   Q.    If you look at the complaint, the complaint
12   is seeking payment of approximately $777,000 of
13   invoices?
14   A.    Yeah.
15   Q.    So let's just say, take your word for it
16   and you were charged back that 8- to 10,000 dollars,
17   would you disagree that the other 767 --
18   approximately $767,000 is still due?
19         MR. FRANK:  Objection.  Please
20   don't answer that.  It calls for
21   speculation.  It's not a subject matter
22   mentioned anywhere in your designee
23   deposition notice.
24         MR. PAIOFF:  How does it call for

112

1    speculation?  I'm asking her questions
2    about the reason why the invoices haven't
3    been paid.
4          MR. FRANK:  You've asked several
5    things.
6          MR. PAIOFF:  She says it's
7    partially the failure to deliver affidavits
8    of performance and then the other thing she
9    said was the gift cards.  So I'm trying to
10   attribute what amount of the outstanding
11   balance does Ms. Kelly attribute to the
12   gift card issue, and then I'm going to
13   examine her on what amount of that
14   outstanding balance does she attribute to
15   the failure to give affidavits of
16   performance.
17         MR. FRANK:  So you're asking her
18   to explain why the company did not pay the
19   balance of the invoice after your
20   mathematical subtraction?
21         MR. PAIOFF:  Correct.
22         MR. FRANK:  And I am telling you
23   that, first of all, she doesn't know, but
24   if she does know --

113

1          MR. PAIOFF:  Wait, are you
2    testifying for the witness or is she?
3          MR. FRANK:  You know, Mr. Paioff,
4    all day long you interrupted me and you're
5    interrupting the witness.  Please stop
6    interrupting.  It's not accidental anymore.
7    I'm explaining that she probably doesn't
8    know, but if she does, it would be based
9    upon attorney-client communications with
10   me.
11         MR. PAIOFF:  How is that possible
12   if -- if --
13         MR. FRANK:  This is our designee.
14         MR. PAIOFF:  I'm sorry, you're
15   saying that -- you're saying that the
16   reason why Townsquare -- the reason why
17   Regency hadn't paid invoices since December
18   of 2019 is because of advice of counsel?
19   It's a question, it's not rhetorical.
20         MR. FRANK:  What's your question,
21   Mr. Paioff?  Let's narrow it down so maybe
22   the witness can address it.
23         MR. PAIOFF:  Can we just do a
24   read back of the last question and answer?

**ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES**

TARA KELLY

---

114

1    (At this time, the court reporter
2    read back from the record as was requested:
3        "Q.  So let's just say, take your
4    word for it and you were charged back that
5    8- to 10,000 dollars, would you disagree
6    that the other 767 -- approximately
7    $767,000 is still due?")
8        MR. FRANK:  Objection.  Don't
9    answer that question.  I believe it's based
10   on attorney-client privilege.
11       MR. PAIOFF:  Come on.  How?  How
12   is that possibly privileged?
13       MR. FRANK:  Mr. Paioff, given --
14       MR. PAIOFF:  This precedes your
15   involvement in this case.  This precedes
16   the case altogether.
17       MR. FRANK:  Mr. Paioff, do you
18   have any more questions?
19       MR. PAIOFF:  Yes, I do have other
20   questions.
21       So, on the record, you're
22   directing your client not to answer that
23   question?
24       MR. FRANK:  Yes.

---

115

1        MR. PAIOFF:  Okay.  We're going
2    to request a privilege log of all
3    communications.  I want them to be
4    identified.
5        MR. FRANK:  You put your request
6    in writing and we will consider it.
7    BY MR. PAIOFF:
8    Q.    Aside from your claim that Townsquare did
9    not deliver affidavits and aside from your claim
10   concerning the gift cards, is there any other reason
11   why Regency is not paying the outstanding invoices?
12       MR. FRANK:  Again, I object to
13   this.  This is absolutely not a subject
14   matter for this designee.
15       You can answer.
16       THE WITNESS:  Not to my
17   knowledge.  I don't know why.
18   BY MR. PAIOFF:
19   Q.    Do you know who at the company decided to
20   withhold payment of the invoices?
21   A.    I don't.
22   Q.    Do you have authority in your role to
23   direct payment of the invoices?
24   A.    No.

---

116

1    Q.    Who at the company is authorized to direct
2    payment of the invoices?
3    A.    Our CFO.
4    Q.    Anyone else?
5    A.    Probably Abdul.
6    Q.    Okay.  Anyone besides those two
7    individuals?
8    A.    Not to my knowledge.
9        MR. PAIOFF:  I just want to take
10   a two-minute break to look over my notes to
11   see if I have any further questions, and if
12   not, we can break and if I have a couple, I
13   can ask them.  Okay?
14       MR. FRANK:  Okay.
15       (At this time, a short break was
16   taken.)
17   BY MR. PAIOFF:
18   Q.    So, Ms. Kelly, you testified earlier about
19   running a pilot, I think you used the word pilot; is
20   that accurate?
21   A.    Yes --
22   Q.    Can you --
23   A.    A test campaign.
24   Q.    A test campaign.

---

117

1        And then it was -- that was -- that plan
2    was put on pause because of COVID?
3    A.    Originally, yes.  It didn't activate
4    because of COVID.  It was supposed to happen in
5    2020.
6    Q.    It activated in 2020.  Do you remember
7    which month?
8    A.    No, it was supposed to activate in 2020.
9    Q.    Supposed to.
10       And did it eventually activate?
11   A.    It did.
12   Q.    And in which month?
13   A.    I want to say January.
14   Q.    Of 2021?
15   A.    I think so.
16   Q.    And who made the decision to activate it?
17   A.    I would say me and David Hu and Craig.
18   Q.    And what was the basis of -- withdrawn.
19       What was the reason for making that
20   decision -- or withdrawn.  Sorry.
21       Why did you make that decision?
22   A.    Why did I make a decision to activate a
23   digital campaign?
24   Q.    Yeah, to activate the digital campaign with

---

**30 (Pages 114 to 117)**

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

118

1    Townsquare at that time.
2    A.     Townsquare had obviously intimate
3    familiarity with Ashley through Mike Ritter.  In the
4    spirit and, you know, looking for a new agency, or
5    making sure that -- you know, I mean, listen, you
6    always want to audit your people and see if there's,
7    you know, somebody more talented out there, somebody
8    more eager to earn their money, you know, whatever
9    it is.  We activated the test program.
10   Q.     And did you, you know, shop around with
11   other agencies?
12   A.     For sure.
13   Q.     At that time?
14   A.     Yes.
15   Q.     And did you ultimately decide to go with
16   Townsquare?
17   A.     No.  We actually ended the test a little
18   early and decided not to go with anybody.
19   Q.     Okay.  And at that time, we're talking, you
20   know, January 2021, was Mike Ritter still on the
21   Townsquare account?
22   A.     I would hope not.  Not to my knowledge.
23   Q.     And is it fair to say that you -- you did
24   run digital campaign with Townsquare in January

119

1    2021, right?
2    A.     Correct.
3    Q.     And then the same goes for February 2021?
4    A.     I booked it.
5    Q.     You booked it?
6    A.     I booked it.
7    Q.     And then also March 2021?
8    A.     I booked March, yes.
9    Q.     You booked March as well.
10          Okay.  What prompted your decision to book
11   campaigns for those three months with Townsquare for
12   digital campaigns for those months?
13   A.     I think it's, like I said, they already had
14   familiarity with Ashley, the other two agencies we
15   brought in for the test did not.  So, you know, we
16   wanted to see how they would fair against somebody
17   who already had years of experience with us.
18   Q.     Got it.
19          Are there any lawsuits by other vendors for
20   nonpayment against Regency going on right now?
21          MR. FRANK:  Objection.  She is
22   certainly not the designee -- this is not a
23   topic that is even remotely within the
24   range of topics you addressed in your

120

1    designee deposition notice.
2           If you know of any such cases,
3    you certainly can explain that in your
4    individual capacity.
5           MR. PAIOFF:  You can answer the
6    question.
7           THE WITNESS:  Not to my
8    knowledge.
9           MR. PAIOFF:  All right.  I have
10   no further questions for this witness.
11          Alan, you said that you're going
12   to be producing another witness, is that
13   what you said this morning?
14          MR. FRANK:  No, she's the
15   witness.
16          MR. PAIOFF:  You said the second
17   witness?
18          MR. FRANK:  That's the witness,
19   you just met her.
20          MR. PAIOFF:  I understand that's
21   the witness, I just deposed her.  I am
22   saying you referred to her and another
23   person as a witness this morning.
24          MR. FRANK:  The second witness of

121

1    today as what I meant.  I thought it was
2    pretty clear too.
3           MR. PAIOFF:  Okay.
4           MR. FRANK:  Okay.
5           MR. PAIOFF:  I'm just going to go
6    on the record that we reserve the right for
7    -- a supplemental deposition of someone
8    who has knowledge of accounting practices,
9    the invoices, basically the crux of this
10   entire lawsuit and we will seek appropriate
11   relief, if we need to.
12          MR. FRANK:  Please note my
13   concerns and my objection.  Okay.  Thank
14   you.  I think we're at a point to adjourn.
15          MR. PAIOFF:  Okay.
16          (Witness excused.)
17          (Deposition via Zoom concluded at
18   4:49 p.m.)
19          (At this time, documents were
20   marked for identification as Exhibits No.
21   P-1 through P-20.)
22
23
24

TARA KELLY

122

1    C E R T I F I C A T I O N
2
3
4            I, Patrice Sweeney,
5    Professional Court Reporter and Notary
6    Public, do hereby certify that the
7    foregoing is a true and accurate transcript
8    of the stenographic notes taken by me in
9    the aforementioned matter.
10
11                - - -
12
13
14
15
16
17
18
19
20
21
22    DATE:        _____
23          Patrice Sweeney
24          Court Reporter

124

1                  EXHIBIT P-2
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

123

1                  EXHIBIT P-1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

125

1                  EXHIBIT P-3
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

32 (Pages 122 to 125)

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

TARA KELLY

126

1                    EXHIBIT P-4
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

128

1                    EXHIBIT P-6
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

127

1                    EXHIBIT P-5
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

129

1                    EXHIBIT P-7
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

33 (Pages 126 to 129)

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

TARA KELLY

|  | 130 |
|---|---|
| 1 | EXHIBIT P-8 |
| 2 | |
| 3 | |
| 4 | |
| 5 | |
| 6 | |
| 7 | |
| 8 | |
| 9 | |
| 10 | |
| 11 | |
| 12 | |
| 13 | |
| 14 | |
| 15 | |
| 16 | |
| 17 | |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |

|  | 132 |
|---|---|
| 1 | EXHIBIT P-10 |
| 2 | |
| 3 | |
| 4 | |
| 5 | |
| 6 | |
| 7 | |
| 8 | |
| 9 | |
| 10 | |
| 11 | |
| 12 | |
| 13 | |
| 14 | |
| 15 | |
| 16 | |
| 17 | |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |

|  | 131 |
|---|---|
| 1 | EXHIBIT P-9 |
| 2 | |
| 3 | |
| 4 | |
| 5 | |
| 6 | |
| 7 | |
| 8 | |
| 9 | |
| 10 | |
| 11 | |
| 12 | |
| 13 | |
| 14 | |
| 15 | |
| 16 | |
| 17 | |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |

|  | 133 |
|---|---|
| 1 | EXHIBIT P-11 |
| 2 | |
| 3 | |
| 4 | |
| 5 | |
| 6 | |
| 7 | |
| 8 | |
| 9 | |
| 10 | |
| 11 | |
| 12 | |
| 13 | |
| 14 | |
| 15 | |
| 16 | |
| 17 | |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

TARA KELLY

| | 134 |
|---|---|
| 1 | EXHIBIT P-11-1 |
| 2 | |
| 3 | |
| 4 | |
| 5 | |
| 6 | |
| 7 | |
| 8 | |
| 9 | |
| 10 | |
| 11 | |
| 12 | |
| 13 | |
| 14 | |
| 15 | |
| 16 | |
| 17 | |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |

| | 136 |
|---|---|
| 1 | EXHIBIT P-13 |
| 2 | |
| 3 | |
| 4 | |
| 5 | |
| 6 | |
| 7 | |
| 8 | |
| 9 | |
| 10 | |
| 11 | |
| 12 | |
| 13 | |
| 14 | |
| 15 | |
| 16 | |
| 17 | |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |

| | 135 |
|---|---|
| 1 | EXHIBIT P-12 |
| 2 | |
| 3 | |
| 4 | |
| 5 | |
| 6 | |
| 7 | |
| 8 | |
| 9 | |
| 10 | |
| 11 | |
| 12 | |
| 13 | |
| 14 | |
| 15 | |
| 16 | |
| 17 | |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |

| | 137 |
|---|---|
| 1 | EXHIBIT P-14 |
| 2 | |
| 3 | |
| 4 | |
| 5 | |
| 6 | |
| 7 | |
| 8 | |
| 9 | |
| 10 | |
| 11 | |
| 12 | |
| 13 | |
| 14 | |
| 15 | |
| 16 | |
| 17 | |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

TARA KELLY

138

1                    EXHIBIT P-15
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

140

1                    EXHIBIT P-17
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

139

1                    EXHIBIT P-16
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

141

1                    EXHIBIT P-18
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

TARA KELLY

142

1                    EXHIBIT P-19
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

143

1                    EXHIBIT P-20
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

TARA KELLY

## A

**Abdul** 10:23 11:19,21 25:14 25:17 69:15 108:5 116:5
**Abdul's** 12:23
**able** 21:5 32:3 48:3,13,15 92:24 97:19 103:20 108:17
**absolutely** 8:20 115:13
**accept** 111:5
**accepted** 108:11
**accepting** 97:15
**access** 50:5 87:13
**accidental** 113:6
**acclimated** 28:3
**account** 7:14 16:9 17:10 24:2 50:6 118:21
**accounting** 26:18 45:5 46:14 62:10 81:7 87:10,13 88:19 95:16,24 121:8
**accounts** 95:18
**accuracy** 23:5
**accurate** 65:21 74:1 91:6 116:20 122:7
**accurately** 89:18
**acquired** 9:23 10:5,24 18:2
**acquiring** 68:19
**acquisition** 13:13,17
**action** 5:14 23:16 26:10 53:7 88:23 91:12 92:14 96:15 101:15
**activate** 117:3,8,10,16,22,24
**activated** 24:22 69:6 103:12 104:8 117:6 118:9
**activation** 66:11
**actual** 31:14 35:24
**ad** 42:9
**add** 73:12,18
**added** 61:4 90:21,23 109:22
**addition** 60:13
**additional** 61:4
**address** 45:6 57:2,12 85:4 87:10,12,13 113:22
**addressed** 57:16 119:24
**addresses** 56:21
**adjourn** 121:14
**Admin** 50:5
**admission** 46:24 48:9

**ads** 102:23,24 104:13
**advertisements** 104:11
**advertising** 9:20 11:15,17 15:16 17:20,21 19:19,21 39:13 42:24 62:11 67:24 74:16
**advice** 113:18
**advise** 26:21
**AdWords** 50:6
**affidavit** 35:22 36:23 38:1,9 38:21 39:7,13 50:8,11,17,23 51:16 52:17 75:18 101:20 102:16 105:21
**affidavits** 34:16,20,23 39:1 40:22 41:1 49:22 50:1 51:11 55:11 61:9 104:23 112:7,15 115:9
**aforementioned** 122:9
**Afrank@alflaw.net** 2:13
**agencies** 24:23 25:2 52:11 118:11 119:14
**agencies'** 33:20
**agency** 74:10,11,16 118:4
**ago** 13:24 14:2 43:7
**Agree** 47:9
**agreement** 5:1 39:11
**agreements** 19:15
**ahead** 54:5 56:3 102:12 107:12
**air** 96:8
**airwaves** 52:10
**Alan** 2:12,12 8:5 9:4 15:10 40:13 59:24 86:23 91:9 120:11
**alarming** 47:3
**ALLISON** 2:8
**allow** 67:21 110:13
**alluded** 86:8
**altogether** 114:16
**Amazon** 45:9
**amount** 45:13,19 60:15 64:15 64:18,19 69:2 74:12 75:5,6 75:8,17 76:3 81:19 82:5 89:20 94:18 112:10,13
**amounts** 45:3 66:21 75:21
**answer** 6:10,12,12,17 8:19 12:8 14:24 15:9,10 16:12,14

17:3,5 18:22 21:4 22:22 25:8 37:10,11 38:2,7 42:16 51:20 54:5,10,23 55:14 56:2 57:14,14,19,24 58:5,7 63:9 65:10 68:6 72:15 88:2,8,15 102:6,6,7,10 104:5,14,16,18 105:18 106:4 107:10,14 111:20 113:24 114:9,22 115:15 120:5
**answered** 64:21
**answers** 6:6 36:7 57:20,21 108:17
**anticipation** 7:19,21 8:9
**anybody** 34:3 69:4 97:16 109:4,6 118:18
**anymore** 113:6
**apologies** 59:11
**appears** 49:13 71:20 92:10
**applied** 111:2,4
**appreciate** 79:16
**approach** 103:13
**approaches** 24:7
**appropriate** 121:10
**approval** 21:16 82:13 99:18 99:21 100:12
**approvals** 21:1
**approve** 20:23 69:9,12,12 72:3
**approved** 20:16,17 21:18 22:1 63:6 66:1 70:1,5 71:2 75:5 76:3,15,16,24 78:2,21 80:2 82:1 84:15,17,17,19 86:5 89:19 101:7,11,18 107:23 108:11
**approving** 26:13 71:18 77:9 77:11 78:10 79:4 101:3
**approximately** 5:19 12:1,4 14:13 111:12,18 114:6
**April** 7:9 21:8 74:9 80:2 85:20 100:5,6
**April-ish** 14:14
**AR** 96:9
**areas** 73:14
**artificially** 36:22
**Ashley** 3:23 4:4,6,7 12:13,16 12:21 13:9 60:14 118:3 119:14

TARA KELLY

**Ashley's** 13:19,19
**aside** 8:9 39:20 71:11 83:4
    98:12 102:15 115:8,9
**asked** 34:24 45:5 58:8 67:17
    112:4
**asking** 30:13 58:6 112:1,17
**asks** 23:14
**asset** 13:15
**associates** 2:12 103:14
**assume** 6:11 25:10 44:7 45:8
    55:3 89:22
**assurances** 39:20
**assured** 39:18
**ATLAS** 2:3
**attached** 3:13 4:3 43:18
**attend** 31:19
**attendance** 32:12
**attended** 31:21
**attention** 64:22 96:11,16
**attorney** 8:10 60:1
**attorney-client** 72:16 106:2
    113:9 114:10
**Attorneys** 2:6,10,14
**attribute** 104:7 112:10,11,14
**audit** 118:6
**audited** 31:13 34:9 35:21
    37:1,6 41:12 44:2
**authority** 115:22
**authorized** 116:1
**Avenue** 2:5
**Avery** 29:13,14,16,24 63:10
    67:17 72:10 77:5,6
**awarded** 60:14
**aware** 18:11 71:12 89:24
    91:7
**Ayyad** 11:21 25:17,20,21
    26:1,5,20

### B

**B** 3:11 4:1
**bachelor's** 9:11
**back** 19:11 20:12 41:7 45:22
    49:7 54:12 58:23 59:1 60:2
    62:2 64:20 65:14 66:9 73:1
    79:21 88:4 94:11 96:7,15
    111:16 113:24 114:2,4
**bad** 67:24

**balance** 112:11,14,19
**barter** 47:1
**based** 36:16 102:17 113:8
    114:9
**basically** 121:9
**basis** 55:17,17 61:13 117:18
**Bates** 43:17,22
**beach** 103:24
**becoming** 28:19
**beginning** 20:6 37:4 80:23
**behalf** 13:8 14:16 42:4 66:6
    72:12,21 73:6 84:7 103:9
**behavior** 62:12 106:10
**believe** 19:13 22:13 26:11
    27:7 29:18 32:9,22 37:23
    38:4,11 41:19,20 45:1,3,16
    46:7 53:17 55:18 59:9
    60:21,21 61:7,14 62:17
    68:17 70:4,20 71:21 72:1
    76:23 77:14 78:5,24 80:1
    82:11 87:12,14 88:21 97:4
    101:15,23 102:1 106:5,12
    108:2 109:3,16 114:9
**believing** 61:11
**benign** 53:3
**best** 7:8 9:24 14:14 17:16
    18:3 19:11 23:7 25:3 29:19
    32:1 35:13,18 45:17 46:18
    65:4 69:6 75:1 84:16 88:20
    89:21,23 94:22 97:4,23
    98:10 106:21
**bet** 88:20
**better** 46:18
**big** 61:4 104:21
**Bill** 32:13 33:10 66:24 67:7
**billed** 75:3
**Billy** 48:7 53:2 60:21 64:24
**bit** 49:24 50:1 66:13
**Black** 61:4
**blank** 32:19
**blind** 65:3 66:10
**blunt** 68:20
**boiled** 37:18
**bonus** 45:11 62:7 109:7
    110:14
**book** 119:10
**booked** 26:17 119:4,5,6,8,9

**booking** 7:9
**boss** 107:23 108:2,4
**bottom** 23:11 41:8 70:14
    71:11 73:9 77:23 90:21
    91:17 98:17
**brand** 10:3
**branding** 13:3
**brands** 11:14
**Brandywine** 89:3,4 95:15
    96:1
**break** 6:14,18 32:20 48:17
    85:10 116:10,12,15
**breakout** 50:4
**Brian** 98:17,22 99:4,15,17
    100:17 106:22 107:1
**Brian's** 100:5
**briefly** 10:11
**bring** 91:15
**bringing** 96:11
**broad** 5:23
**broadcast** 105:13,17
**broadcasts** 74:14,15,17
**broadly** 5:22
**brought** 64:22 119:15
**Bryan** 33:9
**bucket** 42:5,6,7
**budget** 3:17,18,19,20,21,22
    20:8,9 21:22,24 22:1 63:2,4
    69:21 72:1,2,13,18 72:3 73:16
    74:4 75:4,6,9,12,15,22 76:4
    76:15,16,24 77:9 78:2,10,21
    78:24 79:4 80:2,21 81:8,10
    81:20,23 82:1 85:20,21 86:5
    89:14,19 90:24 91:4 109:13
    109:16,17
**budgets** 7:11 63:6 69:9,12,12
    73:13 100:24 101:3,10,17
**bullet** 50:14 51:8 52:22 61:22
    103:21 104:2
**bumped** 75:10
**buried** 109:16,17,18
**bury** 62:13 67:23
**business** 11:9 18:1 35:2,11
    37:3,5 40:1 97:15
**butcher** 25:13
**buy** 67:21
**buying** 45:11 60:14 62:6

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

| C | | |
|---|---|---|

**C** 2:1 122:1,1
**calendar** 32:17
**call** 40:20 42:6,7 47:1 48:11 59:4,15 60:5 98:1 105:9 106:11,12 111:24
**called** 11:2 40:24 80:24 91:9
**calling** 102:16 103:14
**calls** 96:6,10,17,22 106:2 111:20
**campaign** 104:20 116:23,24 117:23,24 118:24
**campaigns** 119:11,12
**Campbell** 32:13 33:11 48:7 53:2 65:1
**capabilities** 33:9,15 34:1
**capacity** 58:5 120:4
**card** 48:10,13 64:23 112:12
**cards** 44:20,23 45:2,7,8,10,10 45:14 46:22 47:14,20 48:4 58:9 59:12 60:14 61:3 62:1 62:2,7 64:20 67:22 106:21 109:10 110:8,20,23 111:8 112:9 115:10
**case** 6:23 7:15 69:4 107:24 114:15,16
**cases** 120:2
**catch** 94:18
**catch-all** 87:9
**cementing** 70:20
**Central** 13:13 15:17 18:3 68:19
**CEO** 11:21
**certain** 82:8 88:17
**certainly** 16:17 24:13 110:13 119:22 120:3
**certainty** 14:5 19:5 46:19 55:3 95:5
**certification** 5:2
**certify** 122:6
**CFO** 26:17 27:4 28:2,5 46:17 116:3
**chain** 56:16 57:1 60:8 70:12 70:15 77:19 83:18 93:1 98:15
**challenge** 67:9,11

**change** 68:23 73:14
**charge** 61:5 64:20 67:22 102:19 110:15,17
**charged** 62:2,18 94:11 110:23 111:16 114:4
**charges** 45:20 46:1,22 48:13 101:15 111:2
**charging** 31:14
**charts** 51:3
**checks-in** 53:3
**chief** 13:23
**Chris** 106:23
**claim** 27:14 64:15 115:8,9
**claimed** 64:18
**claiming** 109:2
**claims** 26:1
**clarification** 30:13
**clarify** 6:9 15:18 88:1
**clean** 6:14
**clear** 51:5 108:13 121:2
**client** 34:3 110:19 114:22
**clients** 105:2
**close** 68:24
**closed** 37:17 94:20,23
**code** 52:5
**collaborative** 24:7
**collector** 25:1
**college** 10:16
**come** 14:7,10 20:12 73:15 114:11
**comes** 39:7
**comfort** 94:9,13 96:14
**coming** 6:21 25:2
**commence** 63:24
**commencing** 1:17
**comment** 34:12
**commercial** 52:3
**commission** 75:2
**common** 108:24
**communicate** 7:11
**communicating** 52:13 81:10
**communication** 8:4 53:10
**communications** 30:6 71:6 72:16 106:3 113:9 115:3
**company** 10:5,5,6,24 12:5,13 13:24 14:3,17 16:18,18,22 17:7,18 26:12,21 28:5 29:10

29:17 45:10 46:13 69:7 72:13 88:15 95:1,7 102:20 107:21 110:11 112:18 115:19 116:1
**comparison** 33:20
**complaint** 3:15 26:2,10 53:15 63:12,23 65:8 111:11,11
**complete** 102:7
**concern** 58:15
**concerning** 27:20 72:19 73:4 93:21 115:10
**concerns** 55:5 121:13
**concluded** 121:17
**condition** 43:8
**conditioned** 42:12 43:2
**conducting** 16:2
**conference** 1:14
**confirm** 23:5 48:13 66:1,15 70:3 71:4 75:19 85:18
**confirmed** 101:10
**confirms** 86:5
**confused** 80:5
**conjecture** 36:18
**Conklin** 32:13 33:10
**connect** 67:19
**connected** 59:8
**connection** 6:23 12:16 15:6 40:10
**consider** 115:6
**consistent** 9:3,5 73:17
**consists** 64:19
**consultant** 28:11,12,15
**consulted** 82:20
**contact** 97:24
**contacting** 97:10
**contained** 46:21
**contending** 64:19
**context** 33:14
**continue** 16:6 35:2
**continued** 3:24 37:5
**contribute** 103:16,18
**conversation** 8:14,18 9:1,5 36:14 49:15 57:5 59:7 67:14 92:21 99:4,9
**conversations** 8:8,17 9:6 25:21,24 53:3,4 92:12,17 100:20

TARA KELLY

copied 100:16,18
copying 98:18
corporate 15:24 95:6
correct 12:7 14:19,22 24:18
    35:10 36:14,15 49:17,18
    60:16 74:5 80:19 81:3,22
    85:8,24 86:10 89:23 112:21
    119:2
corrected 85:23
cost 59:11 61:3 62:14,17
    108:20 109:23
costs 45:2 47:14,19 62:13
counsel 2:8 5:1 9:8 113:18
couple 103:12 116:12
course 14:12 24:8 26:6 39:7
    56:13 61:12 74:10 84:2
court 1:1,21 22:5,11 48:23
    54:11 56:11 58:24 72:24
    114:1 122:5,24
covered 61:3
COVID 17:13 33:17 35:6,9
    53:1 94:21 117:2,4
Craig 27:1,3,4 46:17 88:17
    97:23 98:9,18,22 99:15
    100:6,10,20 117:7
creative 24:14 62:10
credit 111:1,3,4
credited 46:1,4
crux 121:9
current 13:16
currently 9:14 13:16 16:8,17
    19:6,8 87:4,8,9 88:3

———————— D ————————

D 3:1
dark 69:18
data 24:24 25:1
date 24:11 35:19 46:10 98:5
    122:22
dated 45:1
dates 7:6 66:21
David 8:11,12 24:16,19,21,23
    24:24 25:4 31:11,12 36:2
    41:17,21 60:2 117:17
Davis 13:21,22,23 25:10
day 113:4
deal 75:1

December 32:9,10 39:18 41:9
    44:21 45:1,14,20 46:21
    47:15,21 48:2,12 49:11,16
    52:21 59:10 63:2 64:24
    70:21 71:3,13 73:16 86:17
    88:4 93:4,8,20 94:2 98:5,8
    113:17
December's 69:21
decide 118:15
decided 115:19 118:18
decision 117:16,20,21,22
    119:10
declines 104:6
Defendants 1:9 2:14
deferring 108:20
define 24:3
definitely 40:18
degree 9:11 105:1
delays 94:10,16 95:2
deliberately 51:8 52:14
delineate 103:20
deliver 112:7 115:9
delivered 47:15,20
department 26:15,18 28:18
    28:19 29:3,15 46:14 51:23
    81:5 87:10 95:16,18
depending 82:14
deploying 103:14
deposed 5:17 120:21
deposition 1:3,13 5:15 6:22
    7:19,22 8:9 9:2 16:3 22:21
    25:7 57:11 72:12,20 73:5
    80:24 87:18 100:24 111:23
    120:1 121:7,17
depositions 15:20
describe 23:17
describing 88:3
DESCRIPTION 3:13 4:3
designated 18:19
designee 15:19,24 17:3 18:12
    22:21 25:7 54:3 56:1 57:10
    57:20 58:14 87:17 88:7
    107:12 111:22 113:13
    115:14 119:22 120:1
despite 48:5
detail 23:17
details 12:24

device 104:3
dialog 7:24 15:21
different 10:19 17:23 30:20
    41:16,19 51:1,22 52:12 89:2
    104:18 109:1
difficult 69:3,4
dig 40:15
digging 67:16
digital 11:15 17:23 19:23
    21:10,11,20,21 34:14 39:9
    39:13 44:2 49:23 52:8,11
    66:6 74:20 76:16 77:1,7
    78:2,21 81:20 85:20 86:24
    105:10,21,23 117:23,24
    118:24 119:12
direct 14:6 26:21 50:16 58:5
    115:23 116:1
directed 57:18 98:24
directing 114:22
directive 72:6
directly 30:1 77:6 97:6
Director 9:20
disagree 47:10 111:17 114:5
disagreement 68:14,16
disclosed 108:23
discount 74:7,11,13,23 86:8
discounted 75:2
discretions 69:8
discussed 33:22 99:9
discussion 27:17,23 34:4,11
    57:6
discussions 26:4,7,9 27:9,13
    27:19 30:2 72:18 73:3
    91:10
display 22:5
dispute 101:6
DISTRICT 1:1,1
document 22:9,10,12 23:2,6
    23:10 29:8 40:10 48:22
    63:17,24 76:20 80:12,18
    81:1,4 84:1 85:16 86:19
    89:11,13,18 91:19,23 92:6
documents 6:22 7:1 43:18,22
    63:20 98:2 121:19
dog 34:2
doing 15:19 18:1 35:2 40:1
    51:6 62:9 96:4 99:17 109:2

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

TARA KELLY

**dollars** 45:4,17,18 62:17
　111:16 114:5
**dots** 67:19
**doubt** 99:6
**due** 64:15 94:21 111:18 114:7
**duly** 5:9

---

E

**E** 2:1,1,4 3:1,11 4:1 122:1
**e-blasts** 103:15
**e-mail** 3:17,18,19,20 21:19
　39:24 40:3,6,9 43:6,8 46:24
　48:9 49:3,9,21,22 50:9
　52:18,20,23 53:11 56:9,16
　56:18,18,21 57:1,1 59:21,23
　60:7 61:17 63:1 66:17,19,24
　67:15 69:19 70:12,15,15,19
　71:5,9,11,12 73:9,15 76:11
　76:13,18 77:19 78:16,18,20
　79:13,20,22 83:4,11 84:17
　84:24 85:1,4 87:9,12,13
　92:6,9,11 93:2,3,8 94:15
　97:2,9,21 98:6,15,17,20
　99:1,11 100:5,11,17
**e-mails** 3:16,21 4:8,9 7:2,18
　7:20 8:2,5 27:7 40:21 51:15
　60:6 67:17 68:9 71:7,12
　77:4 79:9 87:11 93:18
　100:16
**E-mails121** 3:22
**eager** 118:8
**earlier** 37:1 49:3 51:10 55:10
　64:21 86:9 98:23 116:18
**early** 10:17 17:15 37:5
　118:18
**earn** 118:8
**easily** 62:10
**education** 9:10
**efficient** 79:17
**efforts** 66:6
**eight** 45:18 46:8 59:13
**either** 72:4
**elevate** 99:24
**employed** 9:14 107:6
**employee** 29:14 78:9 79:3
**employees** 12:1,4 24:9
**employment** 10:11

**encompass** 11:16
**ended** 118:17
**engage** 30:6 71:18
**enter** 19:14
**entire** 75:15 121:10
**entities** 16:2,3
**entity** 11:1,12
**entity's** 11:4
**equal** 75:6
**equity** 10:7
**error** 30:19
**ERSA** 1:21
**especially** 104:7
**ESQUIRE** 2:4,8,12
**essentially** 35:23 38:17 42:10
　50:15 67:18
**established** 74:9
**event** 108:15
**eventually** 117:10
**everybody** 37:17 95:4
**evidencing** 98:3
**exact** 35:19 43:11
**exactly** 45:5 104:22
**EXAMINATION** 1:5
**examine** 112:13
**examined** 5:9
**example** 102:22 104:11
**exceeded** 76:3
**exchange** 7:3 48:10 50:4 60:2
　68:9
**exchanged** 27:7 81:13
**exclusively** 15:14 34:14
　96:18
**excused** 121:16
**execute** 42:4
**executed** 20:5 69:6
**execution** 41:10,15 42:1,13
　43:10 50:3
**exercise** 79:14
**exhausted** 75:13
**exhibit** 22:6 41:7 48:22 56:10
　63:18 65:14 70:8 76:7
　77:16 78:13 79:7 80:8,11,15
　83:8 85:15 89:7,10 90:6
　91:16 98:12 123:1 124:1
　125:1 126:1 127:1 128:1
　129:1 130:1 131:1 132:1

　133:1 134:1 135:1 136:1
　137:1 138:1 139:1 140:1
　141:1 142:1 143:1
**exhibit-12** 86:13,16
**Exhibits** 121:20
**expect** 34:3
**expectation** 37:19
**expectations** 53:8
**experience** 62:8 119:17
**explain** 20:4 58:17 112:18
　120:3
**explaining** 113:7
**explanation** 60:24 61:24 67:9
　67:12
**explicit** 51:8 52:14
**extent** 18:11 22:18 23:17
　28:4 40:19 82:14 106:2,14
**eye** 62:11
**eyes** 65:4

---

F

**F** 122:1
**face** 76:20
**fact** 37:20 43:12 46:9 49:11
　56:24 62:21 66:15 81:23
　86:2 92:9,17 99:20 100:11
　104:19 107:2
**factoring** 73:14
**facts** 23:16
**failure** 105:20 112:7,15
**fair** 36:21 65:20 75:14 91:4
　94:17 101:11 118:23 119:16
**fairness** 50:17
**familiar** 11:1 12:13 13:4
　56:15 63:17 78:6 91:20,23
**familiarity** 13:7 118:3 119:14
**familiarize** 22:12 48:24 91:18
**Family** 9:13
**far** 57:16 96:12
**fast** 32:4 73:18
**favor** 109:8
**FCC** 52:1
**February** 35:15 78:3 89:14
　89:19 119:3
**feel** 32:14
**fielding** 96:6,9,17
**file** 43:24

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

TARA KELLY

**filed** 26:10 63:24
**filing** 5:2
**fill** 32:20
**financial** 94:24 95:3
**find** 40:14 48:16
**fine** 6:19 40:18 102:11
**finish** 36:7,8 102:10
**finished** 44:15 49:1 64:8
  78:16 102:9
**finite** 72:5
**Fios** 10:20
**firm** 5:14 10:7
**first** 6:17 13:10 18:5,14 19:3
  28:1 83:12 90:13,17 91:7
  93:22 112:23
**flagged** 45:5
**flight** 81:7
**flights** 20:9,10
**Floor** 2:5
**focusing** 23:10 31:8
**folded** 109:12,17
**folks** 65:17
**follow** 60:8 93:3
**follow-up** 39:24 67:6 93:8
**followed** 72:6
**follows** 5:10 66:20
**footprint** 13:13 18:3 68:19
**foregoing** 31:10 44:19 122:7
**form** 5:4 14:23 15:8 21:16
  37:7,9 42:15 51:19 55:13
  62:7 65:9 68:5 88:5 104:15
**formal** 53:10 72:7
**formally** 7:10 72:6
**format** 84:10,11,12
**formed** 18:6,18 19:4
**former** 29:14
**forms** 10:19
**forward** 7:16 97:19
**forwarded** 59:22,23,24 60:8
  82:10 83:4
**found** 43:17 49:4 59:15
**four** 12:3 50:14 103:13
**Fran** 7:15 59:4,7,14 83:12
  84:6 92:7 93:2,11,14,19
  96:14
**franchising** 10:19
**Frank** 2:12,12 8:15 14:23

15:8,11,18 16:1,5,10,23
17:1,11 18:7,9,16,20 22:18
25:5 36:6 37:7,12 42:15
47:7 51:19 54:1 55:13,20,24
57:9,15 58:1,6,12 65:9 68:5
72:14,19 73:4 83:5 87:16
88:5 102:5 104:15 106:1
107:8 111:19 112:4,17,22
113:3,13,20 114:8,13,17,24
115:5,12 116:14 119:21
120:14,18,24 121:4,12
**frequently** 108:14
**Friday** 61:5
**front** 53:11 92:22 108:24
**full** 69:20
**furloughed** 95:21
**furnished** 62:16
**furniture** 1:7 10:23 11:2,10
  12:14,17,20,21 42:24
**further** 61:17 71:6 105:3
  116:11 120:10

---
### G

**G** 24:16
**garden** 7:3 8:1
**general** 2:8 34:12
**generally** 11:11 95:9 101:7
**generated** 81:6 87:6
**generates** 81:4
**gentleman** 31:23
**geographical** 73:14
**gestures** 6:13
**getting** 34:17 36:21 96:15
  97:16 110:9
**gift** 44:20,23 45:2,7,8,10,10
  45:14 46:22 47:14,20 48:4
  48:10,13 58:9 59:12 60:14
  61:3 62:1,2,7 64:20,23
  67:22 106:21 109:10 110:8
  110:20,23 111:8 112:9,12
  115:10
**gifts** 107:16,18 108:7,10,11
**girls** 109:7
**give** 10:11 20:8 29:10 40:7
  62:6 94:8,13 96:13 108:18
  109:7 112:15
**giveaways** 109:20

**given** 21:16 37:16 76:3 77:12
  103:12 114:13
**giving** 6:7 110:7
**go** 7:16 23:9 25:16,17 37:18
  42:8 44:1,14 45:22 54:5
  56:2 65:14 68:21 79:14,20
  81:16 89:1 91:24 102:12
  107:12 118:15,18 121:5
**goes** 20:10 47:12 66:9 89:2,4
  91:1,1 119:3
**going** 6:5,11 8:15 15:21 16:10
  18:11 22:4,8,19 24:15 25:12
  25:12,13 28:10 31:3,5 34:18
  38:18 40:12,14,15,20 41:6
  42:3,4,5,6 44:8,12 47:5 51:6
  52:4 53:5 54:1 56:8 60:5
  62:13 63:12 64:6 67:23
  70:10,14 76:10 77:18 78:15
  79:10 83:10,21 85:13 86:15
  86:22 91:19 92:16 93:17
  98:1,14 99:19 100:4 109:5,8
  109:9 112:12 115:1 119:20
  120:11 121:5
**good** 36:17 65:17 97:18
  110:11
**graduate** 10:15
**GREENBERG** 2:3
**group** 15:14
**guess** 8:6 12:12 14:14 17:16
  18:3 19:11 25:2 65:3 92:19
  94:8,19,22 97:18 101:1
  104:4 106:20
**guessing** 93:15
**guests** 103:14
**guys** 96:7

---
### H

**H** 3:11 4:1 25:12
**hand** 6:13
**handled** 69:16 77:7
**handling** 21:1
**happen** 21:23 33:16 62:10
  75:12 117:4
**happened** 37:15 46:8 47:2
  61:16 65:1 75:23 76:1 99:7
  105:7 106:13 107:2
**happening** 48:11 60:3 62:12

TARA KELLY

hard 45:1 59:11 62:14,16 68:21 109:22
head 6:13 26:15 28:18,19 45:21 76:1 90:4 111:10
heading 61:18
headquarters 95:12
hear 52:2 103:2 104:10,11
heard 11:4 104:19
height 53:1
held 10:8
help 32:18 100:19
helpful 65:18,22
helping 79:16
helps 33:13 56:12
hereto 43:18
hey 34:18 96:7 108:15 109:6
Hi 5:13 99:17
higher 110:10
highest 9:10
history 10:12
holiday 45:7,11 62:7 109:7
holidays 110:8
Holy 9:13
honestly 12:8 53:17 72:4 88:9 94:13,14 95:20
honor 34:20 51:3,7 102:18
hope 98:22 99:17 118:22
hopefully 96:16
house 95:24
Hu 8:11,12 9:1 24:16,19,21 25:4 31:11,12 34:8 36:2 41:17,21 60:2 117:17
hundred 12:12 18:4 28:9 53:18,22 54:17 55:2 56:5 95:21
hurt 104:21

**I**

identification 48:21 121:20
identified 24:17 115:4
identify 23:15 43:21 46:15
ignore 93:15
ignored 93:11
imagine 82:6 95:3 107:3
impact 95:1,4 103:4
impacted 95:4
in-house 74:10,10

inaccurate 37:24 38:4,11
inappropriate 45:24 106:10
inappropriatecies 106:13
inappropriately 44:19,22 64:20
include 8:3
included 7:24 18:14 44:20,23 45:14 53:14,15 57:2
including 93:19
incorrect 37:24 38:5,12
indication 104:12
individual 32:22,23 57:20 73:13 120:4
individually 16:13 22:22 25:8 54:5 56:2 57:18 87:19
individuals 116:7
industry 42:23,23
inflated 36:22
influence 69:2
influenced 106:13,16,18
information 23:6 24:14 28:21 29:1 38:14,15 43:15 43:17 52:13,22 55:23 65:18 65:22 69:14 97:20
infrastructure 105:6
initiated 33:5 100:17
input 29:11
insertion 7:3,5 72:7 80:22 81:1 85:7,19 90:2,8
inside 105:5
instance 20:8 38:18 52:2
instances 101:1
intend 107:20
intended 62:18
intention 107:20
interchangable 110:18
interest 69:6
internal 8:2 24:7
interpret 36:10 50:24
interpretation 50:18,20,22
Interrogatories 3:14
interrogatory 23:14 30:14,17 30:21 31:1,3 44:13
interrupted 113:4
interrupting 113:5,6
intimate 118:2
introduced 13:10,14

invested 38:22
investment 42:21 79:22 108:22
invite 32:17
invoice 35:21 38:8 44:20 47:2 59:10 62:16 74:6 75:16 82:3,7,12 87:6 90:1 109:8 110:14,15,16,17,20 111:3 112:19
invoiced 82:19 110:7,24
invoices 4:5 7:2,24 25:21 26:13,16,22 27:10 28:22 30:3,8 31:13 34:5,9 37:2,6 37:24 38:12 41:13 42:11 43:9,14 44:2,24 45:15,20 46:6,8,10,11,20,21 47:15,20 48:1,4,12 53:13,20 54:14 55:19 59:10 60:22 64:10,16 64:22,24 65:6 74:8 75:20 82:9,21 86:17,21,24 87:2,11 87:20 88:12,22 89:1 91:12 92:14 94:11 96:23 98:4 99:18,20 100:21 101:14,16 105:17,23 111:13 112:2 113:17 115:11,20,23 116:2 121:9
invoicing 39:4 109:24
involved 26:19 36:13 82:12 101:2,10
involvement 17:19 24:19 27:5 28:16 29:21 36:16 68:24 114:15
Irv 28:10,11 29:3 30:1 67:17
ISKI 52:5
issue 62:1 68:2 112:12
issues 23:16
item 62:17
itemized 64:11
items 38:17 45:2 59:11 60:24 64:23

**J**

J-A-Z-O-U-L-I 32:6
January 21:14 35:12 50:3 52:5 76:17 77:1 81:20 82:4 90:8 91:4 117:13 118:20,24
Jared 2:4 5:13 62:5 72:4

TARA KELLY

**Jazouli** 31:24
**jeez** 33:24
**Jenkintown** 2:14
**Jersey** 13:13 15:17 18:3
  68:19
**jive** 82:15
**job** 11:12,13
**joined** 13:24 14:3 98:9
**Jones** 27:1,3,10,14,20 98:18
  100:6,21
**Jones'** 99:15 100:10
**Jpaioff@ssrga.com** 2:4
**June** 19:11,12 67:1

**K**

**keep** 7:12 91:19
**keeps** 51:23
**Kelly** 1:8 3:5 5:8,13 15:23
  22:8,24 23:13 48:20 56:15
  58:21 60:6,11 63:16 64:6
  70:10 76:10 85:13 91:18
  93:18 112:11 116:18
**kept** 51:24 97:10,14
**kind** 7:12 21:23 24:24 26:14
  27:8 34:18,19 51:3 53:7,21
  54:16 58:1 69:17 72:7
  81:10 94:12
**Klein** 28:10,11 67:17
**knew** 108:3 109:4
**know** 6:4,4 7:16 9:4 10:23
  11:13 12:8,8,24 16:19 17:9
  17:24 18:5 19:2 20:7,11
  22:9 24:13,24 25:1,12 26:15
  27:8 28:20,24 29:2,2,24
  30:18 31:4 33:19 34:2,14
  35:19 36:5,20,23 38:6,7,19
  42:8,8 43:11,11,12,15 44:7
  44:14 45:21 46:13,17 47:1
  48:10 49:1 50:2,7,24 51:3
  51:16 52:7 53:2,3,7 55:8,8
  56:10 58:16 59:20 60:3,19
  62:5,9 63:7,9,16,19 64:8
  65:2 66:1,10 67:14,18 68:20
  69:10,13,14 70:11,15,16,18
  71:13 72:8,9 74:24 75:10,11
  76:20,21,22 77:19 78:16
  79:16 80:11,18 81:8 83:2,18

85:4 87:7 88:3,15,17,19,24
89:2,5,10 90:16,17 93:13
94:9,9,12 95:20,20 96:2,7,7
96:8,12,13,14,18 97:18
98:15 99:20,22 100:2,3,11
100:14 101:19 104:24,24
105:18 106:10,20,22 107:3
107:7,10,13,21 108:2,16,17
109:6 110:7,8,10 112:23,24
113:3,8 115:17,19 118:4,5,7
118:8,10,20 119:15 120:2
**knowledge** 7:9 9:24 16:17
  23:7,15,18 25:23 26:20,24
  29:4,5,19 32:1 35:14,18
  46:16,18 47:24 65:12 84:16
  89:21,23 97:4 108:9 115:17
  116:8 118:22 120:8 121:8
**known** 67:17
**knows** 16:12
**Krystin** 32:13 33:10

**L**

**L** 2:12,12 27:1
**labeled** 83:23
**lack** 55:22
**Lang** 98:18 99:5
**larger** 107:2
**late** 31:10 32:7 38:24
**latitude** 37:16
**LAW** 2:12
**lawsuit** 9:7 25:22 26:2,23
  27:11,15 28:22 30:4,8 34:6
  42:12 64:1,11 82:22 88:13
  91:8 121:10
**lawsuits** 119:19
**layman** 41:24
**layman's** 42:3
**leading** 10:12
**leave** 32:19 50:18,20,21,22
**led** 38:10
**left** 59:9
**legal** 9:7 26:10 63:24
**let's** 10:15 21:14 42:6,7 70:7
  73:20 79:6,14 83:14 84:18
  87:5 90:19 98:11 99:13
  102:22 111:15 113:21 114:3
**letting** 68:21

**level** 9:10 109:4
**license** 13:2
**licensee** 12:18,20 13:1 15:14
**line** 38:17 41:7 45:2 47:17
  59:11 60:12,24 61:1 62:17
  64:23
**listed** 45:2 86:8
**listen** 68:20 88:24 102:24
  118:5
**listened** 52:2
**little** 14:1 49:24 50:1 66:13
  118:17
**LLC** 1:8
**LLP** 2:3
**located** 95:9
**locations** 94:21
**log** 115:2
**logged** 87:15
**logs** 51:24,24 105:5
**long** 6:15 9:21 17:24 97:5
  113:4
**longer** 31:23
**look** 22:9 30:16 32:4 40:8
  48:22 56:8 60:11 61:17,21
  66:19 76:11 77:18 78:15
  79:9 80:10 83:10,21 85:14
  89:9 90:3,16 93:1 98:14
  100:4 111:11 116:10
**looking** 7:13 22:19 34:13
  40:9 60:24 63:20 118:4
**looks** 70:21 85:1
**Loosely** 20:6
**lost** 17:12 81:9 89:5 106:20
**lot** 7:23 37:16 50:18 63:20
  89:1 94:9 95:20 102:3
**lots** 103:16

**M**

**Madison** 2:5
**main** 60:12
**maintained** 51:24
**making** 51:2 69:22 81:8
  117:19 118:5
**management** 1:8 7:14 9:17
  9:19,22 10:13 11:8 12:17,20
  12:23 18:1 19:3,7,10,14,18
  23:14 24:10 28:14,15 30:3,7

70:2 81:7,8 109:4
**Management's** 27:20
**manager** 29:18
**managing** 21:4,7 39:9 63:7
**Manhattanville** 2:9
**manner** 20:22,23 62:19
**March** 35:17 78:22 79:22
   80:4,5 99:1 119:7,8,9
**marked** 3:13 4:3 48:21 56:9
   63:17 80:11 85:14 86:16
   89:9 121:20
**market** 10:21 31:14 36:1
   103:13
**marketing** 9:20 11:14,16
   15:16 28:11 29:15,18 42:24
   104:3
**Maryland** 95:15
**materials** 43:3
**math** 73:17
**mathematical** 112:20
**Matt** 32:13,15,21
**matter** 5:23 54:3 56:1 57:10
   58:8 93:21 101:23 102:1
   107:11,19 111:21 115:14
   122:9
**matters** 102:2
**McMillan** 33:10
**Mealey's** 10:22
**mean** 24:4,6,13 29:2 33:24
   34:1 36:1,18 38:6,16 41:2,4
   42:23 44:1,22 50:16,24
   52:17 53:24 54:7,20 60:23
   61:15 65:21 69:15,17 70:17
   71:4,6 73:18 76:18 82:17
   86:23 89:21 90:3,24 92:22
   93:10 94:24,24 97:17
   101:22 104:1,1 107:18
   110:17 118:5
**meaning** 90:10 104:2
**means** 42:10
**meant** 36:10,17,19 65:2
   67:15 121:1
**media** 1:3 2:8 5:16 7:15 8:3
   11:15 13:5,8,11 14:8,11,17
   14:21 15:7 16:7 16:9 17:19,24
   19:3,6,19 24:11,20 26:5
   38:19 42:6 51:11 61:2,4

62:21 67:21 92:18 94:10
   101:16 102:15,19 103:5,8
   103:11 104:7 107:19 108:14
   110:9,19
**medias** 104:8
**meeting** 31:11,18,19,22,24
   32:7,24 33:5,7,8,11,14,23
   34:5,23 35:3 36:4 38:24
   39:3,18 49:15
**memorialized** 43:5 53:9
   81:11,12
**mentioned** 10:9 23:23 36:3
   43:6 49:14 55:1 111:22
**merchandising** 108:23
**message-service@sender**
   85:2
**met** 106:22,24 120:19
**Michael** 31:11 68:2 72:11
   78:8 79:2
**middle** 50:14 65:17 83:11
   84:24 92:5
**Mike** 13:15,18,20 14:4 15:3
   16:8,21 30:1 63:10 65:24
   68:8,13,17,20 69:8 72:10
   77:6,6,14 101:2 106:19
   107:4,6 108:1 109:2 118:3
   118:20
**million** 75:11
**mind** 18:24 32:2
**minute** 40:7,14
**minutes** 43:7
**mistake** 62:16
**model** 41:10,15 42:1,14 43:10
   50:3
**modifications** 20:19
**modified** 71:13
**money** 38:21 42:3 62:21
   118:8
**month** 7:13 20:7 21:13 32:8
   71:1,19 75:5,17 76:3,16,24
   77:12 78:3,22 80:2 82:4
   84:9,11,12 86:17 117:7,12
**monthly** 75:4
**months** 13:24 14:2 46:9 75:8
   75:15,21 94:20 101:1,5,9,13
   119:11,12
**morning** 65:17 120:13,23

**motion** 47:8
**move** 47:5 97:19
**moved** 69:21
**multi-layered** 26:14
**multiple** 24:23 47:13,18
   104:8

**N**

**N** 2:1 3:1 122:1
**name** 5:13 10:6 11:5 12:23
   25:13,16 31:24 32:5,16
**named** 10:7
**Naming** 13:3
**narrow** 113:21
**nature** 11:8 23:17 34:10
   37:14 109:21
**necessarily** 96:11
**need** 6:14 34:19,20 40:2 43:9
   43:13 58:17 121:11
**needed** 24:15
**negate** 37:20
**negotiating** 15:16
**Nelson** 29:13,14,22 63:10
**Nelson's** 29:16
**never** 59:8 110:13
**new** 1:1 2:6 13:13 15:17 18:3
   28:2 45:11 62:6 68:19
   118:4
**news** 97:18,19
**nine** 57:17
**nods** 6:13 90:14 101:4,8
**nonpayment** 91:11 92:13
   96:22,24 119:20
**Northridge** 7:16 83:12 84:6
   92:7 93:2,19
**Northridge's** 97:2
**notarized** 105:2
**Notary** 1:16 122:5
**note** 87:16 121:12
**notes** 90:20 116:10 122:8
**notice** 22:22 25:7 57:11 58:10
   58:18 62:12 87:18 111:23
   120:1
**noticed** 15:20 16:11 18:10,15
**November** 61:18 63:4 69:23
   93:2,7,20
**number** 3:13 4:3 96:6,6

103:17
**numbers** 73:13
**NY** 2:6,10
**NYC** 60:14

---
**O**
---

**O** 122:1
**oath** 6:7
**object** 16:10 54:2 115:12
**objection** 14:23 15:8 16:23
    17:11 18:7 22:20 31:12
    34:9 37:7,8 42:15 47:7
    51:19 55:13,24 57:9 58:2
    65:9 68:5 72:14 88:5,6
    104:15 106:1 107:8,9
    111:19 114:8 119:21 121:13
**objections** 5:4 44:18
**objective** 69:5
**objectivity** 106:20
**obligation** 39:12,21
**obviously** 24:6 26:17 33:16
    34:15 44:1 71:6 75:1 92:23
    96:13 118:2
**occasions** 47:13,18 76:2
**occur** 26:9 33:3
**occurred** 8:17 32:7
**Odyssey** 109:6
**office** 33:4 62:20 89:2,3 95:6
    95:8
**officer** 13:23
**offices** 37:17 88:24
**oh** 14:12 20:21 33:9,24 51:1
    52:24 84:12,14 85:22 104:4
**okay** 5:22 6:4,21 7:18 8:8,19
    10:8 11:1,4 12:4 13:4 14:3
    14:16 15:12 16:5,8,16 21:15
    21:20 22:3,15 23:8,13,23
    24:9 25:20 30:23 31:7,8
    32:11 33:2,12,22 34:4,22
    35:17 36:9 39:3 41:6 44:12
    45:13 46:20 47:4,9 49:5,14
    49:19 52:17 53:9,13 56:8,14
    60:11 64:2,6,9,14,18 65:13
    65:24 66:8,12,19,24 70:14
    70:22 71:8,11,16 76:13 77:8
    77:18 78:12,20 79:2,6,15
    80:5,6,14,17 81:4,6,12 82:9

82:20 83:10 84:7,9,15,20
    85:9,22 86:11,15 87:1,20
    88:21 90:18 91:3,14,16
    92:16 96:3 98:11,17 99:12
    99:23 100:10 105:20 111:6
    115:1 116:6,13,14 118:19
    119:10 121:3,4,13,15
**old** 2:13 45:19 67:16 96:8
**onboarded** 28:1
**once** 5:20,21 69:20
**opinion** 62:13,15
**opposed** 88:4
**optimizations** 60:13
**ORAL** 1:5
**order** 72:7 80:21,22,22 81:1
    85:7,19 90:2,8
**orders** 7:3,5
**original** 69:21
**Originally** 110:24 117:3
**outlined** 43:12
**outside** 16:18 27:8 72:19 73:3
    76:21 86:23
**outstanding** 105:16,23
    112:10,14 115:11
**overage** 61:18
**Overby** 33:10
**overlap** 23:24 24:3
**oversimplification** 103:11
**owned** 10:4
**owner** 10:22
**ownership** 68:23

---
**P**
---

**P** 2:1,1
**P-1** 3:14 121:21 123:1
**P-10** 3:22 132:1
**P-11** 3:23 133:1
**P-11-1** 4:4 134:1
**P-12** 4:5 135:1
**P-13** 136:1
**P-14** 137:1
**P-15** 138:1
**P-16** 4:6 139:1
**P-17** 4:7 140:1
**P-18** 141:1
**P-19** 4:8 142:1
**P-2** 3:15 124:1

**P-20** 4:9 121:21 143:1
**P-3** 3:16 125:1
**P-4** 126:1
**P-5** 3:17 127:1
**P-6** 3:18 128:1
**P-7** 3:19 129:1
**P-8** 3:20 130:1
**P-9** 3:21 131:1
**P.C** 2:12
**p.m** 1:17 67:1 121:18
**PA** 1:22 2:14
**packet** 44:7
**page** 3:3,12,12 4:2,2 22:17
    23:10,11,21 41:8 49:7,7
    73:12 80:17,18 83:12 84:22
    92:5 93:23
**pages** 83:22
**paid** 46:11,19 53:16 55:1
    56:6 82:7 94:12 97:16
    105:16,22 106:11 112:3
    113:17
**Paioff** 2:4 3:8 5:12,13 8:23
    15:1,19,23 16:4,7,15,20
    17:5,8,17 18:13,17,21 19:1
    22:4,7,16,23 23:9,12,20,22
    25:11 30:10,12,24 31:2 36:6
    36:8,12 37:22 40:19,23
    42:18 44:8,11 47:4,9,11
    48:19 49:6,8 52:16 54:6,9
    54:23 55:6,16,21 56:7 57:13
    57:22 58:3,4,9,16,20,22
    59:5 60:4,10 63:11,15 64:2
    64:5 65:13,15 66:12,14
    68:10 70:7,9 72:17,23 73:8
    73:10 76:7,9 77:15,17,22
    78:1,12,14 79:6,12 80:7,9
    83:7,9,14,17 84:21,23 85:12
    86:3,4,11,14,18,20 87:20,22
    88:11 89:6,8,16,17 90:5,9
    90:19,22 91:15,22,24 92:2,4
    93:17 94:1 98:1,11,13 99:13
    99:14 102:5,8,13 105:11
    106:7 107:15 111:24 112:6
    112:21 113:1,3,11,14,21,23
    114:11,13,14,17,19 115:1,7
    115:18 116:9,17 120:5,9,16
    120:20 121:3,5,15

pandemic 95:19
paperwork 11:6
paragraph 60:12 63:13 64:3
    64:4,11,14 69:20
paragraphs 64:7
Parallel 10:7,22
part 13:12 15:13 21:24 24:21
    34:10 36:19 39:12 47:5
    55:8 57:17 59:17 61:8
    66:10 69:11 76:19 94:19
    100:14 105:24 106:6
partially 112:7
particular 45:24 94:11
parties 18:18
partner 67:21 110:10,19
partners 34:13,14 52:11
    107:19 108:14
partnership 106:14
passed 40:13
passing 29:4
Patrice 1:15 122:4,23
pause 117:2
pay 26:22 112:18
payable 95:18
paying 43:9 87:2 109:23
    110:1,3,4,5,6 115:11
payment 26:13 42:11 43:14
    48:1 53:19 54:14 55:18
    64:11 65:7 82:20 94:16
    95:2 96:24 100:1,12 101:14
    111:12 115:20,23 116:2
payments 94:10 97:5,8,12,21
    98:3
PDF 83:22
pending 6:16,16
people 26:19 50:24 87:12
    95:21 96:6,19 118:6
percent 12:12 18:4 28:9
    53:18,22 54:18 55:3 56:5
    57:18 74:14 95:21 108:22
perform 19:7
performance 33:21 34:16,21
    35:22 36:23 38:1,9,21 39:8
    41:2,3,23 42:22 43:13 44:6
    49:23 50:8,11,17,23 51:11
    51:17 55:11 61:9 62:14
    75:18 101:20 102:2,16

104:24 105:8,21 107:22
    110:11 112:8,16
performed 19:9,16 39:5,14
period 39:15,16 66:11 77:14
periods 17:23
peripheral 29:4
person 15:2 32:14,24 66:5
    97:23 98:10 108:12 120:23
personal 6:2,3
personally 14:11 107:23
    108:13
personnel 110:8
persons 23:15
perspective 71:19 96:10
pertain 26:7 53:14 96:22
pertaining 17:2
Philadelphia 1:22 33:4 89:3
    89:4 95:11
Philly 96:1
phone 59:3 96:9
phrase 35:24
pie 51:2
pilot 24:21 33:15,18,19 35:8
    53:6 116:19,19
pitching 34:3
place 13:14 17:20,21 50:9
placed 13:8
placement 103:5
placing 15:15 104:13
plaintiff 1:5 2:6,10 5:14 13:4
    40:22 44:19 47:13,19,24
    101:14
Plaintiff's 22:5 48:21 56:9
    63:18 80:11 85:14 86:16
    89:10 98:4
plan 41:10,15,24 42:1,2,13
    43:9 50:3 53:7 70:21 117:1
planning 66:11
plans 11:14
platform 85:5
platforms 52:8
play 106:11
playing 94:17
plays 102:24
Plaza 1:22
please 6:8,12 16:6 36:6 43:21
    48:22 50:1 54:4 58:23 76:8

89:9 102:7,9 111:19 113:5
    121:12
plural 108:12
point 14:10 25:9 49:19 52:21
    54:4 58:7 67:8,10,11 87:14
    107:17 110:12 121:14
points 41:16,19 50:15 51:8
    52:22 61:22
pony 34:2
possess 23:15
possible 100:13 113:11
possibly 17:15 26:16 41:20
    60:2 114:12
post-COVID 12:9
postmortem 21:23
PR 11:14
practice 67:24 68:3 76:19
    108:19,24
practices 81:7 121:8
pre-COVID 12:10
precedes 114:14,15
predate 65:8
predicated 53:21,23 54:17,20
prepare 29:7
prepared 50:2 84:5 85:19
preparing 33:15
presence 72:19 73:4
present 8:18 51:2 72:3
presented 21:22 36:24 62:19
    62:20 77:9,12 100:24
presenting 71:18
pretty 11:15 40:13 121:2
prevent 75:12
previous 47:2 68:22 103:14
previously 10:3
prior 6:21 11:7 13:16 14:17
    14:20 21:4 28:19 38:24
    39:3,17 47:15,20 48:1,11
    52:22 68:18 69:16 74:24
    76:6 93:8 98:7
privilege 72:16 106:3 114:10
    115:2
privileged 114:12
privy 71:7
prizes 108:18,21 109:20
probably 17:14 18:2 28:1,4
    28:23 29:4 32:17 35:13,16

TARA KELLY

35:18 36:20 40:7,14 41:16
46:5,7,14,17,17 72:10 86:22
86:22 88:20 89:23 91:6
94:8,12,13,20 96:5 97:23
100:19 113:7 116:5
**problem** 39:19 79:18
**procedure** 71:17,22 72:2
**process** 6:5 20:4 21:24 71:16
78:6 79:1 82:13 87:1,24
88:1,3
**processing** 65:23
**produced** 15:24 16:1 40:10
72:12,20 73:5
**producing** 120:12
**product** 105:9
**production** 40:11,21 60:5
98:2
**Professional** 1:15 122:5
**program** 118:9
**promise** 94:5 97:3
**promised** 47:13,19
**promotion** 20:9
**promotions** 20:11
**prompt** 99:24
**prompted** 57:8 59:2 70:18
119:10
**proof** 41:2,3,23 42:22 43:12
44:6 105:8,8
**proposal** 7:17 20:12,15,15,17
20:20,24 21:21 77:12 84:4,5
84:9,15
**proposals** 7:24 21:18
**proposed** 75:4
**prove** 102:2
**provide** 6:6 16:12 19:6 20:7
39:12,19,22 40:2 51:5
**provided** 37:2 40:20 44:2
51:11
**providing** 39:1 51:17
**proving** 31:13
**provision** 42:13 43:2 55:22
**Public** 1:16 122:6
**publisher** 50:5
**pull** 32:17 43:24 58:10 70:7
77:15 78:12 79:6 80:7 83:7
86:13 89:6 90:5 98:12
**purchase** 2:10 19:18 80:21

**purchased** 19:22 101:17
102:15 103:8
**purchases** 20:1,5 51:12 55:12
**purpose** 17:4 33:7,8 110:10
**purposes** 30:13
**pursuant** 64:15 101:17
**push** 61:5
**pushing** 100:12
**put** 7:17 20:12 40:3 42:5,7
53:10 58:2 63:12 69:22
74:10 76:7 86:11 98:11
115:5 117:2

---

## Q

**quantify** 65:5
**question** 5:5 6:8,16,16 8:21
18:22 20:2 38:3 43:1,1
44:13,15 47:6 54:7 57:24
58:23 62:24 63:9 66:3
70:17 88:16 104:5,14,18
113:19,20,24 114:9,23
120:6
**question-and-answer** 108:16
**questioned** 46:7
**questioning** 46:8
**questions** 6:6,10 17:2 31:5
57:17 67:6 112:1 114:18,20
116:11 120:10
**QuickBooks** 87:15
**quickly** 100:12

---

## R

**R** 2:1 122:1
**R1** 90:17
**radio** 7:10 10:18 17:23 19:23
20:7,11 21:9,10,18 24:14
34:15 35:13,16,19 39:6,8
51:13,14,15,18,23 52:2,3
53:14 55:11,19 74:18 84:13
84:14 85:21,22,23 89:14,19
102:23 104:11,22 105:5
**raise** 22:20
**raised** 31:12 34:9,17
**ran** 52:6,6,7 104:20 105:3
**range** 43:22 119:24
**rate** 31:14,15 36:1,21,22
**rates** 50:4

**reached** 59:12
**read** 31:3 44:12 54:12 58:17
58:23 59:1 64:7 67:4 73:1
113:24 114:2
**reading** 44:15
**real** 32:4 46:19 73:18
**really** 17:16 37:18 109:7
**reason** 37:4,23 38:4 51:9
53:19 54:13 61:7,11 62:23
70:4 71:21 72:1,11 76:23
77:3 78:5,23 80:1 88:21
97:12 99:6 101:6 105:22
106:8 112:2 113:16,16
115:10 117:19
**recall** 28:2,7 32:8 67:13,13
75:24 82:11 90:4 91:13
92:20,23,24 94:14 99:4,7,8
99:11
**receipt** 67:15
**receive** 11:14 34:23 50:5,6
55:11 56:24 82:3,9 88:12
92:9 98:19 107:16 108:7
**received** 37:6 65:22 88:23
107:18,19 108:10
**receiving** 37:20 87:2 102:15
**recipient** 57:2
**recognize** 22:10 76:13 79:20
80:12,17 84:1 89:11 98:15
**recollection** 92:11
**reconcile** 61:24
**record** 6:14 54:12 58:2 59:1
63:22 73:1 87:17 114:2,21
121:6
**recurring** 74:12
**red** 79:21
**redacted** 59:17,19 82:24 83:2
**reduced** 74:1
**refer** 25:13 35:24 41:7 70:14
**reference** 40:12
**referred** 31:18 43:23 80:24
120:22
**referring** 10:1 30:20 49:3
61:2 74:18 81:2 96:18,19
100:10 106:15 108:5 110:23
**refers** 63:1
**reflect** 64:4 76:15 78:20
81:19 89:18 101:16

TARA KELLY

**reflected** 48:14
**refresh** 92:11
**refuting** 98:3
**regarding** 9:1 25:21 27:10,14
   28:21 30:3,7 34:5 59:10
   92:13 100:21
**Regency** 1:7,7 9:17,18,21
   10:5,12 11:2,8 12:17,19,20
   12:22 18:1 19:3,7,10,14,18
   20:17,23 23:14 24:10 27:20
   28:13,15 30:3,7 31:21 37:3
   37:4 39:4 60:7 62:2 63:6
   64:19 66:7 68:18 70:1
   71:17 72:21 73:6 74:6,7
   78:9 79:3 82:1,3,9 87:1
   88:12,23 97:20 100:11
   105:16,22 107:7 110:22
   113:17 115:11 119:20
**Regency's** 103:8
**REICH** 2:3
**reiterate** 53:7
**reiterating** 36:3
**related** 6:1 7:24 29:6 33:24
**relationship** 15:4,7 18:5,17
   19:2 27:6,21 29:22 68:14,18
   69:1
**relevant** 23:16
**relief** 121:11
**rely** 104:19
**remember** 6:5 29:19 32:16
   45:5 57:5 59:13 96:5 98:8
   100:22 117:6
**remitted** 75:21
**remotely** 95:19 119:23
**remove** 47:14,19
**removed** 46:6 48:15
**rendered** 38:13 48:1
**repayment** 65:7
**repeat** 54:10 72:22
**repeating** 18:24
**rephrase** 6:8
**replied** 94:14
**reply** 100:6
**report** 11:18,19 12:1 13:20
   14:4,6 25:4 30:1 103:20
**reported** 30:1 77:6
**reporter** 1:15 6:13 22:5,11

48:23 54:11 56:11 58:24
   72:24 114:1 122:5,24
**REPORTERS** 1:21
**reporting** 11:23
**reports** 25:10
**represent** 63:22
**represents** 5:14
**reps** 7:15 94:10 96:10
**request** 23:11 41:9,11,12,14
   41:22 43:15 44:6 49:22
   50:10,10,12,13,15 52:22
   74:7,23 93:17 99:24 115:2,5
**requested** 41:21 54:12 55:23
   59:1 73:1 109:19 114:2
**requesting** 40:22
**requests** 108:14
**require** 42:22 105:2 108:22
**required** 43:13 50:19 52:15
**requirement** 39:21 40:1
**reserve** 121:6
**reserved** 5:5
**respect** 24:20 28:17 39:13
   87:2
**respective** 57:1
**respectively** 20:9 57:3
**respond** 18:12 58:14 93:7
   94:7
**responded** 65:1 87:19 94:2
**responding** 88:2 97:2
**responds** 66:24
**response** 28:24 30:16,17,17
   30:20,21 31:1,6,8 34:8
   43:16,23 44:10,14,17,18
   45:23 47:12 65:16 66:17
   67:2,4 79:10 83:12 99:15
**responses** 29:7,11
**responsibilities** 11:12,13
   69:11
**responsible** 15:15 26:12,15
   68:22 77:8,11 78:9 79:3
   101:3,5
**responsive** 6:12 47:8
**result** 55:4 59:16
**retailer** 11:10
**return** 59:15 61:2
**reveal** 8:16
**revenues** 103:5

**review** 6:22 7:1,18,20,21 8:2
   20:13,15 23:2 33:8,14 56:10
   69:12 84:4 86:19
**reviewed** 7:2,2
**revised** 90:7,8,10,10,11
**revision** 90:12,13
**revisions** 89:22,24 90:4,15
**rewards** 107:22
**rhetorical** 113:19
**right** 16:5 35:6 38:9 54:22
   60:22 87:21 92:2 93:16
   101:3,22,24 102:20 103:2
   104:21 105:4 108:17 109:5
   109:10,15,22 110:18 119:1
   119:20 120:9 121:6
**rights** 13:3
**risk** 68:20
**Ritter** 13:15,18,20 14:4 15:3
   16:8,21 17:2 23:23 24:1
   31:11 63:10 66:4,15 68:2,8
   68:13 69:8 72:11 78:8 79:2
   101:2 106:19 107:4,6 108:1
   109:2 118:3,20
**Road** 2:9,13
**Rob** 107:1
**role** 10:12 15:6 17:18 26:17
   26:18 29:16 58:2 115:22
**room** 50:18,20,21,22
**run** 109:9 118:24
**running** 29:3 105:4 116:19

---

**S**

**S** 2:1 3:11 4:1
**sales** 13:19 103:13,17 107:21
   108:15
**satellite** 95:8
**satisfy** 96:8
**satisfying** 55:5
**saw** 11:6 103:19
**saying** 12:19 18:18 21:3,6
   48:5 58:12 97:2 104:5
   107:24 108:4 109:6,19
   110:3,15,21,21,22 113:15
   113:15 120:22
**says** 27:1 30:17 31:9 41:8
   43:17 45:24 47:18 50:2
   58:11 60:14 61:1,18 69:20

TARA KELLY

79:21 83:13 84:17 85:1
90:17 99:17,24 112:6
**SCC** 34:16
**scenario** 20:12 81:16 107:3
**scenarios** 75:23
**scheduled** 33:16
**SCHWARTZ** 2:3
**SCO** 38:19 42:7
**scope** 25:6
**screen** 64:4
**scroll** 22:11,17 23:21 30:10
31:1 44:9 48:23 49:2,6,24
56:11,13 63:14 64:3 66:13
70:10 71:8 73:8,24,24 77:22
83:15 84:18,21 86:3,18
89:16 90:19 91:16,17 93:22
99:13
**sealing** 5:2
**second** 31:9 69:19 73:9 79:22
84:22 92:5 120:16,24
**secret** 107:1
**section** 82:24
**see** 21:14 22:20 23:13,18
24:16 27:1 30:17 31:16
34:20 43:9,19 46:2 47:16,22
49:9 58:13,15 59:17 60:12
60:17 61:1,5,21 63:1 64:10
64:14 65:16 66:22 67:2
69:19 71:9 74:1 79:21
82:24 84:24 85:16 92:6,23
93:5 94:2 98:19,22 99:2,15
99:23 100:8 103:4 104:6,6
116:11 118:6 119:16
**seek** 121:10
**seeking** 47:24 101:14 111:12
**seeks** 64:11
**seen** 22:13 30:14 56:2 63:19
70:11 76:14 77:20 78:18
83:18 86:21 111:3,5
**send** 56:24
**sender** 57:2
**sending** 70:18
**sense** 36:17 68:1 82:15
**sent** 24:14 40:6 49:9,11 50:17
52:20,23 70:15,16 81:14
87:11 93:2,3 97:22 99:1
**sentence** 31:9 43:16 45:23

61:8 99:23
**separate** 15:22
**Separately** 41:8
**September** 1:16 9:24
**series** 6:6 86:16
**serves** 110:10
**services** 1:8 9:17,19,22 10:13
19:7,10,15,19,21 39:4,14
74:7
**Services'** 11:9
**session** 108:16
**shake** 36:21
**share** 39:23 41:10,15 50:3,3
66:20
**shared** 9:4 86:24
**shop** 118:10
**short** 48:17 85:10 116:15
**show** 34:2 44:1,3 52:1 86:15
**showing** 48:20
**shown** 80:14
**showrooms** 13:12 15:17
**shut** 35:19
**side** 8:12 34:15,15 39:6,8,9
51:18,23 62:15 67:16 74:20
86:12 102:23 105:10,13,21
105:23
**sight** 51:5
**sign** 38:8
**signature** 22:24
**signing** 5:2 23:3,6
**silver** 103:21 104:2
**sipping** 67:16
**sir** 105:14
**sit** 62:5 89:24 91:3 97:15,18
111:1
**situations** 89:1
**SLADKUS** 2:3
**slice** 42:8
**slow** 96:24
**slowly** 91:17 96:15
**small** 10:20
**social** 11:15 38:19 42:6
**solely** 15:15
**somebody** 62:15 108:17
110:13 118:7,7 119:16
**sorry** 7:20 8:21,22 12:21 14:9
14:20 18:23 20:22 37:8

41:18 63:13 68:7 72:22
74:22,23 76:16 77:9 85:23
87:11 90:1 105:19 110:2
113:14 117:20
**sort** 39:11
**sought** 65:8
**sound** 6:19
**sounding** 68:20
**South** 1:21
**SOUTHERN** 1:1
**speak** 8:12 36:11 39:6,9,17
55:2 74:24 76:5 78:24 95:5
97:6 106:21
**speaking** 11:11 20:6 95:10
101:7
**spearheading** 66:6
**specific** 7:6 38:10 43:21,22
50:19 103:20 104:7
**specifically** 43:14 50:10 53:1
59:14 75:24
**speculate** 101:22
**speculation** 94:19 111:21
112:1
**spelling** 32:2
**spend** 42:3,21
**spent** 38:22,22 62:21 75:5,9
75:17 76:3
**spike** 103:19
**spikes** 104:6
**spirit** 50:16 118:4
**spit** 7:12
**Spoke** 98:23
**spoken** 9:4 68:8
**spot** 104:20
**spots** 24:14 65:3 66:10 69:18
75:10
**Squire** 106:23
**staff** 37:17 110:14,20
**stamp** 43:18
**stand** 85:23
**Standard** 74:16
**start** 21:11 33:15 35:7 87:5
**started** 14:18,20 21:7,9 24:11
53:6 59:16 60:23 100:18
**starters** 109:3
**starting** 7:8 83:11
**starts** 60:13

TARA KELLY

**stated** 60:20,22
**statement** 3:23 4:4,6,7 61:14 65:21 101:11
**STATES** 1:1
**station** 52:7
**stenographic** 122:8
**stick** 95:23
**stint** 10:20
**stipulate** 79:8
**stipulated** 39:24
**stop** 92:2 99:19 113:5
**strategy** 13:23
**Street** 1:21
**strike** 47:5
**strokes** 5:23
**structures** 19:24
**struggled** 68:23
**stuff** 7:4 8:1 103:15 109:20
**subject** 5:23 25:22 26:22 27:11 28:22 30:4,8 31:9 34:6 42:12 44:18 54:3 56:1 57:10 58:7 82:22 87:17,18 88:13,22 91:12 92:14 93:21 107:11 111:21 115:13
**subjects** 18:10 25:6
**submit** 20:14
**submitted** 99:18,21
**subsequent** 34:22 59:21 60:6 90:15 98:5 100:5
**subsequently** 106:24
**substance** 8:13,24 59:6 92:20
**substantiate** 36:23 47:3 60:22
**subtraction** 112:20
**successful** 69:22
**sufficient** 67:20
**suggest** 8:16
**Suite** 1:22 2:9
**sum** 8:13,24 59:6 92:20
**summed** 99:10
**summer** 106:24
**summons** 63:23
**sunsetted** 10:4
**supplemental** 121:7
**supply** 105:20
**support** 24:15 38:21 50:8 60:15 61:10

**supported** 38:23
**supports** 105:6
**supposed** 30:19,20 33:18 117:4,8,9
**sure** 6:20 7:7 12:12,22 18:4 20:3,21 25:15 27:22 28:6,9 30:22 33:6 36:20 39:2 40:13,15 41:4 43:4 44:16 46:5 48:3 49:13 53:17,18,21 53:22 54:16,18 55:1,9 56:5 60:3 63:19,21 65:23 68:15 69:5,15,16,22 73:11 75:10 75:23 76:1,12 81:8 82:16 84:13 88:10,14 92:10 93:10 93:12 94:4 95:4,22 97:3,14 99:10 102:8,21 103:3,6,6 104:4 107:5 110:24 118:5 118:12
**sway** 106:11
**Sweeney** 1:15 22:16 23:20 30:24 32:2 44:9 54:10 58:22 63:11 66:13 72:23 77:23 122:4,23
**sworn** 5:9
**system** 7:11,14 34:20 51:4,7 102:18

**T**

**T** 3:11 4:1 122:1,1
**T-A-O-U-F-I-K** 32:5
**tactic** 60:13
**take** 6:14,15,17 20:13 22:8 40:14 48:22 51:4 56:8 61:21 68:2 76:20 77:18 78:15 83:10,21 85:14 89:9 98:14 100:4 111:15 114:3 116:9
**taken** 1:14 48:18 85:11 116:16 122:8
**takes** 62:11
**talented** 118:7
**talk** 98:10
**talking** 102:3 111:6 118:19
**tally** 7:12
**Taoufik** 31:24
**Tara** 1:8 3:5 5:8 8:15 98:23
**team** 24:13 40:13 45:12 61:3

62:6 69:1 77:6
**teams** 60:15
**tell** 12:10 21:5 28:6 58:13 59:19 72:4,5
**telling** 112:22
**ten** 10:18,19 58:8
**term** 36:2,5
**terms** 7:6,6 24:1 41:24 42:3 44:17 104:2 106:10
**test** 24:22 33:15,18,19 53:6 116:23,24 118:9,17 119:15
**testified** 5:9 21:7 37:1,2 51:10 100:23 111:7 116:18
**testify** 55:10
**testifying** 113:2
**testing** 35:8
**Thank** 121:13
**Thanks** 65:17 66:20 83:13
**thing** 8:6 21:23 103:20 112:8
**things** 34:13 50:7 51:1,22 68:22 69:5 75:11 89:5 96:14 103:16,17 105:3,7 108:3 109:20,23 112:5
**think** 5:20 10:21 11:6 13:21 18:20 21:7,14 26:14,18 29:2 29:3,5 32:1,23 34:12 37:13 37:18 42:20 53:5,5 54:2,8 58:13 59:12 60:21 61:15 64:21 68:23 78:4 80:14 87:14 88:18 91:9 94:17 97:8,12,14,16 98:9 100:17 100:18 103:10 105:24 106:9 106:19,21,22 111:7,9 116:19 117:15 119:13 121:14
**third** 60:11 108:12
**thought** 100:19 121:1
**thread** 48:9 59:16
**threads** 76:19
**three** 13:24 14:1 25:2 33:20 61:21 64:7 119:11
**time** 5:5 6:15 14:7,10 17:9 19:9 24:5 40:16 41:20 48:17 49:19 52:6,21 54:11 58:18,24 63:8 66:5 67:4 68:21 70:3 71:16 72:2,24 78:7,8 79:1,2 85:10 87:5

96:5 99:21 100:13,21
  103:12 104:9 107:17 114:1
  116:15 118:1,13,19 121:19
**times** 5:19 52:24,24 58:8
  59:13 94:9
**title** 9:18 29:20
**titles** 10:9
**TKelly@Regencyfurnitur...**
  56:19
**today** 6:21 72:12,20 73:5
  90:1 91:3 111:1 121:1
**today's** 18:12
**told** 45:6
**top** 45:21 59:17 71:9,12
  73:15 76:1 90:4 92:7 111:9
**topic** 16:11 22:21 88:7
  119:23
**topics** 18:15,21 57:12,15
  119:24
**total** 12:6 45:13,19 59:13
  64:15,18 73:15 79:22
**totaled** 45:3
**totally** 47:8
**Townsquare** 1:3 2:8 5:15
  7:10 8:3 13:5,11 14:8,11,17
  14:21 15:7 16:9 17:19,24
  19:3,6,14,19 24:4,10,20
  26:5 27:6,21 28:17 29:23
  31:12,13 32:11 34:17 35:3
  35:12 37:3,5 39:1,4 40:4
  41:9,14 46:5 49:15 51:10
  61:2 62:6,15 68:14,18 69:1
  69:9 71:17 74:6 75:16
  77:13 78:10,21 79:4 81:17
  81:21 82:4,10,21 84:7 85:9
  85:20 91:11 92:13,18 93:19
  96:19 102:23 103:5,9
  104:12 105:15 106:17,18,19
  107:17 108:8 109:6,20
  110:5 113:16 115:8 118:1,2
  118:16,21,24 119:11
**Townsquare's** 17:10 24:1
  26:1 39:12 42:11,13 45:11
  53:13 105:22
**traffic** 51:23 103:16
**trained** 62:11
**training** 108:15

**transcribe** 32:3
**transcript** 1:13 5:3 122:7
**translating** 25:1
**translation** 81:9
**transmit** 85:7
**tremendous** 69:2
**trial** 5:6
**Troy** 13:21,22,23 25:10 33:10
**true** 60:17 61:8 62:22 122:7
**trust** 38:6 103:21,23
**truth** 28:6 61:14
**truthfully** 62:18
**try** 104:17
**trying** 28:3 67:19 104:5
  112:9
**TSM** 61:2
**turn** 62:14 63:13 67:22
**TV** 34:15
**two** 50:14 51:22 88:24 116:6
  119:14
**two-minute** 116:10
**type** 17:21 19:15,18,21 29:5
  39:21 42:21
**types** 46:24

U

**Uh-huh** 61:20 109:14
**ultimately** 118:15
**uncommon** 108:18
**uncover** 48:3
**understand** 6:8,11 20:2 37:8
  120:20
**understanding** 15:13
**unfortunately** 97:6 105:7,19
**unheard** 42:23
**United** 1:1,22
**universe** 42:20
**unresponsive** 47:6
**unsure** 46:12
**unusual** 59:15 108:24
**upcoming** 9:1
**upper** 109:4
**urge** 18:11
**use** 36:2 56:21 87:15 107:20
  109:10 110:14
**uses** 87:10
**utilized** 72:2

V

**validate** 104:20
**validating** 26:16
**validation** 105:3
**value** 76:20 109:22
**variety** 7:3 8:1
**various** 73:13 100:24 101:1
**varying** 45:3
**vendor** 81:14 82:14
**vendors** 28:4 87:3 96:20,21
  119:19
**verbally** 6:12
**verification** 40:24
**verify** 38:7 84:18 103:8
**verifying** 102:14
**version** 22:13 90:11
**versus** 26:16 51:5 62:14
**Virtually** 57:11
**Visa** 45:9
**vision** 51:5
**voicemails** 59:9
**voices** 52:3
**volume** 103:17
**VP** 13:19
**vs** 1:6

W

**Wait** 113:1
**waived** 5:3
**waiving** 31:10 44:19
**walls** 103:13
**want** 7:8 9:23 17:13 28:8
  30:18 36:11 40:16 43:24
  47:1 48:11 50:20 57:23
  58:10,18 73:11,19 85:18
  101:22 105:9 106:12,23
  108:12,17 109:7,9 115:3
  116:9 117:13 118:6
**wanted** 36:20 37:21 62:6
  68:24 94:8,12 96:13 119:16
**wasn't** 18:19 38:22,23 39:8
  40:20 43:1 48:3 63:7 66:10
  70:2,4 71:22 72:2 80:2
**waste** 40:16 58:18
**way** 25:3 43:5 45:8 52:8 65:4
  72:5 94:7,14 98:24 101:19
  104:18,23 106:21

ways 41:4 52:12 102:4,14
  103:7
we're 11:10 24:6 34:18 42:4,6
  73:11 79:19 102:2 108:15
  109:9,23 110:4,6,6,7 111:6
  115:1 118:19 121:14
we've 66:1
web 1:14
website 103:15
Wednesday 1:16
weeds 12:24
weeks 90:21,23
weird 110:18,19
went 10:22 91:2 110:20
weren't 44:2 55:4 56:5 77:3
  89:22 97:11,16
Williams 107:1
withdraw 62:24 70:17
withdrawn 15:5 20:16 26:8
  27:18 49:20 54:8 71:1,23
  75:14 77:10 87:23 95:17
  117:18,20
withheld 53:20 54:15 55:18
withhold 115:20
witness 3:3 8:22 15:10,12
  16:14,16,24 17:6,12 18:8,23
  25:9 36:9 37:11,13 40:21
  42:17 51:21 54:22,24 55:15
  56:4 59:3 65:11 68:7 73:7
  79:8 83:16 86:19 88:9 90:7
  90:14,20 91:20 92:1 98:7
  101:4,8 102:11 104:17
  106:5 107:13 113:2,5,22
  115:16 120:7,10,12,15,17
  120:18,21,23,24 121:16
word 51:4 111:15 114:4
  116:19
words 42:9 43:11
work 7:3 16:8,21 24:4 28:13
  34:1 51:7 52:8 56:18,22
  95:6,8,24 96:4
worked 9:21 10:3,17,18 14:7
  14:8,11 17:9 24:10 29:15
working 14:17,20 24:1,11
  94:4 95:19 96:3 97:3
  100:11
works 17:6 31:23

world 62:11 104:21
worth 111:8
wouldn't 16:19 21:5 28:20
  92:24 93:10,13,14 96:11
  102:17
writing 21:2,15,16,16 39:24
  40:18 53:10,10 60:9 115:6

---

## X

X 3:1,11 4:1

---

## Y

yeah 7:7 8:20 14:12 19:13
  20:21 25:18 41:4 49:2
  56:13 58:4 61:12 65:23
  73:20 78:17,23 85:5 97:17
  104:4,4 111:14 117:24
year 17:13 28:7,8 35:4,5
  106:24 109:8
years 10:18,19 47:2 48:11
  62:9 119:17
York 1:1 2:6,13 45:11 62:6
Yup 14:12 54:24 71:10 74:3
  84:19

---

## Z

Zoho 85:5
ZOLOT 2:8
zoom 1:14 2:2 3:6 22:11,11
  56:12,12 121:17

---

## 0

---

## 1

1 1:16 2:9 22:6 41:7
1,500 12:11
1/20 3:19
10 48:22 80:8,11 83:22
10- 111:9
10,000 38:20 45:4,16,18 74:2
  111:7,16 114:5
100 109:9
10022 2:6
10577 2:10
10K 69:21
11 30:11,14,17 83:8
11-1 85:15
11/19 3:17

12 31:1,4
12/19 3:18 4:5
12/20 3:22 4:8
121 3:14,15,16,17,18,19,20
  3:21,23 4:4,5,6,7,8,9
128 3:14
129 3:15
13 44:9,13
130 3:16
131 3:17
132 3:18
133 3:19
134 3:20
135 2:13 3:21
136 3:22
137 3:23
138 4:4
139 4:5
140 4:6
141 4:7
142 4:8
143 4:9
15 63:13 64:3,4,7,12 74:14
152,170 79:23
1520 1:22
16 49:11 64:14 89:7,10 93:3,7
  93:20
162,000 73:16
162K 74:4
17 64:4,8 90:6
172 73:21,22
17th 1:21
19 91:16
19046 2:14
19103 1:22
1st 52:5 100:5,6

---

## 2

2 23:10,11,14 49:7,7 63:18
  108:22
2,000 12:11
2/20 3:20
2:03 1:17
2:25 67:1
20 70:24 98:12 109:10
2000 49:16
2000s 10:17

TARA KELLY

**2005** 10:17
**2016** 9:24 10:8
**2019** 7:9 14:14 17:15 21:8
  31:10 32:8,10 35:7 38:24
  39:3,18 44:21 45:1,14,20
  46:21 47:15,21 48:2,4,12
  49:16 64:24 65:8 70:23
  71:3,14 73:16 74:9 86:17,24
  88:4 113:18
**202** 2:9
**2020** 17:15 33:16 35:7,12,15
  35:17 37:15 41:9 49:12
  52:21 53:1 67:1 76:17 77:1
  78:3,22 80:3 93:3,4,8,9,20
  93:21 94:17 98:5,8 117:5,6
  117:8
**2021** 1:17 19:12 21:12 24:22
  35:8 37:4,6 39:17 81:20
  82:4 85:20 89:19 91:4 99:1
  100:5,6 117:14 118:20
  119:1,3,7
**215** 1:23
**22nd** 67:1
**23,657** 61:19
**25** 62:9
**25,500** 86:6
**25th** 99:1
**2nd** 93:4,8,21 94:2 98:5

---
**3**
---
**3** 23:21 56:10 65:14
**3/20** 3:21
**30** 1:21
**32,500** 81:23 82:5
**34,000** 89:20
**35,700** 91:5

---
**4**
---
**4** 83:22,23
**4/21** 4:9
**4:49** 121:18
**444** 2:5

---
**5**
---
**5** 3:8 70:8
**5,000** 38:19
**564-1233** 1:23

---
**6**
---
**6** 41:8 76:8
**6K** 60:15
**6th** 2:5

---
**7**
---
**7** 77:16 83:23
**7,657** 61:4
**7:21-cv-04695-KMK** 1:2
**767** 111:17 114:6
**767,000** 111:18 114:7
**777,000** 111:12
**777,389** 64:16

---
**8**
---
**8** 78:13
**8-** 45:4,16 111:9,16 114:5
**80** 109:9

---
**9**
---
**9** 79:7