UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

TOWNSQUARE MEDIA, INC.,

                          Plaintiff,

     v.

REGENCY FURNITURE, INC. *and*
REGENCY MANAGEMENT SERVICES,
LLC,

                      Defendants.

No. 21-CV-4695 (KMK)

<u>OPINION & ORDER</u>

---

<u>Appearances:</u>

Jared E. Paioff, Esq.
Schwartz Sladkus Reich Greenberg Atlas LLP
New York, NY
*Counsel for Plaintiff*

Alan L. Frank, Esq.
Alan L. Frank Law Associates, P.C.
New York, NY
*Counsel for Defendants*

KENNETH M. KARAS, District Judge:

      Townsquare Media, Inc. ("Townsquare" or "Plaintiff") brings this Action against

Regency Furniture, Inc. ("Regency Furniture") and Regency Management Services, LLC,

("Regency Management"; collectively, "Defendants"), alleging breach of contract and account

stated against Defendants arising from unpaid contracts for advertising services.  (*See* Am. Not.

of Removal (Dkt. No. 15), Ex. B ("Compl.") ¶¶ 22–32 (Dkt. No. 15-2).)  Before the Court is

Defendants' Motion for Summary Judgment as well as Plaintiff's motions for summary

judgment, to amend the pleadings to conform to the evidence, and to dismiss Defendants'

affirmative defenses.  (Defs.' Not. of Mot. (Dkt. No. 35); Pl.'s Not. of Mot. (Dkt. No. 39).)  For

the following reasons, Defendants' Motion is denied, and Plaintiff's Motion is granted in part and denied in part.

## I. Background

### A. Factual Background

The following facts are taken from the Parties' statements pursuant to Local Civil Rule 56.1, specifically: Defendants' 56.1 Statement (Defs.' Local Civil Rule 56.1 Statement ("Defs.' 56.1") (Dkt. No. 38)), Plaintiff's response thereto, (Pl.'s Mem. of Law in Opp. of Defs.' Mot. ("Pl.'s Opp.") (Dkt. No. 42), Ex. 1 (Pl.'s Response to Defs.' 56.1) ("Pl.'s 56.1 Resp.") (Dkt. No. 42-1)), Plaintiff's 56.1 Statement (Pl.'s Local Civil Rule 56.1 Statement ("Pl.'s 56.1") (Dkt. No. 41)), Defendants' response thereto, (Defs.' Mem. of Law in Opp. to Pl.'s Mot. ("Defs.' Opp.") (Dkt. No. 43), Ex. 6 (Defs.' Response to Pl.'s 56.1) ("Defs.' 56.1 Resp.") (Dkt. No. 43-6)), and the admissible evidence submitted by the Parties. The facts as described below are in dispute to the extent indicated.

#### 1. The Parties

Regency Furniture "is a business corporation organized under the laws of the State of Maryland." (Pl.'s 56.1 ¶ 2; Defs.' 56.1 Resp. ¶ 2.) "Regency Management is a limited liability company organized under the laws of the State of Maryland." (Pl.'s 56.1 ¶ 3; Defs.' 56.1 Resp. ¶ 3.) The exact business in which Regency Management operates is disputed. Defendants aver that the company is solely a "paymaster" insofar as it "operates on behalf of other companies," one of which is Regency Furniture; Plaintiff alleges that Regency Management is "a furniture retailer." (Defs.' 56.1 ¶ 16; Pl.'s 56.1 Resp. ¶ 16.) Abdul Ayyad ("Ayyad") is the CEO of Regency Management. (*See* Pl.'s Not. of Mot. Ex. 4 (Affirmation of Jared E. Paioff) ("Paioff Aff'n") (Dkt. No. 39-4) Ex. 17 (Deposition of Tara Kelly) ("Kelly Tr.") 11:19–21 (Dkt. No. 39-

20).)  Craig Jones is the CFO of Regency Management.  (*Id.* at 27:3–4.)  Tara Kelly ("Kelly") is

the "Director of marketing and advertising" at Regency Management.  (*Id.* at 9:17–20.)  Finally,

Avery Nelson is "a former employee [of Regency Management] who also worked in the

marketing department."  (*Id.* at 29:14–15.)

Plaintiff is a media marketing company that "owns radio stations and is in digital media."

(Pl.'s 56.1 ¶ 4; Defs.' 56.1 Resp. ¶ 4.)  "Plaintiff enters into agreements with businesses to

provide broadcasting and digital advertising for those businesses."  (Defs.' 56.1 ¶ 2; Pl.'s 56.1

Resp. ¶ 2.)  Brian Lang ("Lang") is "the market president, chief revenue and content officer" for

Plaintiff's Trenton, New Jersey, office.  (Decl. of Alan L. Frank ("Frank Decl.") (Dkt. No. 37)

Ex. B (Deposition of Brian Lang) ("Lang Tr.") 13:6–8 (Dkt. No. 37-2).)  Fran Northridge

("Northridge") is a media representative for Plaintiff.  (*See* Kelly Tr. 7:15–16; *see also* Pl.'s Not.

of Mot. Ex. 17, at 2 (Dkt. No. 39-17).)  William Campbell ("Campbell") is a sales manager for

Plaintiff.  (Paioff Aff'n Ex. 18 (Deposition of William Campbell) ("Campbell Tr.") 10:15–16

(Dkt. No. 39-21).)

### 2.  Contracting

In 2018, Plaintiff began providing radio (referred to as "broadcast") and digital

advertisements, though Defendants dispute whether this was for the defendant entities or others.

(*See* Pl.'s 56.1 ¶ 5; Defs.' 56.1 Resp. ¶ 5.)  Plaintiff asserts that the terms of the agreements, or

contracts, between Plaintiff and Defendants are encompassed in multiple emails between

representatives of each corporate entity, including modifications to such agreements.  (*See* Pl.'s

56.1 ¶¶ 6, 7; Pl.'s 56.1 Resp. ¶ 4.)  By contrast, Defendants assert that there were no agreements

between Plaintiff and Regency Management.  (*See* Defs.' 56.1 ¶ 4; Defs.' 56.1 Resp. ¶¶ 6, 7.)

On March 1, 2021, Defendants paid $28,475 to Plaintiff.  (*See* Pl.'s 56.1 ¶ 17; Defs.' 56.1 Resp. ¶ 17; *see also* Paioff Aff'n Ex. 23 (Dkt. No. 39-26).)  Additionally, Plaintiff received two payments from Defendants on April 30, 2021, and May 11, 2021, for $27,200 and $14,450, respectively, which pertained to Plaintiff's December 2020 and January 2021 invoices, respectively.  (*See* Pl.'s 56.1 ¶ 12; Defs.' 56.1 Resp. ¶ 12.)  However, Defendants have not made a payment since the May 11, 2021, payment.  (*See* Pl.'s 56.1 ¶ 13; Defs.' 56.1 Resp. ¶ 13.)  Defendants received Plaintiff's outstanding invoices, none of which include a fee or debit for gift cards.  (Pl.'s 56.1 ¶¶ 14, 19; Defs.' 56.1 Resp. ¶¶ 14, 19.)[1, 2]  "Regency Management advised Plaintiff that it was pushing to get payment of Plaintiff's outstanding invoices as quickly as possible."  (Pl.'s 56.1 ¶ 15; Defs.' 56.1 Resp. ¶ 15.)

---

[1] Defendants "[d]ispute[] in part" this fact, stating that "[i]t is disputed that Plaintiff sent any invoices to Regency Management[]; rather, Plaintiff sent all invoices [to other entities]." (Defs.' 56.1 Resp. ¶ 14.)  However, "[w]here the [p]arties identify disputed facts but with semantic objections only or by asserting irrelevant facts, [the Court will not consider] these purported disputes, which do not actually challenge the factual substance described in the relevant paragraphs, . . . as creating disputes of fact."  *Arch Specialty Ins. Co. v. TDL Restoration, Inc.*, No. 18-CV-6712, 2021 WL 1225447, at *1 n.1 (S.D.N.Y. Mar. 31, 2021) (collecting cases).  Defendants do not object to having received the invoices, notwithstanding that they may have been addressed to other parties.  Accordingly, the Court deems this fact admitted.

[2] There exists a tangential issue in this Action: the existence of an improper charge Plaintiff may have issued against Defendants to pay for gift cards.  (*See generally* Transcript of Hearing on Sept. 29, 2021 (Dkt. No. 45) (discussing the relevancy of gift cards, culminating in Judge McCarthy's prohibition of requests regarding this issue).)  This issue, however, is a red herring, as "[t]he gift cards that were invoiced on the 2019 invoices, everybody agrees, was ultimately credited back."  (*Id.* at 17:20–21; *see also* Kelly Tr. 45:23–46:26 (conceding that the gift card charges have been credited and that no further gift cards appear on invoices).)  Accordingly, in his testimony, Jones says that "there's no way for me to know how many gift cards were charged," (Paioff Aff'n Ex. 20 (Deposition of Craig Jones) 52:4–12 (Dkt. No. 39-32)), "do[es] not actually challenge the factual substance described in the relevant paragraphs" and only "assert[s] irrelevant facts" such that "the Court will not consider them as creating disputes of fact," *Arch Specialty*, 2021 WL 1225447, at *1 (collecting cases).  In other words, the Court does not consider there to exist a genuine dispute of a *material* fact at issue vis-à-vis the gift cards or charges related thereto.

### 3. Specific Email Exchanges

The following documentary evidence was produced regarding specific contracts:

1. In November 2019, Nelson emails with individuals and listservs affiliated with Plaintiff regarding the "plan for December," including the different events to highlight in the advertisements, totaling $172,000.  (Pl.'s Not. of Mot. Ex. 33 ("Contract Compilation") 1–2. (Dkt. No. 39-33).)[3] Subsequently, Nelson modifies the contract to reduce it by $10,000, yielding $162,000.  (*Id.* at 1.)

2. In early December 2019, Kelly and Northridge email regarding a December 2019 purchase order for $12,750 in broadcast advertising.  (Contract Compilation 25–26.)

3. In December 2019, Nelson requests another round of digital advertising spend, again articulating the dollar amounts to allocate to specific markets, totaling $163,500.  (*Id.* at 3–4.)[4]

4. On January 16, 2020, Nelson again emails various employees of Plaintiff, saying "[t]his budget will pick up on February 3rd for our President's Day promotion" and requests a total of $195,000 in digital advertising.  (*Id.* at 5–6.)[5]

5. On February 14, 2020, Nelson emails various employees of Plaintiff, once again highlighting certain promotions throughout the month of March to be highlighted and requests again a total of $195,000 in digital advertising.  (*Id.* at 7–8.)[6]

---

[3] Specifically, Nelson requests: $15,000 for "digital" for "Central PA," $12,000 for "digital" for "DE" (presumably Delaware), $10,000 for "digital" for "Lehigh Valley," $45,000 for "digital" for "Baltimore (includ[ing] Hagerstown/Easton and newly added Columbia)," $40,000 for "digital" for "DC (includ[ing] Frederick)," and $50,000 for "digital" for "CNJ" (presumably Central New Jersey).  (*See* Contract Compilation 1–2.)  This totals $172,000.

[4] The "digital spend" requests for January 2020, first by Nelson then subject to amendment by an individual at Townsquare, are as follows: $45,000 for "CNJ," $40,000 for Baltimore, $35,000 for Washington, D.C., $21,500 for Central PA with "25% allocation [or] $5,375 to Lancaster)," $12,000 for "Lehigh Valley," and $10,000 for Delaware.  (*Id.* at 3.)  This totals $163,500.

[5] Nelson requested the same allocation splits as the prior month.

[6] Specifically, the "digital spend" requests by Nelson for March 2020 are: $55,000 for "CNJ," $45,000 for Baltimore, $40,000 for "WA," $25,000 for "Central PA . . . (includes Lancaster)," $15,000 for Delaware.  (*Id.* at 7–8.)  This totals $195,000.

6.  Between July 28 and 31, 2020, Kelly and Northridge email regarding an August 2020 purchase order for $26,860 in broadcast advertising.  (*Id.* at 16–17.)

7.  In late August 2020, Kelly and Northridge email regarding a September 2020 purchase order for $35,275 in broadcast advertising.  (*Id.* at 27–28.)

8.  Between September 27 and 28, 2020, Kelly and Northridge email regarding an October 2020 purchase order for $28,475 in broadcast advertising.  (*Id.* at 14–15.)

9.  On December 16, 2020, Kelly emailed with Lang and Campbell regarding the "January 2021 total budget for Townsquare" to be spent on digital advertising, setting it at $32,500.  (*Id.* at 29–31.)

10.  Between January 22 and 25, 2021, Kelly and Northridge email regarding a February 2021 purchase order for $34,000 in broadcast advertising.  (*Id.* at 19–20.)

11.  In mid-February 2021, Jones emailed Kelly, Campbell, Lang, Ritter, Matt Brodie (Townsquare), and Krystin Conklin (Townsquare), stating Plaintiff's "March [2021] budget" for digital advertising is $26,117, including articulating the allocation to be spent per store.  (*Id.* at 32–33.)

12.  Between March 23 and 25, 2021, Kelly and Northridge email regarding an April 2021 purchase order for $25,500 in broadcast advertising.  (*Id.* at 11–12.)

13.  In early April 2021, Jones emailed Kelly, Campbell, Lang, Ritter, Matt Brodie (Townsquare), and Krystin Conklin (Townsquare), stating Plaintiff's "total budget for May [2021 in digital advertising is] $25,347," again articulating the allocation to be spent per store.  (*Id.* at 35–39.)

14.  On April 16, 2021, Kelly and Northridge email regarding a May 2021 purchase order for $19,550 in broadcast advertising.  (*Id.* at 21–23.)

The following additional emails were produced in support of the Parties' Motions, which are also worth specifically highlighting:

• On June 9, 2020, Kelly emails Northridge requesting 58 invoices be re-submitted to "*my* accounting department . . . [to] be sure they are added to *our* system."  (Pl.'s Not. of Mot. Ex. 3 (Aff. of William Campbell)

("Campbell Aff.") (Dkt. No. 39-3) Ex. 16, at 2 (Dkt. No. 39-16).)[7]
Northridge states that she has again sent them to the email alias requested—
one that ends in "regencyfurniture.biz"—and Kelly subsequently confirms
that she has received them.  (*Id.* at 1–2.)

- In November 2020, Northridge and Kelly email regarding "a timeline for
  the payment of the 2019 digital invoices."  (Pl.'s Not. of Mot. Ex. 2 (Aff. of
  Fran Northridge) ("Northridge Aff.") (Dkt. No. 39-2), Ex. 13, at 2 (Dkt. No.
  39-17).)  Kelly responds back in early December stating "we are working
  on it – I promise…"  (*Id.* at 1 (ellipses in original).)

- On April 2, 2021, Jones emails Andrea Buck, asking whether "*we* pa[id]
  Townsquare media anything in March[.]"  (Paioff Aff'n Ex. 23, at 2
  (emphasis added) (Dkt. No. 39-26).)  Buck responds by saying only:
  "$28[,]475.00 on March 1st."  (*Id.* at 1.)  Jones responds: "Ok thanks." (*Id.*)

- On April 6, 2021, Lang emails Jones, stating that there was an outstanding
  balance, offering to "work together to get the account current and put
  together a suggested payment schedule," and making clear that absent
  payment, Townsquare would have "to pause all advertising which none of
  us want to do."  (Paioff Aff'n Ex. 24, at 2 (Dkt. No. 39-27).)  Jones then
  forwarded this to Ayyad, asking Ayyad how he would like to proceed.  (*Id.*
  at 1.)  In response, Ayad states: "Lol [Lots of laughs], I don't like to be
  threatened especially when I have so many other alternatives."  (*Id.*)

- On April 13, 2021, Jones emails Ayyad, stating "[w]e still have an
  outstanding invoice for [T]ownsquare . . . . Total outstanding to Townsquare
  is $206,300 (which doesn't include anything before 10/1/2020)."  Ayyad
  replies: "Ok good."  (Paioff Aff'n Ex. 25, at 1 (Dkt. No. 29-28).)

B.  Procedural History

Plaintiff filed its Complaint on May 10, 2021, in the Supreme Court of New York,

Westchester County.  (*See* Am. Not. of Removal ¶ 1; *see also* Compl.)  Plaintiff served

---

[7] The invoices are as follows: 1423709B-2; 1423709A-1; 1423709D-2; 1386183B-4;
1423709C-1; 1463048A-1; 1463048C-1; 1463048D-2; 1463048B-2; 1505378A-1; 1505378D-2;
1505378B-2; 1505378C-1; 1385245B-2; 1385245A-1; 1385245B-4; 1423844C-1; 1423844D-2;
1423844A-1; 1385245A-2; 1423844B-2; 1462867A; 1462867B-2; 1462867C-1; 1462867D-2;
1505050A; 1505050B-2; 1505050D; 1364042B-1; 1364136A-2; 1364136B-1; 1364042A-2;
1395452A-2; 1395462A-2; 1364487B-1; 1364232B-1; 1364386B-1; 1364543A-1; 1364487A-2;
1364232A-2; 1364386A-2; 1364543B-3; 1395386A-2; 1395365A-2; 1395335B-3; 1395433A-2;
1450810-2; 1450830-2; 1450792-3; 1450817-2; 1450804-2; 1450834-2; 1484654-3; 1494398-2;
1494375-2; 1494391-2; 1494371-2; and, 1494386-2.  (*Id.* at 2–3.)

Defendants the same day.  (*See* Am. Not. of Removal ¶ 2.)  On May 26, 2021, Defendants timely sought removal pursuant to the Court's diversity jurisdiction.  (*See* Not. of Removal (Dkt. No. 1) ¶ 8; Am. Not. of Removal ¶ 9.)  On June 1, 2021, Defendants filed an Amended Notice of Removal.  (*See* Am. Not. of Removal.)  Defendants filed an Answer on June 2, 2021.  (*See* Answer (Dkt. No. 16).)

Pursuant to the Court's Motion Scheduling Order, (Dkt. No. 34), the Parties filed their respective Motions for Summary Judgment and supporting papers on December 10, 2021, (*see* Defs.' Not. of Mot.; Defs.' Mem. of Law in Supp. of Defs.' Mot. for Summ. J. ("Defs.' Mem.") (Dkt. No. 36); Frank Decl.; Defs.' 56.1; Pl.'s Not. of Mot.; Pl.'s Mem. of Law in Supp. of Pl.'s Mot. for Summ. J. ("Pl.'s Mem.") (Dkt. No. 40); Pl.'s 56.1).  On January 14, 2022, Plaintiff filed a memorandum of law in opposition to Defendants' Motion as well as its response in opposition to Defendants' 56.1 statement.  (*See* Pl.'s Opp.; Pl.'s 56.1 Resp.)  On the same day, Defendants filed a memorandum of law in opposition to Plaintiff's Motion as well as their response in opposition to Plaintiff's Rule 56.1 statement.  (*See* Defs.' Opp.; Defs.' 56.1 Resp.)

## II.  Discussion

### A.  Standard of Review

Summary judgment is appropriate where the movant shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (same); *Psihoyos v. John Wiley & Sons, Inc.*, 748 F.3d 120, 123–24 (2d Cir. 2014) (same).  "In deciding whether to award summary judgment, the court must construe the record evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor."  *Torcivia v. Suffolk County*, 17 F.4th 342, 354 (2d Cir. 2021); *see also Horror Inc. v. Miller*, 15 F.4th 232,

240 (2d Cir. 2021) (same).  "It is the movant's burden to show that no genuine factual dispute exists." *Vt. Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004); *see also Red Pocket, Inc. v. Interactive Commc'ns Int'l, Inc.*, No. 17-CV-5670, 2020 WL 838279, at *4 (S.D.N.Y. Feb. 20, 2020) (same).

"However, when the burden of proof at trial would fall on the nonmoving party, it ordinarily is sufficient for the movant to point to a lack of evidence to go to the trier of fact on an essential element of the non[-]movant's claim," in which case "the non[-]moving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." *CILP Assocs., L.P. v. Pricewaterhouse Coopers LLP*, 735 F.3d 114, 123 (2d Cir. 2013) (alteration, citation, and quotation marks omitted).  Further, "[t]o survive a [summary judgment] motion . . . , [a non-movant] need[s] to create more than a 'metaphysical' possibility that [its] allegations were correct; [it] need[s] to 'come forward with specific facts showing that there is a genuine issue for trial,'" *Wrobel v. County of Erie*, 692 F.3d 22, 30 (2d Cir. 2012) (emphasis omitted) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986)), "and cannot rely on the mere allegations or denials contained in the pleadings," *Guardian Life Ins. Co. v. Gilmore*, 45 F. Supp. 3d 310, 322 (S.D.N.Y. 2014) (quotation marks omitted); *see also Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009) ("When a motion for summary judgment is properly supported by documents or other evidentiary materials, the party opposing summary judgment may not merely rest on the allegations or denials of his pleading . . . .").

"On a motion for summary judgment, a fact is material if it might affect the outcome of the suit under the governing law." *Royal Crown Day Care LLC v. Dep't of Health & Mental Hygiene*, 746 F.3d 538, 544 (2d Cir. 2014) (quotation marks omitted).  At this stage, "[t]he role

of the court is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried." *Brod v. Omya, Inc.*, 653 F.3d 156, 164 (2d Cir. 2011) (citation omitted). Thus, a court's goal should be "to isolate and dispose of factually unsupported claims." *Geneva Pharms. Tech. Corp. v. Barr Laby's. Inc.*, 386 F.3d 485, 495 (2d Cir. 2004) (quoting *Celotex*, 477 U.S. at 323–24).

When ruling on a motion for summary judgment, a district court should consider only evidence that would be admissible at trial. *See Nora Beverages, Inc. v. Perrier Grp. of Am., Inc.*, 164 F.3d 736, 746 (2d Cir. 1998). "[W]here a party relies on affidavits or deposition testimony to establish facts, the statements 'must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated.'" *DiStiso v. Cook*, 691 F.3d 226, 230 (2d Cir. 2012) (quoting Fed. R. Civ. P. 56(c)(4)); *see also Sellers v. M.C. Floor Crafters, Inc.*, 842 F.2d 639, 643 (2d Cir. 1988) ("Rule 56 requires a motion for summary judgment to be supported with affidavits based on personal knowledge . . . ."); *Baity v. Kralik*, 51 F. Supp. 3d 414, 419 (S.D.N.Y. 2014) (disregarding "statements not based on [the] [p]laintiff's personal knowledge"); *Flaherty v. Filardi*, No. 03-CV-2167, 2007 WL 163112, at *5 (S.D.N.Y. Jan. 24, 2007) ("The test for admissibility is whether a reasonable trier of fact could believe the witness had personal knowledge." (citation omitted)).

"Where, as here, cross motions for summary judgment are filed, [courts] 'evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration.'" *Byrne v. Rutledge*, 623 F.3d 46, 53 (2d Cir. 2010) (quoting *Hotel Emps. & Rest. Emps. Union v. City of N.Y. Dep't of Parks & Recreation*, 311 F.3d 534, 543 (2d Cir. 2002)); *see also Dish Network Corp. v. Ace Am. Ins. Co.*,

No. 20-0268, 2021 WL 6058146, at *3 (2d Cir. Dec. 22, 2021) ("When both parties have moved for summary judgment, 'the court must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration.'" (quoting *Coutard v. Mun. Credit Union*, 848 F.3d 102, 114 (2d Cir. 2017))); *Est. of Smith v. Cash Money Recs., Inc.*, No. 14-CV-2703, 2018 WL 2224993, at *3 (S.D.N.Y. May 15, 2018) ("On dueling motions for summary judgment, the court must evaluate each party's motion on its merits and determine whether either is entitled to judgment as a matter of law" (citing *Coutard*, 848 F.3d at 114)).

### B.  Analysis

Plaintiff moves for summary judgment with respect to its claims.  (*See* Pl.'s Mem. 9–16; Pl.'s Opp. 6–17.)  Additionally, Plaintiff seeks to conform the pleadings to the evidence produced, namely regarding the amount sought.  (Pl.'s Mem. 16.)  By contrast, Defendants "seek only to dismiss Regency Management" and otherwise "reserve all rights with respect to Plaintiff's claims against Regency Furniture[.]"  (Defs.' Mem. 2 n.1.)

#### 1.  Breach of Contract

Plaintiff asserts that each of the elements for a breach of contract claim have been established and that no genuine issue of fact remains.  (*See* Pl.'s Mem. 9–14.)  Defendants contend that Plaintiff and Defendants—specifically Regency Management—were never bound by any contract.  (Defs.' Mem. 12–14.)

##### a.  Applicable Law

"In a breach of contract case, a plaintiff must plead '(1) the existence of a contract between itself and that defendant; (2) performance of the plaintiff's obligations under the contract; (3) breach of the contract by that defendant; and (4) damages to the plaintiff caused by

that defendant's breach.'" *Thales Alenia Space France v. Thermo Funding Co., LLC*, 959 F.

Supp. 2d 459, 464 (S.D.N.Y. 2013) (quoting *Diesel Props S.r.l. v. Greystone Bus. Credit II LLC*,

631 F.3d 42, 52 (2d Cir. 2011)).

      "To create a binding contract, there must be a manifestation of mutual assent sufficiently

definite to assure that the parties are truly in agreement with respect to all material terms."

*Express Indus. & Terminal Corp. v. N.Y. State Dep't of Transp.*, 715 N.E.2d 1050, 1053 (N.Y.

1999) (citation omitted); *see also Kowalchuk v. Stroup*, 873 N.Y.S.2d 43, 46 (App. Div. 2009)

("To establish the existence of an enforceable agreement, a plaintiff must establish an offer,

acceptance of the offer, consideration, mutual assent, and an intent to be bound." (citing 22 N.Y.

Jur. 2d Contracts § 9)); *Broder v. Cablevision Sys. Corp.*, 329 F. Supp. 2d 551, 556 (S.D.N.Y.

2004) ("For a contract to be valid under New York law, there must be an offer, acceptance, and

consideration." (footnote and citation omitted)), *aff'd*, 418 F.3d 187 (2d Cir. 2005).

      "Mutual assent may be manifested 'by word, act, or conduct which evinces the intention

of the parties to contract.'" *Wilson v. Triller, Inc.*, No. 21-CV-11228, 2022 WL 1138073, at *8

(S.D.N.Y. Apr. 18, 2022) (quoting *Minelli Constr. Co. v. Volmar Constr., Inc.*, 917 N.Y.S.2d

687, 688 (App. Div. 2011)).  Moreover, "[t]he manifestation of mutual assent must be

sufficiently definite to assure that the parties are truly in agreement with respect to all material

terms." *Starke v. SquareTrade, Inc.*, 913 F.3d 279, 289 (2d Cir. 2019) (collecting cases)).

      Finally, "it is well established in New York that an email exchange may create an

enforceable contract." *Meltzer, Lippe, Goldstein & Breitstone, LLP v. Malfetti*, No. 16-CV-

1637, 2018 WL 4627667, at *9 (E.D.N.Y. Sept. 27, 2018) (collecting cases), *aff'd*, 777 F. App'x

571 (2d Cir. 2019).

### b.  Application

Defendants do not substantively argue with three of the four elements of Plaintiff's breach of contract claim: performance, breach, and damages.  (*See generally* Defs.' Mem.; Defs.' Opp.)  Therefore, the Court only concerns itself with the first element, namely the existence of a contract between Plaintiff and Defendants.  *See Doe v. City of New York*, No. 18-CV-670, 2020 WL 108265, at *6 (E.D.N.Y. Jan. 9, 2020) (stating that where "[t]he defendants do not dispute" certain elements of a cause of action, the court need "not analyze th[ose] element[s]"); *P.P. v. City of New York*, No. 13-CV-5049, 2014 WL 4704800, at *25 (S.D.N.Y. Sept. 19, 2014) (holding that by arguing only one element of a plaintiff's claim, the defendants "apparently [] chose[] to concede all other elements").

"[W]hile the existence of a contract is a question of fact, the question of whether a certain or undisputed state of facts establishes a contract is one of law for the courts."  *Jabczynski v. Advanced Drying & Restoration*, 32 N.Y.S.3d 407, 408 (App. Div. 2016) (alteration in original) (quoting *Resetarits Const. Corp. v. Olmsted*, 988 N.Y.S.2d 797, 798 (App. Div. 2014)).  The Court must accordingly determine whether the undisputed evidence establishes a contract.

### i.  Defendants' Request for Sanctions

Before detailing whether a contract exists, Defendants request sanctions against Plaintiff in the form of "prevent[ing] [Plaintiff] from supporting or defending its claim" on the basis of Plaintiff's purportedly unsatisfactory corporate designee testimony.  (Defs.' Opp. 16; *see id.* at 16–22.)

Under Rule 30(b)(6), a corporate entity may be noticed for a deposition, which may then designate a representative "to testify on its behalf."  Fed. R. Civ. P. 30(b)(6).  When this scenario arises, "[t]o satisfy Rule 30(b)(6), the corporate deponent has an affirmative duty to make

available [a representative] able to give complete, knowledgeable and binding answers on its

behalf." *Reilly v. Natwest Markets Group Inc.*, 181 F.3d 253, 268 (2d Cir. 1999) (quotation

marks omitted).  "Moreover, a corporation's obligation to prepare a witness to address topics

included in a Rule 30(b)(6) notice of deposition is triggered where the witness lacks personal

knowledge of the matters set forth in the deposition notice."  *Heras v. Metro. Learning Institute*,

No. 19-CV-2694, 2022 WL 20899, at *2 (E.D.N.Y. Jan. 3, 2022).  To wit, "[t]he responding

party must 'prepare the designee to the extent matters are reasonably available, whether from

documents, past employees, or other sources.'"  *Soroof Trading Dev. Co. v. GE Fuel Cell Sys.,*

*LLC*, No. 10-CV-1391, 2013 WL 1286078, at *2 (S.D.N.Y. Mar. 28, 2013) (quotation marks

omitted) (quoting *Rahman v. Smith & Wollensky Restaurant Grp., Inc.*, No. 06-CV-6198, 2009

WL 773344, at *1 (S.D.N.Y. March 18, 2009)).  "Producing an unprepared witness is

tantamount to a failure to appear."  *Elavon, Inc. v. Ne. Advance Techs., Inc.*, No. 15-CV-7985,

2022 WL 1166157, at *2 (S.D.N.Y. Apr. 20, 2022) (quotation marks omitted) (quoting *United*

*States v. Taylor*, 166 F.R.D. 356, 363 (M.D.N.C. 1996)); *see also Jenkins v. XpresSpa Grp., Inc.*,

No. 19-CV-1774, 2020 WL 1644012, at *4 (S.D.N.Y. Apr. 2, 2020) ("In determining whether to

award sanctions, 'courts treat the production of an unprepared [Rule 30(b)(6)] witness as

tantamount to a failure to appear.'" (alteration in original) (quotation marks omitted) (quoting

*Crawford v. Franklin Credit Mgmt. Corp.*, 261 F.R.D. 34, 39 (S.D.N.Y. 2009))).

　　　"When a party fails to comply with Rule 30(b)(6), Rule 37 allows courts to impose

various sanctions, including the preclusion of evidence."  *Reilly*, 181 F.3d at 268.  "It is true that

Rule 37(b)(2) gives the Court discretion to 'prohibit[ ] the disobedient party from supporting or

opposing designated claims or defenses, or from introducing designated matters in evidence.'"

*Bush v. Element Fin. Corp.*, No. 16-CV-1007, 2016 WL 8814347, at *2 (S.D.N.Y. Dec. 13,

14

2016) (alteration in original) (quoting Fed. R. Civ. P. 37(b)(2)(A)(ii)).  It is also true "that district courts possess 'wide discretion' in imposing sanctions under Rule 37." *Shcherbakovskiy v. Da Capo Al Fine, Ltd.*, 490 F.3d 130, 135 (2d Cir. 2007) (quoting *Daval Steel Prods. v. M/V Fakredine*, 951 F.2d 1357, 1365 (2d Cir. 1991)).

That is not to say that district courts' discretion is unfettered.  The Second Circuit has cited the following "factors" as "useful" in evaluating the propriety of sanctions when 30(b)(6) deponents are, to say the least, sub-par: "(1) the willfulness of the non-compliant party or the reason for noncompliance; (2) the efficacy of lesser sanctions; (3) the duration of the period of noncompliance; and (4) whether the non-compliant party had been warned of the consequences of noncompliance." *S. New England Tel. Co. v. Global NAPs Inc.*, 624 F.3d 123, 144 (2d Cir. 2010) (quoting *Agiwal v. Mid Island Mortg. Corp.*, 555 F.3d 298, 302 (2d Cir. 2009)); *see also World Wide Polymers, Inc. v. Shinkong Synthetic Fibers Corp.*, 694 F.3d 155, 159 (2d Cir. 2012) (citing the same factors and quoting *Agiwal*, 555 F.3d at 302).  "No single factor is dispositive." *Doubleline Cap. LP v. Odebrecht Fin., Ltd.*, No. 17-CV-4576, 2022 WL 3029014, at *10 (S.D.N.Y. July 19, 2022).  The upshot of such considerations is that "[s]anctions in connection with a Rule 30(b)(6) deposition are appropriate only where 'the inadequacies in a deponent's testimony [are] egregious and not merely lacking in desired specificity in discrete areas.'" *Heras*, 2022 WL 20899, at *2 (collecting cases) (quoting *Kyoei Fire & Marine Ins. Co. Ltd. v. M/V Maritime Antalya*, 248 F.R.D. 126, 152 (S.D.N.Y. 2007)).

Ultimately, Defendants seek too much.  First, Defendants "overstate[] the prejudice [they] suffered." *Spanski Enterprises, Inc. v. Telewizja Polska, S.A.*, No. 07-CV-930, 2009 WL 3270794, at *4 (S.D.N.Y. Oct. 13, 2009).  While Plaintiff's deponents were severely "lacking" in myriad ways, *Branch v. State Univ. of N.Y.*, No. 18-CV-9516, 2020 WL 7230703, at *4

15

(S.D.N.Y. Dec. 8, 2020), Defendants seemingly sought to—and successfully did—establish one key fact: there were no traditional contracts written as standalone documents between the Parties, (*see* Defs.' Mem. 14; Lang Tr. 20:20–21:1).  But Plaintiff's theory of the case does not rise and fall on this fact; rather, the question at issue is whether an established contract is clear based on the emails exchanged by the Parties' representatives as well as Defendants' corporate designee, Kelly, speaking to Regency Management's state of mind.  *See infra* II.B.1.b.ii–iii.  In other words, any inadequacies exhibited by Lang and Campbell's insufficient preparation, while understandably frustrating, do not in fact prejudice Defendants.

The same is true with respect to Defendants' concern as to an alter-ego theory.

Defendants assert:

> Neither of Plaintiff's two corporate designees could offer any other evidence whatsoever that Regency Furniture, Inc. and Regency Management Services, LLC are alter-egos, such as the absence of corporate formalities, inadequate capitalization, funds being used for personal purposes, common ownership, common office space, common address and telephone numbers more business discretion displayed by the allegedly dominated corporation, or the like.

(Defs.' Opp. 20–21.)  But Plaintiff makes clear that it is not pursuing an alter ego theory.  (Pl.'s Opp. 16.)  Given the direct liability Plaintiff seeks, a lack of evidence on this point does not frustrate Defendants' ability to press its argument.  Because "[p]reclusion is a harsh sanction preserved for exceptional cases where a . . . party's failure to provide the requested discovery results in prejudice to the requesting party," the Court finds such a remedy inappropriate here. *Passlogix, Inc. v. 2FA Tech., LLC*, 708 F. Supp. 2d 378, 421 (S.D.N.Y. 2010) (alteration in original); *cf. Tchatat v. O'Hara*, 249 F. Supp. 3d 701, 707 (S.D.N.Y. 2017) ("[I]t is well accepted that a court should always impose the least harsh sanction that can provide an adequate remedy.  The choices include—from least harsh to most harsh—further discovery, cost-shifting, fines, special jury instructions, preclusion, and the entry of default judgment or dismissal."

16

(quoting *Dorchester Fin. Holdings Corp. v. Banco BRJ S.A.*, 304 F.R.D. 178, 185 (S.D.N.Y. 2014)), *objections overruled*, 2017 WL 3172715 (S.D.N.Y. July 25, 2017), *aff'd sub nom. Tchatat v. City of New York*, 795 F. App'x 34 (2d Cir. 2019).

This does not excuse Plaintiff from its Rule 30(b)(6) obligations, however.  Indeed, courts have imposed monetary penalties when preclusion was deemed too harsh.  *See Bush*, 2016 WL 8814347, at *3 (refusing to preclude the defendants from defending the case following an insufficient Rule 30(b)(6) deposition while ordering the defendants to put forward another witness and ordering that the defendants pay for this additional deposition); *Passlogix*, 708 F. Supp. 2d 378, 421–23 (refusing to preclude evidence or order the defendants to pay for the costs of an insufficient deposition while imposing a monetary against the defendants as a result of their actions as it "serves the dual purposes of deterrence and punishment").  The same result is warranted here.

Rule 37(b)(2)(C) sets forth that "in addition to" the sanctions contemplated under Rule 37(b)(2), a district court has the authority to "order the disobedient party, the attorney advising that party, or both to pay the reasonable expenses, including attorney's fees, caused by the failure, unless the failure was substantially justified or other circumstances make an award of expenses unjust."  Fed. R. Civ. P. 37(b)(2)(C).

Lang testified that he reviewed the relevant invoices five months prior to testimony.  (*See* Lang. Tr. 36:8–11.)  Lang also testified that his preparation was only in the form of requesting the invoices and looking at some of them but not "at all of them."  (*Id.* at 36:22.)  Moreover, while testifying to the existence of emails that "*can*" give rise to contracts, (*id.* at 37:20, 37:22 (emphasis added)), Lang could not even testify that such email contracts existed, (*id.* at 39:8–9), nor did he have a concept of how many such "e-mail agreements" existed between Plaintiff and

Defendants to give rise to this Action, (*id.* at 38:20–39:9).  Lang similarly failed to "take any

steps to determine" why invoices would be addressed to Regency Marketing, (*id.* at 40:13–16),

notwithstanding that the Deposition Notice for Lang specifically sought information as to "[w]hy

invoices are directed to 'Regency Marketing Inc. (In House),'" (Frank Decl. Ex. 7, at 4 ¶ 23

(Dkt. No. 37-7)).  To make matters worse, Lang's "own testimony made it clear that he could

have familiarized himself with" the facts giving rise to these invoices, including whether and to

what extent they'd been paid, "by consulting with" others, *Agniel v. Cent. Park Boathouse LLC*,

No. 12-CV-7227, 2015 WL 463971, at *3 (S.D.N.Y. Jan. 26, 2015), namely certain unnamed

"personnel," (Lang Tr. 50:2–8).  Another metric is similarly telling: Lang answered a variant of

"I don't know" or "I'm not sure" over twenty times within a deposition that yielded only 58

transcript pages, *cf. Agniel*, 2015 WL 463971, at *3 (referencing number of deposition pages—

400—as a emblematic or indicative of the degree of the testimony's completeness), including

even whether he had seen the notice of deposition, (Lang Tr. 22:13–21).  In sum, with respect to

Lang, "the inadequacies in [his] testimony [were] egregious and not merely lacking in desired

specificity in discrete areas." *Heras*, 2022 WL 20899, at *2 (quoting *Kyoei Fire*, 248 F.R.D. at

152).

Campbell's testimony was not similarly lacking.  Campbell reviewed the relevant legal

documents, including the complaint and interrogatories, objections and responses to the request

for documents, and relevant emails, albeit the latter category "not recently." (Campbell Tr.

32:24–33:22.)  Moreover, to the extent Campbell could not recall portions of the salient facts, a

lack of recollection is not, alone, sufficient to merit sanctions, as "Rule 30(b)(6) is not designed

to be a memory contest." *E.E.O.C. v. Am. Int'l Grp., Inc.*, No. 93-CV-6390, 1994 WL 376052,

at *3 (S.D.N.Y. July 18, 1994); *see also Blackrock Allocation Target Shares: Series S Portfolio*

*v. Wells Fargo Bank, Nat'l Ass'n et al.*, No. 14-CV-9371, 2017 WL 9400671, at *2 (S.D.N.Y.

Apr. 27, 2017) (explaining that a Rule 30(b)(6) deposition "should not be a 'memory contest' of

topics better suited to a written response or a supplemental document production").  Rather, the

document production rendered was "not so voluminous so as to have prohibited [Defendants']

counsel from extracting and presenting [Campbell] with key communications or other documents

on which to answer with greater detail," *Jenkins*, 2020 WL 1644012, at *5—which is exactly

what occurred, as Campbell identified and discussed the relevant documents upon presentment,

(*see generally id.*), rendering the deposition passable and permitting Defendants the ability to ask

the questions required to present their case in chief.  And, again, Defendants' argument that

Campbell's deposition was insufficient insofar as he could not offer evidence that Regency

Management and Regency Marketing are alter-egos of one another, (*see* Defs.' Opp. 10), is

immaterial because, as stated before, this is not Plaintiff's argument.  Therefore, again,

Campbell's testimony did not prejudice or hinder Defendants in any way and thus does not give

rise to sanctions.

Focusing then on Lang's problematic deposition, the Court also must make clear that

Plaintiff's counsel seemingly exacerbated the issue.  When defense counsel raised this frustration

and offered the deponent the opportunity to speak with counsel such that he may provide more

fulsome answers, counsel for Plaintiff blew past this invitation, stating that Lang was in fact

"doing a great job" and that "[i]t"—which the Court understands to mean Lang's obfuscation—

"worked to our benefit the last time around, so let's do it again."  (Lang Tr. 38:3, 38:14–16).

Considered in context, counsel's apparent encouraging of evasiveness "seriously disrupted

[Defendants'] ability to obtain testimony from Plaintiff" in the form of its corporate designee.

*Fashion Exch. LLC v. Hybrid Promotions, LLC*, 333 F.R.D. 302, 307 (S.D.N.Y. 2019) (finding

sanctions appropriate under Rule 30(d)(2) where "Plaintiff's counsel's conduct . . . unnecessarily extended the length of [the] [p]laintiffs [ ] deposition and seriously disrupted [the] [d]efendant's ability to obtain testimony from [the] [p]laintiff"); *cf. Antolini v. McCloskey*, No. 19-CV-9038, 2022 WL 1689331, at *3 (S.D.N.Y. May 26, 2022) (imposing sanctions on counsel where counsel "impeded and frustrated the fair examination of Plaintiff," thus warranting sanctions pursuant to, inter alia, Rule 37).

Accordingly, Defendants "shall make a reasonable fee application to the Court, which shall include contemporaneous time records specifying 'for each attorney, the date, the hours expended, and the nature of the work done,' as well as receipts" with regard to Lang's testimony. *Bush*, 2016 WL 8814347, at *4 (quoting *N.Y. State Ass'n for Retarded Children, Inc. v. Carey*, 711 F.2d 1136, 1141 (2d Cir. 1983)).  The fee application is due within 30 days of this Opinion & Order.  Defendants' response will be due fourteen days thereafter.

### ii.  Contract Process and Mutual Assent

"In determining whether the parties intended to enter a contract, and the nature of the contract's material terms, [the Court] look[s] to the 'objective manifestations of the intent of the parties as gathered by their expressed words and deeds.'"  *Stonehill Cap. Mgmt., LLC v. Bank of the W.*, 68 N.E.3d 683, 689 (N.Y. 2016) (quoting *Brown Bros. Elec. Contractors v. Beam Const. Corp.*, 361 N.E.2d 999, 1001 (N.Y. 1977)).  Indeed, "where there is a question of mutual assent, the Court may look outside the four corners of the agreement because '[t]he manifestation or expression of assent necessary to form a contract may be by word, act, or conduct which evinces the intention of the parties to contract.'"  *In re Toscano*, 799 F. Supp. 2d 230, 249 (E.D.N.Y. 2011) (alteration in original) (quoting *Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393, 427 (2d Cir. 2004)).

According to Kelly—again, Regency Management's Director of Marketing and
Advertising as well as the Corporate Designee for Defendants, (*see* Kelly Tr., 9:14–20, 16:1–
2)—the process for purchasing radio advertising was as follows:

| [Paioff:] | Explain to me the process of how the [radio] purchases were executed. |
|---|---|
| [Kelly:] | [A]t the beginning of each month, we would provide, you know, I'd say a radio budget, for instance.  We would give them the flights and the promotion, respectively, the budget that goes with each of those flights and those promotions and they would, you know, in the radio scenario come back and put together a proposal for review and we would take it from there. |
| [Paioff:] | . . . Would that proposal be approved by Regency? |
| [Kelly:] | Yes. |
| [Paioff:] | Would there ever be modifications to the proposal? |
| [Kelly:] | Oh, for sure. Yeah. |
| [Paioff:] | In what manner?  . . .  In what manner would Regency approve a proposal? |
| [Kelly:] | So when I was handling it, those approvals were always done in writing. |
| . . . | |
| [Paioff:] | Okay.  And when you say "in writing," the approval was given in writing, what form of writing would it be in? |
| [Kelly:] | The radio proposals would be approved via e-mail. |

(*Id.* at 20:4–21:19.)

The process for purchasing digital advertising, described as follows, was not all that
different:

| [Paioff:] | Okay.  What about digital? |
|---|---|
| [Kelly:] | Well, digital there was no proposal presented.  It was more of a budget.  It's more of a postmortem kind of thing that has to happen. |

> [Paioff:]        With the budget as part of the process, would the budget be approved?
>
> [Kelly:]        Yes.

(*Id.* at 21:20–22:2.)  This description comports with Campbell's:

> Specifically on how our industry works, we are given budgeting, that budgeting is for typically a flight. . . .  In this case, these are monthly flights.  So every month we were given a budget, a plan was presented, an agreement was made on a budget per spend.  Changes or optimizations to campaigns occur as the market performs and how their media performs in and those changes are ongoing, they can happen any time within a month.

(Campbell Tr. 80:4–13.)

The New York Court of Appeals has held that when courts endeavor to interpret "the objective manifestations of the intent of the parties as gathered by their expressed words and deeds[,] . . . the aim is a practical interpretation of the expressions of the parties to the end that there be a realization of their reasonable expectations."  *Brown Bros.*, 361 N.E.2d at 1001 (alteration and quotation marks omitted).  The undisputed documentary evidence (email exchanges) produced clearly shows that the Parties' "communications are 'sufficiently clear and concrete' to establish [] an intent" to contract."  *Brighton Inv., Ltd. v. Har-ZVI*, 932 N.Y.S.2d 214, 216 (App. Div. 2011) ("[A]n exchange of e-mails may constitute an enforceable contract . . . when the communications are 'sufficiently clear and concrete' to establish such an intent" (quoting *Williamson v. Delsener*, 874 N.Y.S.2d 41, 42 (App. Div. 2009))).  Specifically, Plaintiff requested approval for a radio purchase order and Defendants approved, or Defendants simply laid out a budget for radio advertising; either way, Defendants' undisputed communications plainly evince an intent to be bound to the terms.  (*See generally* Contract Compilation.)

Accordingly, the Court finds that the undisputed evidence gives rise to the following contracts for digital advertising:

1. The November 2019 email exchange and its subsequent amendment, totaling $162,000 in digital advertising for December 2019, (*see* Contract Compilation 1–2; Frank Decl. Ex. 4, at 1 (Dkt. No. 37-4));

2. The December 2019 email exchange ordering $163,500 in digital advertising for January 2020, (*see* Contract Compilation 3–4);

3. The January 2020 email exchange ordering a total of $195,000 in digital advertising for February 2020, (*id.* at p. 5–6);

4. The February 2020 email exchange again ordering $195,000 in digital advertising for March 2020, (*id.* at p. 7–8);

5. The mid-December 2020 email exchange regarding $32,500 in digital advertising for January 2021, (*id.* at 29–31);

6. The mid-February 2021 email culminating in $26,117 in digital advertising for March 2021, (*id.* at 32–33); and,

7. The April 2021 email exchange for digital advertising totaling $25,347 for May 2021, (*id.* at 35–39).

[Henceforth the "Seven Digital Contracts".]  In these instances, Regency Management (via Nelson or Kelly in almost all instances) put forward the budget for such advertising, which included the amounts and the specific allocations for stores.  To say that these emails are anything less than a clear intent to be bound to a contract—especially when read in the context of Kelly's and Campbell's aligned vision as to how advertising contracts are rendered, (*see* Kelly Tr. 21:20–22:2; Campbell Tr. 80:4–13)—would be incredulous.

The same is true for Regency Management's approval of purchase orders of broadcast advertising.  "[I]t is recognized in New York that purchase orders may create a binding contract." *Kay-Bee Toys Corp. v. Winston Sports Corp.*, 625 N.Y.S.2d 208, 209 (App. Div. 1995) (citations omitted); *see also Gui's Lumber & Home Ctr., Inc. v. Mader Const. Co.*, 787 N.Y.S.2d 555, 556 (App. Div. 2004) ("The purchase order herein constitutes the contract between [the] plaintiff and [the defendant]. . . ."); *cf. Navitas LLC v. Health Matters Am., Inc.*, No. 16-CV-699, 2018 WL 1317348, at *7 (W.D.N.Y. Mar. 14, 2018) ("Depending on the

circumstances, written purchase orders can either create contracts on their own or can confirm

existing oral or written contracts.").  In the following instances, Plaintiff proposed a purchase

order for radio advertising, and Regency Marketing—specifically Kelly—approved the order,

thereby evincing mutual assent:

1. The early December 2019 for $12,750 in broadcast advertising for that month, (Contract Compilation 24–26);

2. The late July 2020 exchange for $26,860 in broadcast advertising for August 2020, (*id.* at 16–17);

3. The late August 2020 email exchange for $35,275 in broadcast advertising for September 2020, (*id.* at 27–28);

4. The late September 2020 email exchange for $28,475 in broadcast advertising for October 2020, (*id.* at 14–15);

5. The mid-January 2021 email exchange for $34,000 in broadcast advertising for February 2021, (*id.* at 19–20);

6. The March 2021 email exchange for $25,500 in broadcast advertising for April 2021, (*id.* at 11–12); and,

7. The April 2021 email exchange for $19,550 in broadcast advertising for May 2021, (*id.* at 22–23).

[Henceforth the "Seven Broadcast Contracts"; collectively with the Seven Digital Contracts, the

"Fourteen Contracts."]

The Court concludes that the Fourteen Contracts were created regarding the above-listed

requests.  Importantly, however, the contracting parties only speak to Plaintiff and Regency

Management, as representatives of the latter organization were the individuals speaking with—

and thus contracting with—Plaintiff.  While the domain name appears as "regencyfurniture.biz,"

each individual's email signature says *only* Regency Management.  (*See generally, e.g.*, Contract

Compilation (showing the email signatures for Nelson and Kelly, which both state clearly

"Regency Management Services").)  This comports with Kelly's statement that she works *only*

24

for Regency Management.  (*See* Kelly Tr. 9:14–24.)  Moreover, Kelly's statement that Regency Management is itself a "furniture retailer," (Kelly Tr. 11:10), offers a clear explanation for any confusion for why Regency Management uses such a domain.

The flip-side of this, however, is that the above-referenced evidence does not establish Plaintiff's contracting efforts with Regency Furniture, to the extent those exist, as the emails evincing intent do not speak to Regency Furniture.  Finally, that Kelly herself has never "heard of" Regency Furniture prior to this Action forecloses any suggestion that Plaintiff's efforts and statements are to be considered as falling under the auspices of Regency Furniture.  (*Id.* at 11:1–8; *see also infra* II.B.1.b.v (concluding that arguments that Regency Management acted as an agent or that the invoices addressed elsewhere foreclose the existence of a contract does not withstand scrutiny).)  Thus, Plaintiff has failed to show that there exists no genuine issue of fact that Plaintiff contracted with Regency Furniture for such advertising practices and Plaintiff's Motion as to Regency Furniture must be denied.

### iii.  Essential Terms

The aforementioned email exchanges not only evince mutual assent, they also provide the essential terms of the contract.  For a contract to be enforceable, the essential terms "must be sufficiently certain and specific so that what was promised can be ascertained."  *Joseph Martin, Jr., Delicatessen, Inc. v. Schumacher*, 417 N.E.2d 541, 543 (N.Y. 1981).  On the other hand, the New York Court of Appeals has also warned against "appl[ying] the definiteness doctrine rigidly."  *166 Mamaroneck Ave. Corp. v. 151 E. Post Rd. Corp.*, 575 N.E.2d 104, 105 (N.Y. 1991).  The Court of Appeals reasoned as follows: because "[c]ontracting parties are often imprecise in their use of language," demanding perfection lest a contract be rendered unenforceable would "defeat the underlying expectations of the contracting parties."  *Id.* at 105–

06; *see also Cobble Hill Nursing Home, Inc. v. Henry & Warren Corp.*, 548 N.E.2d 203, 206

(N.Y. 1989) ("[C]ourts should not be 'pedantic or meticulous' in interpreting contract

expressions." (citation omitted)).  Accordingly, "[s]triking down a contract as indefinite and in

essence meaningless 'is at best a last resort.'"  *166 Mamaroneck Ave.*, 575 N.E.2d at 106

(quoting *Heyman Cohen & Sons v. M. Lurie Woolen Co.*, 133 N.E. 370, 371 (N.Y. 1921)).

Determining what constitutes an essential term "is necessarily flexible, varying for

example with the subject of the agreement, its complexity, the purpose for which the contract

was made, the circumstances under which it was made, and the relation of the parties," *Cobble

Hill*, 548 N.E.2d at 206.  Here, the Court finds that Plaintiff and Regency Management have

cleared this standard.  The Parties are clearly aware of one another's roles and identity, the

subject of the agreement—the advertising services—the costs, and the degree of flexibility; in

other words, they have agreed on every term that "seriously affects the rights and obligations of

the [P]arties," *Ginsberg Mach. Co. v. J. & H. Label Processing Corp.*, 341 F.2d 825, 828 (2d

Cir. 1965); *see also* 28 N.Y. Prac., Contract Law § 2:27 ("A term is 'essential' if it seriously

affects the rights and obligations of the parties.").

A fact that erases any doubt is that Defendants—and specifically Regency

Management—paid a portion of the invoices previously billed (even if billed to Regency

Marketing), (*see* Northridge Aff. ¶ 3 n.2), which establishes both the mutual assent to contract as

well as the existence of an enforceable contract, *see Bank of Am., N.A. v. Farley*, No. 00-CV-

9346, 2002 WL 5586, at *5 (S.D.N.Y. Jan. 2, 2002) (concluding that the defendant's actions,

which were in accordance with terms of agreement, including payments to reduce debt under

agreement, establishes the existence of a contract between the parties, warranting summary

judgment for the plaintiff asserting lack of payment pursuant to a contract); *Clarke v. Parkway*

26

*Vill. Equities Corp.*, No. 28283/2010, 984 N.Y.S.2d 631 (Table), 2014 WL 128548, at *8 (Sup. Ct. 2014) (unreported decision) ("[A]n agreement may be implied where a defendant . . . makes partial payment on the account."); *cf. Apex Oil Co. v. Vanguard Oil Serv. Co.*, 760 F.2d 417, 422 (2d Cir. 1985) ("[T]he existence of a contract may be established through conduct of the parties recognizing the contract." (citations omitted)).

### iv.  Breach and Damages

As stated above, the Seven Digital Contracts total $799,464 and the Seven Broadcast Contracts total $182,410, which amounts to $981,874.  Plaintiff's damages request, following its amendment, though, is $786,945.  (*See* Pl.'s Mem. 15.)  This misalignment is but the tip of the iceberg with respect to the mismatched evidence before the Court and portends the piecemeal way in which the Court must adjudicate Plaintiff's Motion.

"With respect to proving such damages, it is well established under New York law that, while a plaintiff must prove the existence of damages with certainty in order to recover for breach of contract, plaintiff need not prove the amount of loss with certainty."  *V.S. Int'l, S.A. v. Boyden World Corp.*, No. 90-CV-4091, 1993 WL 59399, at *6 (S.D.N.Y. Mar. 4, 1993).  The Second Circuit long ago pronounced the following regarding the "scientific rigor in the calculation of damages," *id.*, pursuant to New York contract law:

> When it is certain that damages have been caused by a breach of contract, and the only uncertainty is as to their amount, there can rarely be any good reason for refusing, on account of such uncertainty, any damages whatever for the breach.  A person violating his contract should not be permitted entirely to escape liability because the amount of the damage which he had caused is uncertain.

*Lexington Products Ltd. v. B.D. Communications, Inc.*, 677 F.2d 251, 253 (2d Cir. 1982) (quoting *Randall-Smith, Inc. v. 43d St. Estates Corp.*, 215 N.E.2d 494, 498 (N.Y. 1966)); *see also Wakeman v. Wheeler & Wilson Mfg. Co.*, 4 N.E. 264, 271 (N.Y. 1886) ("If there is no more

27

certain method of arriving at the amount, the injured party is entitled to submit to the jury the particular facts and to show the whole situation which is the foundation of the claim and expectation of profit, so far as any detail offered has a legal tendency to support such claim.").

Thus, where such damages are shown, "the burden of uncertainty as to the amount of damage is upon the wrongdoer," and at trial the "plaintiff need only show a 'stable foundation for a reasonable estimate' of the damages incurred as a result of the breach." *Process Am., Inc. v. Cynergy Holdings, LLC*, 839 F.3d 125, 141 (2d Cir. 2016) (quoting *Contemp. Mission, Inc. v. Famous Music Corp.*, 557 F.2d 918, 926 (2d Cir. 1977); and then quoting *Freund v. Washington Square Press, Inc.*, 314 N.E.2d 419, 421 (N.Y. 1974)); *see also Moreno-Godoy v. Kartagener*, 7 F.4th 78, 86 (2d Cir. 2021) (holding that, following a breach of contract, the victim of the breach is "entitled to damages for the value of those services if he can 'show a stable foundation for a reasonable estimate' of that value" (quoting *Tractebel Energy Mktg., Inc. v. AEP Power Mktg., Inc.*, 487 F.3d 89, 110 (2d Cir. 2007))); *Boyce v. Soundview Tech. Grp., Inc.*, 464 F.3d 376, 391 (2d Cir. 2006) (adopting the same holding); *Contemp. Mission, Inc.*, 557 F.2d at 926 ("[U]nder the long-standing New York rule, when the existence of damage is certain, and the only uncertainty is as to its amount, the plaintiff will not be denied a recovery of substantial damages. Moreover, the burden of uncertainty as to the amount of damage is upon the wrongdoer." (citations omitted)).  In other words, "damages 'must be *reasonably certain* and such only as actually follow or may follow from the breach of contract,'" with the understanding that "certainty . . . refers to the fact of damage, not the amount.'" *N.Y.C. Transit Auth. v. Express Scripts, Inc.*, No. 19-CV-5196, 2022 WL 603937, at *11 (S.D.N.Y. Mar. 1, 2022) (emphasis in original) (alterations, italics, and quotation marks omitted) (quoting *Tractebel Energy*, 487 F.3d at 110), *reconsideration denied*, 2022 WL 3577426 (S.D.N.Y. Aug. 19, 2022).

Notwithstanding this deferential standard, Plaintiff has largely failed to establish damages with certainty.  Northridge's affidavit proffers a "breakdown by month of total outstanding invoices for broadcast [radio] and digital [advertising]":

**Broadcast:**

| | |
|---|---|
| December 2020 | $27,200.00 |
| January 2021 | $35,700.00 |
| February 2021 | $34,000.00 |
| March 2021 | $25,500.00 |
| April 2021 | $24,225.00 |
| May 2021 | $ 6,800.00 |
| **Total:** | **$153,425.00** |

**Digital:**

| | |
|---|---|
| December 2019 | $110,900.00 |
| January 2020 | $141,500.00 |
| February 2020 | $155,000.00 |
| March 2020 | $152,170.00 |
| January 2021 | $32,500.00 |
| February 2021 | $36,802.00 |
| March 2021 | $26,117.00 |
| May 2021 | $20,181.00 |
| **Total:** | **$675,170.00** |

(Northridge Aff. ¶ 3.)  Thereafter, Northridge notes that "Plaintiff received two payments from Defendants, on April 30, 2021 for $27,200 and on May 11, 2021 for $14,450, against Plaintiff's December 2020 and January 2021 invoices, respectively, for broadcast advertising services.  Those payments are not reflected in this table and [D]efendants made no payments since."  (*Id.* ¶ 3 n.2.)

But the invoices put forward as damages in the Northridge Affidavit generally do not track the contracts claimed above; in fact, in only two instances does the amount listed as the outstanding affidavit match the amount for which the Parties contracted, per the documentary evidence.  Otherwise, the documentary evidence and the invoices claimed fall into three distinct categories of discrepancy: (1) the contract created by the documentary email does not have a

29

corresponding invoice claimed as outstanding, and thus, correspondent damages; (2) the invoice

held out as outstanding does not have documentary evidence evincing a contract giving rise to

the invoice; or (3) the amount the Parties contracted for does not match the amount claimed.  The

following table provides a pictorial review:[8]

| Type of Advertising | Outstanding Invoice / Contract Date | Invoice | Contract | Category |
|---|---|---|---|---|
| Broadcast | Dec. 2019 | N/A | $12,750.00 | (1) No damage alleged for contract |
|  | Aug. 2020 | N/A | $26,860.00 | (1) No damage alleged for contract |
|  | Sep. 2020 | N/A | $35,275.00 | (1) No damage alleged for contract |
|  | Oct. 2020 | N/A | $28,475.00 | (1) No damage alleged for contract |
|  | Dec. 2020 | $27,200.00 | N/A | (2) No contract giving rise to invoice[9] |
|  | Jan. 2021 | $35,700.00 | N/A | (2) No contract giving rise to invoice[10] |
|  | Feb. 2021 | $34,000.00 | $34,000.00 | *Claimed damage matches contract* |
|  | Mar. 2021 | $25,500.00 | N/A | (2) No contract giving rise to invoice |
|  | Apr. 2021 | $24,225.00 | $25,500.00 | (3) Invoice, contract do not match |
|  | May 2021 | $6,800.00 | $19,550.00 | (3) Invoice, contract do not match |
| Digital | Dec. 2019 | $110,900.00 | $162,000.00 | (3) Invoice, contract do not match |
|  | Jan. 2020 | $141,500.00 | $163,500.00 | (3) Invoice, contract do not match |
|  | Feb. 2020 | $155,000.00 | $195,000.00 | (3) Invoice, contract do not match |
|  | Mar. 2020 | $152,170.00 | $195,000.00 | (3) Invoice, contract do not match |
|  | Jan. 2021 | $32,500.00 | N/A | (2) No contract giving rise to invoice |
|  | Feb. 2021 | $36,802.00 | N/A | (2) No contract giving rise to invoice |
|  | Mar. 2021 | $26,117.00 | $26,117.00 | *Claimed damage matches contract* |
|  | May 2021 | $20,181.00 | $25,347.00 | (3) Invoice, contract do not match |

For the two contracts in which the outstanding invoice matches—February 2021

broadcasting, and March 2021 digital—Plaintiff has undoubtedly provided a "'reasonable

estimate' of the damages incurred as a result of the breach."  *Process Am.*, 839 F.3d at 141.

---

[8] (*See* Northridge Aff. ¶ 3; *see generally* Contract Compilation.)  "N/A" denotes where there exists in the record no specific documentary evidence giving rise to a contract or where the Northridge affidavit does not detail an outstanding invoice.

[9] Per Plaintiff, this invoice was paid for in full on April 30, 2021.  (*See* Northridge Aff. ¶ 3 n.2.)

[10] Per Plaintiff, Defendants paid $14,450 against this invoice on May 11, 2021.  (*See* Northridge Aff. ¶ 3 n.2.)

Accordingly, Plaintiff's Motion with respect to his breach of contract claim arising from these two contracts totaling $60,117.00 is granted. The remaining contracts, however, are slightly thornier.

"Under New York law, where actual damages have not been proven with the requisite certainty, and indeed even if the breach of contract caused no loss at all, nominal damages are available 'as a formal vindication of plaintiff's legal right to compensation.'" *NAF Holdings, LLC v. Li & Fung (Trading) Ltd.*, No. 10-CV-5762, 2016 WL 3098842, at *17 (S.D.N.Y. June 1, 2016) (quoting *Freund*, 34 N.Y.2d at 384). Thus, that there is no outstanding invoice—and thus no damage—is not necessarily fatal to Plaintiff's claim for sake of a lack of damages. But, more foundationally, by failing to establish in any way that there is no outstanding invoice matched to four of these contracts, Plaintiff puts forward no evidence whatsoever to establish Defendants in fact breached the contracts at issue. Accordingly, the Court must deny Plaintiff's Motion with respect to these four contracts.

The same conclusion must also be reached for the contracts in which Northridge has attested that there exists an outstanding invoice recognizing an amount owed. "Depending on the circumstances, written purchase orders can either create contracts on their own or can confirm existing oral or written contracts." *Navitas LLC*, 2018 WL 1317348, at *7. Therefore, the invoices and attestation thereto, the general discussion of billing practices with which this invoice aligns, and the Defendants' discussion of outstanding debts raises a genuine issue of material fact as to the contract's existence; however, there exists insufficient evidence to put this factual issue to bed insofar as there is an absence of additional evidence that the Parties assented to this contract. *See ADCO Elec. Corp. v. HRH Const., LLC*, 880 N.Y.S.2d 188, 189 (App. Div. 2009) ("A question of fact arises as to the parties' intent to enter into an enforceable obligation

"[] where the intent must be determined by . . . inferences outside the written words of the instrument'" (quoting *Mallad Const. Corp. v. Cnty. Fed. Sav. & Loan Ass'n*, 298 N.E.2d 96, 100 (N.Y. 1973)); *cf. Pereida v. Wilkinson*, 141 S. Ct. 754, 765 n.6 (2021) ("It is generally a question of fact for the jury whether or not a contract actually exists." (alteration and quotation marks omitted)). Therefore, Plaintiff's Motion on such contracts is denied.

The last category of contracts is slightly trickier. In these, discrepancies range from several hundred dollars (e.g., $1,200 discrepancy for the April 2021 broadcast advertising contract) to tens of thousands of dollars (i.e., the December 2019, January, February, and March 2020 digital advertising contracts). Even if the attestation correctly states outstanding debts—an uncertain fact, as Plaintiff failed to provide any comprehensible key, legend, or roadmap by which to connect the many disorganized invoices produced as in support of its Motion and sum to the amount stated in the attestation—Plaintiff fails to explain the nature of these discrepancies—particularly where two such contracts align perfectly with the outstanding invoices. Accordingly, the affidavit alone does not provide the Court with "a plausible theory that amounts to something more than a speculative measure of damages" when the contracted-for amount differed. *Cottam v. Glob. Emerging Cap. Grp., LLC*, No. 16-CV-4584, 2021 WL 1222120, at *5 & n.8 (S.D.N.Y. Mar. 31, 2021) (collecting cases in which a plaintiff failed to establish the amount of damages clearly and convincingly at the summary judgment stage).

Nevertheless, with respect to these seven contracts, "[w]hile the amount of damages is unclear at this point, [Plaintiff] has presented evidence of damage, and the assessment of damages requires factfinding that can only take place at trial." *MTV Networks v. NVE Pharm.*, No. 01-CV-1699, 2002 WL 1203853, *6 (S.D.N.Y. June 3, 2002) (denying summary judgment on issue of damages in breach of contract action where existence of damages was proven but the

quantum of damages was unclear, necessitating factfinding at trial). Therefore, Plaintiff's

Motion for Summary Judgment as to these contracts is granted with respect to liability but

denied as to damages. *See TNT USA Inc. v. DHL Exp. (USA), Inc.*, No. 09-CV-481, 2012 WL

601452, at *5 (E.D.N.Y. Feb. 23, 2012) ("[The plaintiff] is entitled to a summary determination

on liability but . . . the evidence is insufficient to award [the plaintiff] summary judgment on

damages."); *4Kids Ent., Inc. v. Upper Deck Co.*, 797 F. Supp. 2d 236, 244–48 (S.D.N.Y. 2011)

(granting a motion for summary judgment as to liability but not as to damages where the

"[d]amages for the breach remain to be calculated"). Rather, for these contracts, "the amount of

[Plaintiff's] damages is for a jury to decide." *TNT*, 2012 WL 601452, at *7.

<u>v.  Defendants' Motion</u>

Defendants' chief argument in support of its Motion regarding Plaintiff's breach of

contract claim—which also serves as the chief argument in opposition to Plaintiff's Motion—is

that Plaintiff failed to state a claim for breach of contract because no contract existed between the

Parties—and particularly Plaintiff and Regency Management. (*See* Defs.' Mem. 12–18; Defs.'

Opp. 10–12.) As discussed above, this is incorrect. *See supra* II.B.1.b.i–iii. However, for sake

of completeness, the Court grapples with Defendants' argument. Specifically, Defendants

contend that Regency Management "was acting as nothing more than an agent on behalf of

others," (Defs.' Opp. 12), which relies almost entirely on where the invoices were sent, (*see id.* at

10–12), as well as semantical arguments regarding Kelly's designation and deposition

testimony.[11]

---

[11] Defendants reprise the invoice argument for purposes of Plaintiff's account stated
claim, too. (*See* Defs.' Opp. 15–16.)

Agency law dictates that "[a] principal is considered to be 'disclosed' if, at the time of a transaction conducted by an agent, the other party to the contract had notice that the agent was acting for the principal and of the principal's identity." *Safety Env'tl., Inc. v. Barberry Rose Mgmt. Co.*, 942 N.Y.S.2d 200, 202 (App. Div. 2012) (citations omitted). "Knowledge of the real principal is the test, and this means actual knowledge, not suspicion." *Ell Dee Clothing Co. v. Marsh*, 160 N.E. 651, 653 (N.Y. 1928). For this reason, "[t]he defense of agency in avoidance of contractual liability is an affirmative defense and the burden of establishing the disclosure of the agency relationship and the corporate existence and identity of the principle is upon he who asserts an agency relationship." *Nippon Yusen Kaisha v. FIL Lines USA Inc.*, 977 F. Supp. 2d 343, 350 (S.D.N.Y. 2013) (quoting *Courthouse Corp. Ctr. LLC v. Schulman*, 902 N.Y.S.2d 160, 162 (App. Div. 2010)); *see also* Restatement (Third) of Agency § 1.02 cmt. d ("[T]he party asserting that a relationship of agency exists generally has the burden in litigation of establishing its existence.").

Defendants offer no evidence showing that Regency Management clearly and unequivocally disclosed their contractual role as an agent for another principal; indeed, none exists in the record. Defendants' argument instead hinges on email from Michael Ritter dated January 2, 2018, in which he states that following an acquisition, "all invoices will need to be changed to Regency Marketing Inc." (Defs.' Opp. 4 (emphasis omitted) (quoting *id.* Ex. 3 (Dkt. No. 43-3)).) That the invoices were send elsewhere, Defendants argue, proves its role as "an agent and nothing more." (*Id.* at 12.) However, the undisputed documentary evidence reveals the strategic cherrypicking that creates the factual predicate for Defendants' argument.

What Defendants omit lies at the heart of this case: Ritter, in 2018, demanded that the invoices "be emailed to Avery Nelson at anelson@regencyfurniture.biz and Tara Kelly

tkelly@regencyfurniture.biz for review and payment," (*Id.* Ex. 3, at 5 (Dkt. No 43-3).)  But Kelly herself confirms in her deposition that she worked *exclusively* for Regency Management. (*See* Kelly Tr. 9:17–20.)  To that end, and Nelson and Kelly's email signatures both sport Regency Management.  (*See generally, e.g.*, Contract Compilation (showing the email signatures for Nelson and Kelly, which both state clearly "Regency Management Services").)  When Regency Management's representative is reviewing the invoice—irrespective of the "label" to which it is assigned—and approving payment without so much as saying that it is on behalf of another entity, it strains credulity to conclude that Regency Management's role is solely one of an agent purchasing for a third party and unbound by the terms of the agreement.  To wit, nowhere in this crucial document does Ritter, on behalf of Regency Management, clearly disclose Regency Management's role as an agent and *only* an agent.  *See Courthouse Corp.*, 902 N.Y.S.2d at 162 (affirming the lower court's denial of the defendants' cross-motion for summary judgment where "the defendants failed to establish, prima facie, that [one of the defendants] disclosed the legal status" as an agent).

Ironically, Defendants tacitly concede this.  Defendants state that Plaintiff sent the invoices to "'Regency Marketing Inc.' because this was the *arrangement* reached with Plaintiff." (Defs.' Opp. 12 (emphasis added).)  The definition of an "agreement"—the foundation of a contract—is "[a]n *arrangement* about action to be taken," *Agreement*, Merriam-Webster, https://www.merriam-webster.com/dictionary/agreement (last visited Aug. 25, 2022).  Indeed, this was the agreement that Kelly—a Regency Management employee—reiterated during the course of these contracts.  (*See* Pl.'s Not. of Mot. Ex. 15, at 1–2 (Dkt. No. 39-15) (Kelly emailing unidentified individuals, including Plaintiff, regarding "*Regency Management Invoices*" and

asking "all invoices for all *Regency Management Brands*" to be emailed to her, and, in the alternative, mailing them to "Regency Management Services" (emphasis added)).)

Defendants' argument of Plaintiff's mistaken identity of its contracting partner takes another form when articulated in support of their Motion, namely speaking to Kelly's deposition and insufficiently clear language to delineate with whom Plaintiff contracted. "Kelly did not differentiate between which Defendant . . . made purchases from Plaintiff, and which Defendant was responsible for payments to Plaintiff." (Defs.' Mem. 5 (emphases omitted).) Defendants further harp on Defense Counsel's statement that Kelly was the designee for both Regency Management and Regency Furniture. (*Id.* at 5–6.) Therefore, Defendants argue, Kelly's use of "Regency" and "we" are ambiguous as to their application to Regency Management or Regency Furniture, (*id.* at 6), and accordingly fail to show that no genuine issue of material fact exists with respect to whether Plaintiff entered into a contract with Defendants (and specifically Regency Management). This argument is unpersuasive.

At the outset of her deposition, Kelly, while being a designee for Regency Furniture, stated unequivocally that she was not "familiar with an entity called Regency Furniture, Inc." and that beyond seeing it in some of the "paperwork" related to this Action, she had not seen it "prior." (Kelly Tr. 11:1–7.) Indeed, following Kelly's statement regarding Regency Furniture, counsel never again mentions Regency Furniture beyond one slip of the tongue, whereas he repeatedly uses the term Regency Management before turning to the shorthand of "Regency." (*See generally id.* at 11:8–121:16; *see id.* at 12:20 (wherein Plaintiff's counsel slips up and refers to Regency Furniture only to immediately correct himself: "of Regency Furniture—sorry, of Ashley Furniture").)

To that point, the specific line of inquiry in the deposition undermines it, as Plaintiff's counsel uses the term "Regency Management" rather than "Regency" several times, (*see generally id.*), including framing the entire line of questioning in the following way:

| | |
|---|---|
| [Paikoff:] | Do you know for how long Townsquare Media has been doing business with *Regency Management*? |
| [Kelly:] | I would say probably since we acquired that Central New Jersey footprint would be a best guess, but I'm not a hundred percent sure. |
| . . . | |
| [Paikoff:] | Do you know how the relationship between Townsquare Media and *Regency Management* first formed? |
| [Kelly:] | Not with certainty, no. |
| [Paikoff:] | Does Townsquare Media currently provide – perform any services for *Regency Management*? |
| [Kelly:] | Currently, no. |
| [Paikoff:] | When was the last time it performed services for *Regency Management*? |
| [Kelly:] | Best guess, I would say back in June. |
| [Paikoff:] | June of 2021? |
| [Kelly:] | I believe so, yeah. |
| [Paikoff:] | Did *Regency Management* and Townsquare enter into any type of agreements for services that were performed? |
| [Kelly:] | No. |
| [Paikoff:] | Did *Regency Management* purchase any type of advertising services from Townsquare Media? |
| [Kelly:] | Yes. |

(*Id.* at 17:24–18:4, 19:12–20 (emphases added).)  In other words, "[i]t would be a particularly unreasonable and irrational conclusion to interpret [Kelly's] deposition statement[] in the manner [Defendants] requests[]" in light of both Kelly's initial disclosure regarding Regency Furniture,

counsel's subsequent exclusive use of Regency Management, and the information Kelly provided in the deposition. *Lutz v. Navistar Int'l Transp. Corp.*, No. 88-CV-513, 1992 WL 695486, at *3 (S.D. Ohio Dec. 31, 1992), *aff'd*, 43 F.3d 1472 (6th Cir. 1994). To suggest, then, that Kelly's answers using "we" could possibly include Regency Furniture strains credulity insofar as it demands a robotic interpretation of language.

Finally, beyond the incorrect facts on which it relies, the impropriety of Defendants' argument is also made clear by its logical extension. Jones stated in his deposition that he does not believe "Regency Management Services should pay an invoice billed to Walmart or to Target." (Jones Tr. 115:7–9.)[12] Were the Court to adopt this reasoning, one contracting party could simply instruct its counterpart to send the invoices elsewhere and subsequently absolve itself of the bill, meaning no contracting party would ever submit themselves to billing. To be sure, such a rule could not be sustained.

In sum, the undisputed documentary evidence as well as several affidavits and depositions show that there exists no genuine dispute that from 2019 to 2021, Plaintiff contracted with Regency Management for broadcast and digital advertising services, and no ultimate third-party beneficiary was disclosed as having been driving the procurement of such services, thereby obligating Defendants, including Regency Management. *See Ads Plus Advert., Inc. v. Ault*, 928 F. Supp. 2d 683, 691 (W.D.N.Y. 2013) (granting summary judgment for advertising service on the basis that the purchaser of advertisements sought such services without disclosing a third-party beneficiary, as the defendant made arguments sounding in agency non-liability).

---

[12] As an aside, "it has not escaped [the Court's] notice," *Associated Indem. Corp. v. Fairchild Indus., Inc.*, 961 F.2d 32, 36 (2d Cir. 1992), that Defendants implicitly rely on Jones' legal determination as to Defendants' liability while simultaneously relying on the fact that "Kelly is not an attorney" and accordingly arguing—stridently, with bolding and italics no less—that Plaintiff cannot rely on her "legal opinion." (Defs.' Mem. 6 (emphases omitted).)

<u>vi.  Defendants' Affirmative Defenses</u>

As stated above, "[t]he moving party bears the initial burden of showing that there is no genuine dispute as to a material fact." *Jaffer v. Hirji*, 887 F.3d 111, 114 (2d Cir. 2018) (quoting *CILP Assocs.*, 735 F.3d at 123).  "But where 'the burden of proof at trial would fall on the nonmoving party,' the moving party can shift the initial burden by 'point[ing] to a lack of evidence to go to the trier of fact on an essential element of the nonmovant's claim.'"  *Id.* (alteration in original) (quoting *Simsbury-Avon Pres. Soc'y, LLC v. Metacon Gun Club, Inc.*, 575 F.3d 199, 204 (2d Cir. 2009)).  "It follows that, where a plaintiff's motion for summary judgment would be meritorious absent the assertion of an affirmative defense, in order to avoid summary judgment, the defendant must adduce evidence which, viewed in the light most favorable to and drawing all reasonable inferences in favor of [it], would permit judgment for [it] on the basis of that defense." *Jose Luis Pelaez, Inc. v. McGraw-Hill Glob. Educ. Holdings LLC*, 399 F. Supp. 3d 120, 127 (S.D.N.Y. 2019) (alterations in original) (quotation marks omitted)).

Defendants' put forward several Affirmative Defenses in their answer: failure to state a claim (which overlaps with their general counterargument); release; estoppel; Plaintiff's own actions; good faith performance (stated in two distinct ways); unclean hands; justified, excused and/or privileged actions; and the statute of frauds.  (*See* Answer 7–8.)  None vindicates their position.

In the first instance, Plaintiff argues that the Affirmative Defenses should be dismissed both on their merits, (*see* Pl.'s Mem. 17–20), and because of Defendants' failure to comply with disclosure obligations, (*see id.* at 20–22).  Defendants respond only to the latter argument, stating that their "affirmative defenses should not be dismissed because Plaintiff has been in error with its request."  (Defs.' Opp. 23.)  In other words, aside from Defendants' argument more broadly

that Plaintiff fails to state a claim, which corresponds with their First Affirmative Defense,

Defendants do not substantively grapple with Plaintiff's arguments on the merits of the

remaining Affirmative Defenses.  (*See generally* Defs.' Mem.; Defs.' Opp.)  Accordingly,

Defendants have "abandoned them, conceding that these defenses are inapplicable and/or

unsupported, and the Court does not analyze them further as they are moot."  *CIT Bank, N.A. v.

Escobar*, No. 16-CV-3722, 2017 WL 3614456, at *6 n.3 (E.D.N.Y. June 16, 2017), *report and

recommendation adopted*, 2017 WL 3634604 (E.D.N.Y. Aug. 18, 2017); *see also Wecare

Holdings, LLC v. Bedminster Int'l Ltd.*, No. 08-CV-6213, 2009 WL 604877, at *8 (W.D.N.Y.

Mar. 9, 2009) ("In the present case, the plaintiffs moved for summary judgment, but the

defendant did not address the plaintiffs' arguments concerning the eight affirmative defenses . . .

in its response to the motion for summary judgment.  As a result of the defendant's failure to

respond to the plaintiffs' arguments, the court finds that the defendant abandoned these claims

relating to the eight affirmative defenses . . . and thus [the] plaintiffs' motion for summary

judgment with respect to those claims is granted."); *Bonnie & Co. Fashions, Inc. v. Bankers

Trust Co.*, 945 F. Supp. 693, 726 (S.D.N.Y. 1996) (holding that where the party moving for

summary judgment addressed affirmative defenses and explained why that they should not

preclude summary judgment, and the opposing party failed to respond to such arguments, the

court need not consider the affirmative defenses and can instead find that the opposing party had

not satisfied its burden); *cf. Taylor v. City of N.Y.*, 269 F. Supp. 2d 68, 75 (E.D.N.Y. 2003)

("Federal courts may deem a claim abandoned when a party moves for summary judgment on

one ground and the party opposing summary judgment fails to address the argument in any

way.")

And "even if [D]efendants' silence did not operate as a forfeiture of these affirmative defenses, they are unavailing" on their merits. *United States v. Livecchi*, No. 03-CV-6451, 2005 WL 2420350, at *15 (W.D.N.Y. Sept. 30, 2005). For the reasons stated above, Defendants' First Affirmative Defense asserting that Plaintiff fails to state a claim is incorrect. *See supra* II.B.1.b.i–v. Defendants' memoranda lack any reference to "release," "estoppel," Plaintiff's "own actions," good faith performance, "unclean hands," justified or privileged actions, or the statute of frauds, (*see generally* Defs.' Mem.; Defs.' Opp.), nor does any evidence in the record support such defenses. "Because [D]efendants have not come forward with specific facts that show that these affirmative defenses create a genuine issue for trial, these affirmative defenses are insufficient to defeat [P]laintiff's motion for summary judgment." *F.D.I.C. v. Betancourt*, 865 F. Supp. 1035, 1041 n.2 (S.D.N.Y. 1994).[13]

Accordingly, Plaintiff's Motion to Dismiss Defendants' Affirmative Defenses with regard to its breach of contract claim vis-à-vis Regency Management is granted, and, for the same reasons, Defendants' Motion is denied.

### 2. Account Stated

Plaintiff also moves for summary judgment for its claim for account stated. (*See* Pl.'s Mem. 14–16.) Defendants reprise their argument that Plaintiff is pursuing this debt from the wrong party, having contracted with other entities. (*See* Defs.' Opp. 15–16; *see also* Defs.' Mem. 14–15.)

---

[13] Because the Court finds that Defendants have abandoned their affirmative defenses and, in the alternative, they show no merit to overcome Plaintiff's meritorious summary judgment motion, the Court need not opine on the extent to which Defendants complied with the requests and, if not, whether striking the affirmative defenses pursuant to Rule 37 is an appropriate remedy.

### a.  Applicable Law

"Under New York law, an 'account stated' refers to a promise by a debtor to pay a stated sum of money which the parties had agreed upon as the amount due." *Arch Specialty*, 2021 WL 1225447, at *9 (quoting *Air Atlanta Aero Eng'g Ltd. v. SP Aircraft Owner I, LLC*, 637 F. Supp. 2d 185, 197 (S.D.N.Y. 2009)).  In other words, "[a]n account stated is nothing more or less than a contract express or implied between the parties . . . which they have come to regarding the amount due on past transactions." *Rodkinson v. Haecker*, 162 N.E. 493, 495 (N.Y. 1928); *see also Givens v. De Moya*, 146 N.Y.S.3d 291, 294 (App. Div. 2021) ("'[A]n account stated is an agreement between parties, based upon their prior transactions, with respect to the correctness of the account items and the specific balance due.'" (quoting *Bashian & Farber, LLP v. Syms*, 46 N.Y.S.3d 202, 204 (App. Div. 2017))).  For this reason, "[a] cause of action for an account stated has been described as 'an alternative theory of liability to recover the same damages allegedly sustained as a result of the breach of contract.'" *Episcopal Health Servs., Inc. v. Pom Recoveries, Inc.*, 31 N.Y.S.3d 113, 114–15 (App. Div. 2016) (quoting *A. Montilli Plumbing & Heating Corp. v. Valentino*, 935 N.Y.S.2d 647, 649 (App. Div. 2011)).

Given the relatedness between claims for breach of contract and those for account stated, "[i]t is well-established," *Arch Specialty*, 2021 WL 1225447, at *10, that a claim for account stated cannot "be utilized simply as another means to attempt to collect under a disputed contract," *4Kids Ent.*, 797 F. Supp. 2d at 249 (quotation marks omitted) (quoting *Martin H. Bauman Assocs., Inc. v. H & M Int'l Transp., Inc.*, 171 A.D.2d 479, 485 (App. Div. 1991)). "[A]s a matter of law, [a] [d]efendant cannot be found liable on both an account stated claim . . . and a breach of contract claim . . . in connection with the same allegations of a failure to pay monies owed." *Wachtel & Masyr LLP v. Brand Progression LLC*, No. 11-CV-7398, 2012 WL

523621, at *1 (S.D.N.Y. Feb. 15, 2012); *see also Design Partners, Inc. v. Five Star Elec. Corp.*, No. 12-CV-2949, 2017 WL 818364, at *7 (E.D.N.Y. Mar. 1, 2017) (stating the same proposition).

A claim for an account stated thus demands three elements be established: "(1) an account was presented; (2) it was accepted as correct; and (3) [the] debtor promised to pay the amount stated." *Cvar Von Habsburg Grp., LLC v. Decurion Corp.*, No. 18-CV-11218, 2020 WL 4577440, at *3 (S.D.N.Y. Mar. 26, 2020) (quotation marks omitted) (quoting *IMG Fragrance Brands, LLC v. Houbigant, Inc.*, 679 F. Supp. 2d 395, 411 (S.D.N.Y. 2009)). "[W]hile the mere silence and failure to object to an account stated cannot be construed as an agreement to the correctness of the account, the factual situation attending the particular transactions may be such that, in the absence of an objection made within a reasonable time, an implied account stated may be found." *Auburn Custom Millwork, Inc. v. Schmidt & Schmidt, Inc.*, 50 N.Y.S.3d 635, 640 (App. Div. 2017) (alteration in original) (quoting *Interman Indus. Prod., Ltd. v. R.S.M. Electron Power, Inc.*, 332 N.E.2d 859, 861 (N.Y. 1975)); *see also LeBoeuf, Lamb, Greene & MacRae, L.L.P. v. Worsham*, 185 F.3d 61, 64 (2d Cir. 1999) ("Such an agreement may be implied if 'a party receiving a statement of account keeps it without objecting to it within a reasonable time' or 'if the debtor makes partial payment.'" (quoting *Chisholm–Ryder Co. v. Sommer & Sommer*, 421 N.Y.S.2d 455, 457 (App. Div. 1979))).

### b.  Application

Plaintiff's claims are "congruent with, and duplicative of, its claim for breach of contract." *4Kids Ent.*, 797 F. Supp. 2d at 249.  As the Second Circuit has explained, "[t]wo claims are duplicative of one another if they arise from the same facts and do not allege distinct damages." *NetJets Aviation, Inc. v. LHC Commc'ns, LLC*, 537 F.3d 168, 175 (2d Cir. 2008)

(citation, ellipsis, and internal quotation marks omitted).  In other words, a claim is duplicative—
and therefore must be dismissed—as long as the "relief sought . . . is identical." *Premier Steel,
Inc. v. Hunterspoint Steel LLC*, No. 10-CV-4206, 2010 WL 5248583, at *4 (S.D.N.Y. Dec. 16,
2010).

"That is the case here," as "Plaintiff's account stated claim stems from identical facts as
its breach of contract claim and seeks identical damages." *Arch Specialty*, 2021 WL 1225447, at
*10.  Accordingly, Plaintiff's Motion is denied and Plaintiff's claims for account stated are
dismissed. *See Bank of Am., N.A. v. City View Blinds of N.Y., Inc.*, No. 20-CV-9911, 2022 WL
580764, at *8 (S.D.N.Y. Feb. 25, 2022) (denying the plaintiff's motion for summary judgment
on an account stated claim and dismissing the claim in its entirety because it "is duplicative of
and seeks the same damages as [the] breach of contract claim").  That Plaintiff's claim for breach
of contract remains in the balance does not foreclose this conclusion. *See 4Kids Ent.*, 797 F.
Supp. 2d at 244–49 (denying a motion for summary judgment with respect to an account stated
claim and sua sponte dismissing the claim where it is "congruent with, and duplicative of, its
claim for breach of contract," notwithstanding that the summary judgment motion regarding the
breach of contract claim was denied as to damages because of the uncertainty thereof).

### 3.  Amending the Complaint to Conform with Damages

Finally, Plaintiff moves to amend the complaint in order to conform with the evidence
obtained in discovery.  (*See* Pl.'s Mem. 16.)  Defendants argue that Plaintiff is not entitled to
such an amendment because Plaintiff could have modified the complaint at earlier stages of
litigation such that the late request was made in bad faith and would prejudice Defendants.  (*See*
Defs.' Opp. 24–25.)

a.  Applicable Law

Rule 15(a) of the Federal Rules of Civil Procedure, which governs amendments before

trial, provides: "[a] party may amend its pleading once as a matter of course within . . . (A) 21

days after serving it, or (B) if the pleading is one to which a responsive pleading is required, 21

days after service of a responsive pleading or 21 days after service of a motion under Rule 12(b),

(e), or (f), whichever is earlier."  Fed. R. Civ. P. 15(a)(1).  Otherwise, prior to trial, "a party may

amend its pleading only with the opposing party's written consent or the court's leave."  *Id.*

15(a)(2).

By contrast, Rule 15(b) governs "[a]mendments [d]uring and [a]fter [t]rial."  *Id.* 15(b).

"Fed. R. Civ. P. 15(b) allows parties to amend their pleadings to conform to the proof received

into evidence at trial.  The decision of whether to allow such an amendment is left to the

discretion of the district court judge."  *Vermont Plastics, Inc. v. Brine, Inc.*, 79 F.3d 272, 279 (2d

Cir. 1996).

*Vermont Plastics* concerned a judgment as a matter of law under Rule 50(a).  79 F.3d at

274.  While technically different motions, the standard for a motion for summary judgment

"mirrors the standard for a directed verdict under Federal Rule of Civil Procedure 50(a)[.]"

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986); *see also U.S. Polo Ass'n, Inc. v. PRL*

*USA Holdings, Inc.*, No. 09-CV-9476, 2016 WL 270867, at *2 (S.D.N.Y. Jan. 21, 2016) ("The

Rule 56 summary judgment standard 'mirrors' the requirements for judgment as a matter of law

under Rule 50(a)." (quoting *Anderson*, 477 U.S. at 250)).  Thus, "[a]lthough Rule 15(b)

explicitly refers to amendments [of the complaint] during or after trial, some courts have applied

Rule 15(b) to conform pleadings to the proof offered at summary judgment."  *Myers v. Moore*,

326 F.R.D. 50, 60–61 (S.D.N.Y. 2018) (quotation marks and alterations omitted) (analyzing the

plaintiff's motion to amend the complaint alongside a motion for summary judgment under Rule 15(b) principles) (quoting *Rockland Exposition, Inc. v. All. of Auto. Serv. Providers of N.J.*, 894 F. Supp. 2d 288, 336 n.44 (S.D.N.Y. 2012))); *see also Clomon v. Jackson,* 988 F.2d 1314, 1323 (2d Cir. 1993) ("[T]he undisputed facts as presented on the summary judgment motion served as a basis to deem the complaint amended to conform with the proof pursuant to Fed. R. Civ. P. 15(b)."); *605 Fifth Prop. Owner, LLC v. Abasic, S.A.*, No. 21-CV-811, 2022 WL 683746, at *2 (S.D.N.Y. Mar. 8, 2022) (citing *Vermont Plastics*' Rule 15 jurisprudence to a motion to amend the pleadings brought in conjunction with a plaintiff's motion for summary judgment); *Hamilton v. City of New York*, No. 15-CV-4574, 2019 WL 1452013, at *30 (E.D.N.Y. Mar. 19, 2019) (same); *Rockland Exposition*, 894 F. Supp. 2d at 336 n.44 (collecting cases); *Regent Ins. Co. v. Storm King Contracting, Inc.,* No. 06-CV-2879, 2008 WL 563465, at *13–14 (S.D.N.Y. Feb. 27, 2008) (analyzing the plaintiff's motion to amend the complaint alongside a motion for summary judgment under Rule 15(b) principles.  Accordingly, the Court similarly incorporates Rule 15 jurisprudence to evaluate Plaintiff's Motion.

"In deciding whether to allow amendment under Rule 15(b), the essential questions are whether the [ ] issues were [litigated] by the parties' express or implied consent and whether the defendant would be prejudiced by the implied amendment, i.e., whether [the defendant] had a fair opportunity to defend . . . ."  *Silverstein v. Penguin Putnam, Inc.*, 522 F. Supp. 2d 579, 604 (S.D.N.Y. 2007) (internal quotation marks and citations omitted); *see also Browning Debenture Holders' Comm. v. DASA Corp.*, 560 F.2d 1078, 1086 (2d Cir. 1977) ("In a motion under [R]ule 15(b) to amend the complaint to conform to the proof, the most important question is whether the new issues were tried by the parties' express or implied consent and whether the defendant would be prejudiced by the implied amendment . . . .").

b.  Application

Plaintiff argues that it is appropriate to amend its pleadings to conform to the evidence obtained during discovery.  (*See* Pl.'s Mem. 16.)  Defendants, in response, assert that doing so would be prejudicial to Defendants in light of the fact that the amendments pertain to several invoices paid and/or issued shortly after Plaintiff filed its Complaint as well as one paid before the Complaint was filed.  (*See* Defs.' Opp. 24–25.)

Insofar as Plaintiff seeks *only* to modify the damages amount and not to raise new claims, the Court is hard-pressed to construe any way in which Defendants could be said to have not consented to having litigated this issue.  Defendants, too, fail to make any argument sounding in a lack of consent.  (*See generally id.*)  And with respect to any prejudice suffered, while Defendants assert the harm visited upon them as a result of Plaintiff's delay, they fail to substantiate it in any way.  (*See generally id.*)  In other words, "[t]his litigation has put [Defendants] on notice that [Plaintiff] is seeking to hold [them] liable for [the contracts for advertising services at issue], and [Defendants] provide[] no argument that this amendment would prejudice [them].  Accordingly, the complaint is deemed amended to" modify the damages purportedly adduced in discovery and brought forward in support of Plaintiff's summary judgment motion.  *605 Fifth*, 2022 WL 683746, at *2.

III.  Conclusion

For the foregoing reasons, Defendants' Motion is denied in full, and Plaintiff's Motion is granted in part and denied in part.  Specifically, regarding Plaintiff's breach of contract claims: with respect to the two contracts in which the amount contracted for and the unpaid invoice matches—Plaintiff's February 2021 broadcasting and March 2021 digital contracts, totaling $60,117.00—Plaintiff's Motion is granted as to liability and as to damages; with respect to

Plaintiff's seven contracts in which the contracting amount and the invoice outstanding differ, Plaintiff's breach of contract claim is granted as to liability but denied as to damages; lastly, with respect to the remaining contracts whose existence is implied either in documentary evidence or in the affidavit, Plaintiff's Motion is denied both as to liability and as to damages.  Regarding Plaintiff's account stated claims, the Motion is denied as the claim is duplicative and dismissed as such.  Finally, Plaintiff's Motion to Amend is granted.

The Clerk of Court is respectfully directed to terminate the pending Motion, (Dkt. Nos. 30).  The Court will hold a status hearing on October 17, 2022 at 2:30 p.m.

SO ORDERED.

DATED:          September 28, 2022
                White Plains, New York

                                            _____
                                            KENNETH M. KARAS
                                            United States District Judge